SEALED   ORIGINAL

CLERK, U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FILED

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

2020 SEP 22  PM 1:46

DEPUTY CLERK _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX REL. RAYBURN ALEX THOMPSON; | § § § | Civil Action No. _____ |

UNITED STATES OF AMERICA EX
REL. RAYBURN ALEX THOMPSON;    §
                              §
                              §
STATE OF TEXAS EX REL. RAYBURN §
ALEX THOMPSON;                §
                              §
STATE OF OKLAHOMA EX REL.      §
RAYBURN ALEX THOMPSON;        §
                              §
STATE OF TENNESSEE EX REL.     §
RAYBURN ALEX THOMPSON;        §
                              §
COMMONWEALTH OF                §
MASSACHUSETTS EX REL. RAYBURN  §
ALEX THOMPSON                 §
                              §
    Plaintiff – Relator        §
                              §
v.                            §
                              §
APOLLO PATH, LLC D/B/A APOLLO  §
LABORATORIES; APOLLO          §
LABORATORIES SERVICES, LLC;    §
ARBOR DIAGNOSTICS, INC.;       §
KORENVAES MANAGEMENT, LLC;     §
DAVID KEY; BRIAN OLIVER; and   §
MAX KORENVAES                 §
                              §
    Defendants.                §
                              §
                              §
                              §
                              §
                              §

Civil Action No. _____

***JURY TRIAL DEMANDED***

**RELATOR'S COMPLAINT AND
DEMAND FOR JURY TRIAL**

**FILED IN CAMERA AND UNDER
SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER INTO PACER
DO NOT ENTER IN CM/ECF
DO NOT PLACE IN PRESS BOX**

**3 - 2 0 C V 2 9 1 7 - Q**

---

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 3

II.  JURISDICTION AND VENUE .......................................................................... 4

III.  FILING UNDER SEAL ...................................................................................... 5

IV.  PARTIES ............................................................................................................ 6
    A.  Relator Rayburn "Alex" Thompson III ..................................................... 6
    B.  Defendant Apollo Laboratories Services, LLC .......................................... 6
    C.  Defendant Apollo Path, LLC D/B/A Apollo Laboratories ......................... 7
    D.  Defendant Arbor Diagnostics, Inc. ............................................................ 8
    E.  Defendant Korenvaes Management, LLC ................................................... 9
    F.  Defendant David Key .............................................................................. 10
    G.  Defendant Brian Oliver ........................................................................... 10
    H.  Defendant Max Korenvaes ...................................................................... 11

V.  RELEVANT LAW ............................................................................................ 12
    A.  The False Claims Act .............................................................................. 12
        i.  Federal False Claims Act ................................................................... 12
        ii.  Texas Medicaid Fraud Prevention Act ............................................... 13
        iii.  The Oklahoma Medicaid False Claims Act.......................................... 16
        iv.  The Tennessee False Claims Act and Medicaid False Claims Act.............. 17
        v.  The Massachusetts False Claims Act ................................................... 18
    B.  The Medicare Program ............................................................................ 19
    C.  The Medicaid Program ............................................................................ 19
    D.  The TRICARE Program .......................................................................... 20
    E.  The VA Program ..................................................................................... 21
    F.  The Anti-Kickback Statute ...................................................................... 21
    G.  The Eliminating Kickbacks in Recovery Act of 2018 .............................. 23
    H.  The Common Law Test for an Employee-Employer Relationship.................. 24
    I.  Liability for Parent Companies and Controlling Companies ..................... 25

VI.  COMPANY WRONGDOING ........................................................................... 26
    A.  Illegal Kickbacks from Apollo Labs to ALS Sales Reps.............................. 37
    B.  EKRA Violations by Defendants Arbor, Apollo Labs, and ALS .............. 45
    C.  Korenvaes Management Established, Controlled, and Participated in the Scheme.......... 46

VII.  CAUSES OF ACTION ..................................................................................... 52

VIII.  CONCLUSION AND PRAYER FOR RELIEF ................................................. 61

IX.  DEMAND FOR JURY TRIAL ......................................................................... 63

## I.   INTRODUCTION

1.    This is an action against Apollo Path, LLC d/b/a Apollo Laboratories ("Apollo

Labs"), Apollo Laboratories Services, LLC ("ALS"), Arbor Diagnostics, Inc. ("Arbor"),

Korenvaes Management LLC ("Korenvaes Management"), David Key, Brian Oliver, and Max

Korenvaes (collectively, the "Defendants") to recover damages and civil penalties for violations

of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, the Medicare and Medicaid

Anti-Kickback Statute ("AKS"), 42 U.S.C. §§ 1320a-7a and 1320a-7b, the Eliminating

Kickbacks in Recovery Act of 2018 ("EKRA"), 18 U.S.C. § 220, the Texas Medicaid Fraud

Prevention Act, Tex. Hum. Res. Code § 36.001, the Oklahoma Medicaid False Claims Act, Okla.

Stat. tit. 63, §§ 5053.1(B), the Tennessee False Claims Act, TN Code § 4-18-103(a), the

Tennessee Medicaid False Claims Act, TN Code § 71-5-181, and the Massachusetts False

Claims Act, M.G.L. c. 12, §§ 5B(a)(1)-(10).

2.    As more fully alleged herein, this action arises out of the Defendants' policy of

hiring independent contractor sales representatives ("sales reps") who referred blood and

toxicology specimen for testing by Apollo Labs—directly and through Arbor—in exchange for

profits-based commissions. The commissions violated the anti-kickback laws as they were paid

to independent contractors and not employees. Regardless of how ALS sales reps were classified

on paper, they were all independent contractors in practice.

3.    The Defendants' policy of hiring and compensating commissioned independent

contractor sales reps rendered Defendant Apollo Labs' claims for payment false due to the

commissions being unlawful under the AKS for claims submitted to Medicare, Medicaid,

Tricare, and the Veterans Administration ("VA") (collectively, "Government Healthcare

Programs"). The Defendants' policy of hiring and compensating commissioned independent

contractor sales reps rendered Defendant Arbor's claims for payment false due to the commissions being unlawful under the EKRA for claims submitted to commercial insurance programs.

4.      The Defendants submitted and/or caused the submission of false claims to Government Healthcare Programs because the Defendants and their agents falsely certified compliance with all applicable federal and state laws when submitting CMS-1500 claims forms and/or their electronic equivalents for laboratory services performed by the Defendants from specimens received from ALS sales reps. Certifications on CMS-1500 claims forms and/or their electronic equivalents were legally false because all Defendants knowingly paid or approved the payment of profits-based commissions to independent contractor ALS sales reps that referred specimens in violation of the AKS and/or EKRA.

5.      The wrongdoing in this case dates back to at least 2015, when Apollo Labs began its operations. This wrongdoing persisted through the date that the Relator ceased working for the Defendants in December 2019 and, on information and belief, is ongoing.

## II.     JURISDICTION AND VENUE

6.      This action arises under the FCA, 31 U.S.C. § 3729 *et seq*., the EKRA, 18 U.S.C. § 220, and the AKS, 42 U.S.C. §§ 1320a-7a and 1320a-7b. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. Supplemental jurisdiction for any non-federal claims arise under 28 U.S.C. § 1367, since these claims are so related to the federal claims that together they form part of the same case or controversy under Article III of the U.S. Constitution.

7.      At times material to the time frames set forth in this Complaint, all Defendant business entities regularly conducted substantial business within the State of Texas, made and are

making significant revenue within the State of Texas, and Reside in the State of Texas. At times material to the time frames set forth in this Complaint, all Defendant individuals regularly conducted substantial business within the State of Texas, made and/or are making significant revenue within the State of Texas, and/or reside in the State of Texas. All Defendants are thus subject to personal jurisdiction in the State of Texas.

8.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because, at times material to the time frames set forth in this Complaint, the Defendants conducted and conduct business throughout this District.

### III.    FILING UNDER SEAL

9.    Under the FCA, this Complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.

10.    As required by the FCA and relevant state statutes, on or around the date that this Complaint was filed, the Relator voluntarily submitted, prior to the filing of this Complaint, a confidential pre-filing disclosure statement (subject to the attorney-client, work product and common-interest privileges) to the Government containing materials, evidence, and information in their possession pertaining to the allegations contained in this Complaint.

11.    The Relator is an original source of the information underlying this Complaint and that information has been provided to the Government prior to filing this Complaint. The Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government.

12.    To the Relator's knowledge, the information underlying the allegations and transactions in this Complaint has not been publicly disclosed.

## IV.    PARTIES

13.    The real parties in interest as Plaintiffs are the United States of America, the State of Texas, State of Oklahoma, State of Tennessee, and the Commonwealth of Massachusetts.

14.    A schematic showing the interrelationship between the below parties as well as other, related business entities and persons is attached hereto as Exhibit 1. *See* Exhibit 1.

### A. Relator Rayburn "Alex" Thompson III

15.    Relator Rayburn "Alex" Thompson III is a resident of the state of Tennessee. From January 2016 to December 2019, the Relator worked as Vice President of Marketing and Channel Sales at Apollo Labs, performing a variety of human resources functions related to ALS sales reps: finding prospective sales reps, hiring sales reps and preparing sales contracts, preparing payroll, and creating sales rep commission reports. The Relator also performed human resource functions for Arbor and other entities controlled by Korenvaes Management, directly communicating with Korenvaes Management's workers about payroll matters for Apollo Labs, ALS, and Arbor.

16.    The Relator has approximately eight years of experience in the medical laboratory industry. Prior to working for Apollo Labs, the Relator worked as a Channel Sales Manager for General Genetics Corporation from July 2013 to September 2015, performing human resource functions for sales representatives related to genetics testing. From April 2012 to March 2013, the Relator worked for another laboratory, Solstas Lab Partners. The Relator has a bachelor's degree in political science and geography from the University of Tennessee, Knoxville.

### B. Defendant Apollo Laboratories Services, LLC

17.    Defendant ALS is a Texas limited liability company with a principal place of business at 3824 Cedar Springs Road #110, Dallas, Texas 75219. Defendant ALS is wholly

owned and managed by a holding company, AP Lab Investments LLC, which also wholly owns and manages Apollo Labs.

18.     Defendant Brian Oliver is CFO of Defendant ALS. Defendant David Key is a Partner at ALS and exercises authority over ALS operations, including the compensation of ALS sales reps, as if he were a COO.

19.     Defendant ALS enters into contracts with independent contractor sales reps who receive compensation in part based on the volume and profits derived from testing specimens referred to Apollo Labs and/or Abor. ALS sales reps referred specimens to Apollo Labs, which then billed Government Healthcare Programs for tests. ALS sales reps similarly received commissions for specimens referred to Arbor for testing that were billed to private insurance.

20.     The Relator, at the instruction of Defendant directors, officers, and stakeholders, including David Key and Brian Oliver, directly managed ALS sales rep agreements and commissions from January 2016 to December 2019.

## C. Defendant Apollo Path, LLC D/B/A Apollo Laboratories

21.     Apollo Labs is a Texas limited liability company with a principal place of business at 3824 Cedar Springs Road #110, Dallas, Texas 75219. Defendant Apollo Labs is wholly owned by a holding company, AP Lab Investments LLC, which also wholly owns and manages Defendant ALS.

22.     Defendant Max Korenvaes is CEO and manager of Apollo Labs. Defendant Brian Oliver is CFO of Apollo Labs.

23.     Defendant Apollo Labs is a Texas urine toxicology and clinical bloodwork, serum, and plasma testing laboratory that receives specimens for testing from physicians across the country via ALS sales representatives and from Arbor.

24.     Apollo Labs is CLIA accredited, making it eligible to receive payment under the Medicare and Medicaid programs. Apollo Labs' NPI number is 1740675297.

25.     Defendant Apollo Labs submitted claims to the federal and state governments for blood and toxicology testing referred by commissioned ALS independent contractor sales reps who received compensation based on specimen volume and/or profits from billing Government Healthcare Programs.

26.     Defendant Apollo Labs also referred specimens from commissioned ALS independent contractor sales reps to Defendant Arbor for specimen testing billed to commercial insurance providers. These commissioned ALS independent contractor sales reps who received compensation based on specimen volume and/or profits from billing specimens.

27.     All or nearly all testing referred to Apollo Labs comes from ALS sales reps and Defendant Arbor.

**D. Defendant Arbor Diagnostics, Inc.**

28.     Defendant Arbor is a Texas nonprofit corporation with a principal place of business at 3824 Cedar Springs Road #427, Dallas, Texas 75219. Defendant Arbor is wholly owned by Artemis Healthcare, LLC. Defendant Arbor's NPI number is 1104277961.

29.     Defendant Brian Oliver is President of Arbor. Defendant Max Korenvaes exerts partial control over Arbor's operations. Defendant Arbor employs approximately 120 people.

30.     Defendant Arbor received specimens for lab testing from commissioned independent contractor ALS sales reps that resulted in violations of the EKRA. Specifically, ALS independent contractor sales reps received a percentage of profits for specimens referred to Arbor for testing, after those specimens were successfully billed to commercial insurance.

### E. Defendant Korenvaes Management, LLC

31.     Defendant Korenvaes Management is a Delaware limited liability company with a principal place of business at 3879 Maple Avenue, Suite 150, Dallas, Texas 75219. Defendant Korenvaes Management is an SEC registered investment adviser and is wholly owned by Korenvaes LLC.

32.     Defendant Brian Oliver is CFO of Korenvaes Management and Harlan Korenvaes, father of Defendant Max Korenvaes, is President of Korenvaes Management. Defendant Max Korenvaes is a Principal at Korenvaes Management.

33.     Defendant Korenvaes Management and its parent company Korenvaes, LLC and related entities including Korenvaes Capital Management, LP, manage dozens of private equity and hedge fund investments at any given time.

34.     Directors, officers, and stakeholders at Korenvaes Management, including Defendants Brian Oliver and Max Korenvaes exercise control over Defendants ALS, Apollo Labs, and Arbor at weekly meetings at Korenvaes' offices.

35.     Defendant Korenvaes Management created the illegal ALS commission structure in collaboration with David Key. Likewise, Korenvaes Management personnel and/or agents, including Brian Oliver, Loren Sauer, and Molly Jackson executed illegal commission-based compensation payroll transactions to ALS sales reps.

36.     Korenvaes Management, by and through its directors, officers, and stakeholders that control the operations of the Defendant corporations, caused the submission of legally false claims under the FCA to federal and state governments for lab testing performed by Apollo Labs. Such claims were legally false under the FCA because they were based on testing specimens

referred to Apollo Labs by commissioned independent contractor ALS sales reps, violating the AKS.

37.    Korenvaes Management, by and through its directors, officers, and stakeholders that control the operations of the Defendant corporations, violate the EKRA by approving of profits-based commissions to ALS independent contractor sales reps for claims to commercial insurance. Such commissions violate the EKRA because commissions to ALS sales reps are based on the volume of specimens referred to the labs and the profits that they generate.

**F. Defendant David Key**

38.    Defendant David Key is a resident of Dallas, Texas. He addressed himself as a of "partner" with Apollo Labs and ALS when communicating with the Relator. Defendant David Key is on Arbor's payroll. Defendant David Key's LinkedIn profile states that he is a Managing Partner at KB Capital Management LLC from January 2009 to the present.

39.    Defendant David Key had oversight responsibilities for sales and operations at Apollo Labs and ALS and is actively involved with business at Arbor, receiving a substantial salary.

40.    Defendant David Key had authority to increase or decrease commissions paid to ALS sales reps based on their profitability. Defendant David Key informed the Relator that he helped create the commission structure for ALS sales reps in collaboration with Korenvaes Management and approved all or nearly all commissions paid to ALS sales reps, typically on a bi-monthly basis.

**G. Defendant Brian Oliver**

41.    Defendant Brian Oliver is a resident of Dallas, Texas. He is the CFO of Korenvaes Management and is the CFO and CCO of Korenvaes Capital Management, LP.

42.     Defendant Brian Oliver is also the CFO of ALS, Apollo Labs, and AP Lab Investments, LLC.

43.     Defendant Brian Oliver is also President of Arbor and a Manager at the payroll company, Double Helix Management, LLC.

44.     Defendant Brian Oliver is a certified public accountant and was a senior associate at the accounting firm KPMG prior to working for Korenvaes Management.

45.     Defendant Brian Oliver controls all or nearly all of the finances of Korenvaes Management, Korenvaes Capital Management, ALS, Apollo Labs, and Arbor. Reports containing ALS sales rep compensation was sent directly to Brian Oliver by the Relator and/or Defendant David Key.

46.     Defendant Brian Oliver works closely with Defendant David Key, Defendant Max Korenvaes, and others at Korenvaes Management, participating in and controlling the business operations of all Defendant corporations named in this action at regular meetings at the Korenvaes office.

**H. Defendant Max Korenvaes**

47.     Defendant Max Korenvaes is a resident of Dallas, Texas. He is CEO and manager of Apollo Labs and exercises managerial responsibilities at Arbor. He is a Principal at Korenvaes Management since July 2014. He is the son of Harlan Korenvaes, the founder, president, and managing member of Korenvaes entities, including Korenvaes Management, LLC.

48.     Defendant Max Korenvaes exercised control over business operations at Apollo Labs, ALS, and Arbor as a director and officer. Likewise, Max Korenvaes exercised control over the Defendant business entities as a Principal at Korenvaes Management.

49.     Defendant Max Korenvaes participated at the weekly meeting at Korenvaes'

offices, making key decisions about Apollo Labs, ALS, Arbor, and Korenvaes Management,

including compensation of ALS sales reps.

50.     The relationship between the Relator, the Defendants, and persons and entities

related to the Defendants is shown in the attached diagram, Exhibit 1.

## V.     RELEVANT LAW

### A. The False Claims Act

#### i.    *Federal False Claims Act*

51.     The False Claims Act provides, in relevant part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for
payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim; [or]...

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(G) knowingly makes, uses, or causes to be made or used, a false record or
statement material to an obligation to pay or transmit money or property to the
Government, or knowingly conceals or knowingly and improperly avoids or
decreases an obligation to pay or transmit money or property to the
Government.

31 U.S.C. § 3729(a)(1).

52.     For purposes of the False Claims Act,

(1) the terms "knowing" and "knowingly"

(A)     mean that a person, with respect to information – (1) has actual
knowledge of the information; (2) acts in deliberate ignorance of the truth
or falsity of the information; or (3) acts in reckless disregard of the truth or
falsity of the information; and

(B)     require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

    53.    A person who violates the FCA is liable to the United States Government for a civil penalty of not less than $11,665 and not more than $23,331 per claim, plus three times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).[1]

### ii.   *Texas Medicaid Fraud Prevention Act*

    54.    The Texas Medicaid Fraud Prevention Act provides that:

A person commits an unlawful act if the person:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; . . .

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program; . . .

(9) conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13); . . .

(12) knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program . . .

Tex. Hum. Res. Code § 36.002.

---

[1] For civil penalties assessed after June 19, 2020, whose associated violations occurred after November 2, 2015. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

55.    The TMFPA also provides liability for a person who "knowingly engages in conduct that constitutes a violation under Section 32.039(b)." *Id.* § 36.002(13).

56.    In turn, Section 32.039(b) provides liability for any person who: . . .

(1-b) solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program....;

(1-c) solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for purchasing, leasing, or ordering, or arranging for or recommending the purchasing, leasing, or ordering of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(1-d) offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to refer an individual to another person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program;

(1-e) offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to purchase, lease, or order, or arrange for or recommend the purchase, lease, or order of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(1-f)  provides, offers, or receives an inducement in a manner or for a purpose not otherwise prohibited by this section or Section 102.001, Occupations Code, to or from a person, including a recipient, provider, employee or agent of a provider, third-party vendor, or public servant, for the purpose of influencing or being influenced in a decision regarding:

> (A) selection of a provider or receipt of a good or service under the medical assistance program;

> (B) the use of goods or services provided under the medical assistance program; or

> (C) the inclusion or exclusion of goods or services available under the medical assistance program;

Tex. Hum. Res. Code § 32.039(b). "Medical assistance program" is defined as Medicaid and "all health care and related services and benefits authorized or provided under federal law for needy individuals" of Texas. *Id.* § 32.003(4).

57.    "Knowing" is defined by the TMFPA to include "conscious indifferent to the truth or falsify of the information" and "reckless disregard of the truth or falsity of the information." *Id.* § 36.0011(a).

58.    The term "claim" includes "a written or electronically submitted request or demand that is signed by a provider or a fiscal agent and that identifies a product or service provided or purported to have been provided to a Medicaid recipient as reimbursable under the Medicaid program, without regard to whether the money that is requested or demanded is paid." *Id.* §36.001(1)(A).

59.    Under subparagraph (a)(1), a person who has committed an unlawful act is liable to the state for the entire amount of the payment or benefit provided under the Medicaid program directly or indirectly as a result of the unlawful act, with no obligation on the state to show that the payment or benefit is an "overpayment," or "damage," or would not have been paid "but for" the unlawful act.

60.    A person who commits an unlawful act under the TMFPA is liable to the State of Texas for treble the amount of any payment or benefit provided under the Medicaid program as a result of the unlawful act, interest on the amount of the payment or benefit, and a civil penalty between $5,500 and $11,000, as adjusted upward by statute and regulation. *See id.* § 36.052.

61.    The TMFPA provides for payment of a percentage of Texas's recovery to a private individual who brings suit on behalf of Texas under the TMFPA. *See id.* §36.110.

62.    In cases where such violation does not result in injury to persons who are elderly, disabled, or younger than eighteen years old, a person who violates the Texas Medicaid Fraud Prevention Act is liable for a civil penalty equal to:

> not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person. . . and two times the amount of the payment or the value of the benefit.

Tex. Hum. Res. Code § 36.052.

### iii.    The Oklahoma Medicaid False Claims Act

63.    The Oklahoma Medicaid False Claims Act provides liability for any person who:

1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3. Conspires to commit a violation of the Oklahoma Medicaid False Claims Act;

4. Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less than all of such money or property;

5. Is authorized to make or deliver a document certifying receipt of property used or to be used by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

6. Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the state who lawfully may not sell or pledge property; or

7. Knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

Okla. Stat. tit. 63, § 5053.1(B).

64.     Violators shall be liable to the State of Oklahoma for a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00), plus three times the amount of damages which the state sustains because of the act of that person. *Id.*.

### iv.    *The Tennessee False Claims Act and Medicaid False Claims Act*

65.     The Tennessee False Claims Act provides liability for any person who:

(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4) Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property;

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

(8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim; or

(9) Knowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision.

TN Code § 4-18-103(a).

66.     Violators shall be liable shall to the state or to the political subdivision for three

(3) times the amount of damages that the state or the political subdivision sustains because of the

act of that person, plus a civil penalty of not less than two thousand five hundred dollars ($2,500)

and not more than ten thousand dollars ($10,000) for each false claim. *Id.*

67.     The Tennessee Medicaid False Claims Act similarly imposes liability on people

and corporations who knowingly submit false claims to Tennessee's Medicaid program. TN

Code § 71-5-182.

### *v.    The Massachusetts False Claims Act*

68.     The Massachusetts False Claims Act provides liability for any person who:

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for
> payment or approval;
>
> (2) knowingly makes, uses or causes to be made or used a false record or
> statement material to a false or fraudulent claim; …
>
> (9) knowingly makes, uses or causes to be made or used a false record or
> statement material to an obligation to pay or to transmit money or property to the
> commonwealth or a political subdivision thereof, or knowingly conceals or
> knowingly and improperly avoids or decreases an obligation to pay or transmit
> money or property to the commonwealth or a political subdivision thereof; or
>
> (10) is a beneficiary of an inadvertent submission of a false claim to the
> commonwealth or a political subdivision thereof, or is a beneficiary of an
> overpayment from the commonwealth or a political subdivision thereof, and who
> subsequently discovers the falsity of the claim or the receipt of overpayment and
> fails to disclose the false claim or receipt of overpayment to the commonwealth
> or a political subdivision by the later of: (i) the date which is 60 days after the
> date on which the false claim or receipt of overpayment was identified; or (ii) the
> date any corresponding cost report is due, if applicable.

Violators shall be liable to the Commonwealth or political subdivision for a civil penalty of

$5,500 – $11,000 per violation, plus three times the amount of damages that the Commonwealth

or a political subdivision thereof sustains because of such violation. M.G.L. c. 12, §§ 5B(a)(1)-(10).

### B. The Medicare Program

69.    Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A. Medicare Part B, which is relevant to the facts of this disclosure, authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures. Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. CMS contracts with private insurance companies to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund. The private insurance companies that contract with CMS to provide these services are called Part B Carriers.

### C. The Medicaid Program

70.    Established in 1965, Medicaid is a publicly financed program providing health and long-term care coverage for certain groups of low-income people throughout the United States. Medicaid is a means-tested individual and state entitlement program jointly financed by states and the federal government. Medicaid eligibility is limited to individuals who fall into five broad coverage categories: children; pregnant women; adults in families with dependent children; individuals with disabilities; and the elderly. In addition to categorical eligibility, persons must also meet income and asset requirements, as well as immigration and residency requirements.[2]

---

[2] Medicaid.gov, *Eligibility* (medicaid.gov/medicaid/eligibility/index.html)

71.     The federal government shares the states' cost of providing coverage for certain basic or mandatory services to most categorically needy Medicaid beneficiaries. The federal government pays states for a specified percentage of program expenditures, called the Federal Medical Assistance Percentage (FMAP). The FMAP varies by state based on criteria such as per capita income. Thus, claims submitted to state Medicaid programs cause claims to be made to both the United States and the state.[3]

### D. The TRICARE Program

72.     TRICARE (formerly known as CHAMPUS) is a federal health care program, as defined in the AKS, 42 U.S.C. § 1320a-7b, this is administered by DHA, a component of the Department of Defense. TRICARE provides health care insurance for active duty military personnel, military retirees, and military dependents.

73.     The Office of the Secretary of Defense defines fraud to include, but not be limited to: "Arrangements by providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge the CHAMPUS through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits." 32 C.F.R. § 199.9(12).

74.     Fraud or abuse by a laboratory may result in the denial of the pharmacy's claims or the exclusion or suspension of the pharmacy from participation in the TRICARE program.  32 C.F.R. § 199.9(b), (f).

---

[3] Medicaid.gov, *Financial Management* (medicaid.gov/medicaid/financial management/index.html)

**E. The VA Program**

75.     The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

**F. The Anti-Kickback Statute**

76.     The Medicare and Medicaid Anti-Kickback Statute ("AKS") arose out of congressional concern that inducements may corrupt patient and professional health care decision-making, impose higher costs on federal health care programs, and divert federal funds towards goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the federal health care programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.

77.     The AKS makes it illegal to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for (A) referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1).

78.     Under the AKS, it is illegal to knowingly and willingly offer or pay any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend

purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. §1320a-7b(b)(2).

79.     Any person that commits an act described in 42 U.S.C. § 1320a-7b(b)(1) or (2) is also liable for damages of not more than three times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose. 42 U.S.C. § 1320a-7a(a)(7). In addition to any other penalties that may be prescribed by law, such person shall be subject to a civil money penalty of $100,000 for each such act.

80.     A claim for reimbursement from a federal health care program for items or services resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA.  42 U.S.C. § 1320A-7b(g).

81.     The AKS contains several exceptions to the prohibition against providing compensation in exchange for referrals. One exception, "bona fide employment" exception, provides that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" will not violate the AKS. 42 U.S.C. § 1320a-7b(b)(3)(B). *See also* 42 C.F.R. § 1001.952(d) (requirements for personal services contracts exception).

82.     Bona fide employees are exempt from the statute's prohibitions due to both the level of control that employers exercise over bona fide employees and the fact that employers are typically liable for the actions of such bona fide employees, which reduces the potential for abuse. *See* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 FR 35952-01, 35981 ("We are confident that the employer-employee relationship

is unlikely to be abusive, in part because the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them.").

83.     Violations of the AKS are per se false and material. *See United States v. Medoc Health Servs. LLC*, Civil Action No. 3:17-cv-02977-M, 2020 U.S. Dist. LEXIS 120351, at \*27 (N.D. Tex. July 2, 2020) ("Because the claims allegedly tainted by kickbacks and submitted in 2015 and 2016 were per se false and material, the Court need not resolve the parties' dispute about whether the Complaint adequately alleges any certification to the Government... After the 2010 amendments to the AKS, a claim tainted by kickbacks is per se false, regardless of any certification of compliance with the AKS, implied or otherwise."); *see also United States ex rel. Goodman v. Arriva Med., LLC*, No. 3:13-cv-0760, 2020 U.S. Dist. LEXIS 119678, at \*28-29 (M.D. Tenn. July 8, 2020) ("The government is therefore correct that there is no contestable issue of materiality with regard to the government's AKS-based claims. Even if the defendants were permitted to engage in the discovery they have requested, and they uncovered the type of information that would support a finding of immateriality under Escobar—such as evidence of widespread toleration of deductible waivers for diabetes supplies in the Medicare program—it would have no bearing on the government's claims, because the PPACA has rendered all claims resulting from AKS violations 'false or fraudulent claims' as a matter of law.").

## G. The Eliminating Kickbacks in Recovery Act of 2018

84.     The EKRA makes it illegal to knowingly and willfully:

(1) solicit[ ] or receive [ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a patient or patronage to a recovery home, clinical treatment facility, or laboratory; or

(2) pay [ ] or offer [ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind [ ] to induce a referral of an individual to a recovery home, clinical treatment facility, or laboratory...

18 U.S.C. 220(a).

85.    The EKRA excludes from the above section:

payment made by an employer to an employee or independent contractor (who has a bona fide employment or contractual relationship with such employer) for employment, if the employee's payment is not determined by or does not vary by—

(A) the number of individuals referred to a particular recovery home, clinical treatment facility, or laboratory;

(B) the number of tests or procedures performed; or

(C) the amount billed to or received from, in part or in whole, the health care benefit program from the individuals referred to a particular recovery home, clinical treatment facility, or laboratory.

18 U.S.C. 220(b).

86.    Violation of the EKRA are punishable by a fine "not more than $200,000, imprisoned not more than 10 years, or both, for each occurrence." 18 U.S.C. 220(a).

**H. The Common Law Test for an Employee-Employer Relationship**

87.    The AKS's reference to the common law definition of employee incorporates the "general common law of agency" for the purpose of determining whether a sales representative is an employee or an independent contractor. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992); *United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (unpublished); *see also United States v. Job*, 387 Fed.Appx. 445, 455 (5th Cir.2010) (unpublished).[4]

88.    The factors applicable to the common law test for who qualifies as an employee to include, with no factor being decisive:

---

[4] The Internal Revenue Code similarly defines "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. 3121(d)(2).

"the hiring party's right to control the manner and means by which the product is accomplished . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Darden*, 503 U.S. at 323-24.

89.    Key factors include the hiring party's "right to control the manner and means of the work performed," "the method of payment," "whether the work is part of the regular business of the hiring party," and "the hiring party's control over work hours," however "all of the incidents of the relationship must be assessed and weighed" and no one factor is dispositive. *Robinson*, 505 F. App'x at 387 (internal quotations removed).

## I.    Liability for Parent Companies and Controlling Companies

90.    A defendant may be liable under the FCA if it operates under a policy that causes others to present false claims to the government. *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004). "Where the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes 'a course of conduct that allowed fraudulent claims to be presented to the federal government.'" *Id.*

91.    If an investing entity exerts sufficient control over a business entity by appointing directors and officers that pursues its business plan resulting in the submission of false claims, the investing entity may be held liable. *See United States ex rel. Medrano v. Diabetic Care RX, LLC*, No. 15-CV-62617, 2018 WL 6978633 (S.D. Fla. Nov. 30, 2018), *report and*

*recommendation adopted in part sub nom. United States ex rel. Medrano v. Diabetic Care RX, LLC*, No. 15-CV-62617, 2019 WL 1054125 (S.D. Fla. Mar. 6, 2019).

## VI.    COMPANY WRONGDOING

92.    As detailed below, Defendants Apollo Labs and Arbor entered into agreements where they received specimens for laboratory testing from commissioned independent contractor sales reps that worked for Defendant ALS.

93.    While ALS sales reps contracted with Defendant ALS, Defendants Apollo Labs and Arbor received specimens for laboratory testing as a result of ALS contracts and Defendants Apollo Labs caused funds received from billing such tested specimens to be sent to ALS sales reps as profits-based commissions.

94.    Apollo Labs and Arbor further referred specimens to one another for testing and billing that were received due to ALS sales rep contracts.

95.    The Relator was hired to perform human resources functions related to ALS sales reps: finding prospective sales reps, hiring sales reps and preparing sales contracts, preparing payroll, and creating sales rep commission reports for Apollo Labs, Arbor, and Korenvaes Management directors, officers, and employees.

96.    Part of the Relator's responsibilities included contacting existing sales reps in the medical field to see if they would contract with ALS and refer testing in exchange for a percentage of profits derived from the testing.

97.    Defendant David Key, the Relator, and the Relator's co-worker, Kevin Faulkner, evaluated prospective ALS sales reps based on whether they had an existing book of business they could direct to Apollo Labs and/or Arbor that would likely be profitable.

98.     On several occasions, David Key sent the Relator LinkedIn profiles of sales reps for the Relator to contact and determine if they could work as a commissioned ALS sales rep.

99.     ALS never publicly advertised its sales rep positions on platforms like LinkedIn, Glassdoor, Indeed, or other job-posting platforms.

100.     From the time the Relator started working for the Defendants until January 2019, prospective ALS sales reps were also referred by "override reps": individuals who received a percentage of the profits-based commissions earned by the ALS sales reps they referred to Apollo Labs and Arbor.

101.     Override reps had no work responsibilities beyond referring sales reps who were hired as ALS sales reps and who generated profits to Defendants Apollo Labs and Arbor by referring specimens for testing.

102.     Most ALS sales reps received a percentage of payor reimbursements, minus the "cost of goods" ("COG"). COG is a predetermined amount deducted from most ALS sales reps' commissions, roughly based on costs incurred to process specimens.

103.     The calculation used by Apollo Labs, Arbor, and ALS for most ALS sales rep commissions was: ([payor reimbursement] − [cost of goods]) x [commission percentage for type of testing], where "cost of goods" is a predetermined approximation of Apollo Labs' and Arbor's costs associated with processing the specimen.

104.     Some ALS sales reps also received a bi-monthly "draw": a payment advance that was later deducted from commission reimbursements.

105.     ALS sales rep compensation typically ranged from 20 to 40 percent of the revenue actually received by specimens sent to Defendants Apollo Labs and Arbor for testing, minus COG.

106.    ALS sales reps typically received a higher percent of revenue for toxicology specimens than for blood specimens. This was because toxicology testing was generally more profitable than blood testing.

107.    ALS sales rep compensation varied based on the sales rep's ability to negotiate a higher percentage of profits-based commissions. Highly profitable sales reps were able to negotiate higher profits-based commission percentages.

108.    ALS sales reps negotiated and renegotiated their commission percentages with Defendant David Key, the Relator, and Kevin Faulkner many times from the date that the Relator started working for the Defendants until January 2019.

109.    Assuming proper procedures were followed, all commissions rates had to be approved by David Key.

110.    The Relator recalls one instance where David Key reprimanded Kevin Faulkner for not obtaining his approval before raising an ALS sales reps' commissions.

111.    Defendant David Key closely monitored ALS sales rep profitability and commission rates, and emailed the Relator to remove ALS sales reps that were not sufficiently profitable from payroll.

112.    ALS sales reps could track their commissions and reimbursements in Apollo Labs' and Arbor's CRM software, HC1, in real time.

113.    The Relator routinely responded to inquiries from ALS sales reps about whether they had not been paid commissions they were owed and how to track when claims were paid by insurance in HC1.

114.    Defendant David Key and Kevin Faulkner also responded to these inquiries in coordination with the Relator, including how to use HC1 and how HC1 tracked billed claims, not accessioned claims.

115.    There were no qualifications or technical knowledge required to be an ALS sales rep. As long as Apollo Labs and Arbor received a sufficient volume of profitable specimens referrals, ALS sales reps remained on payroll.

116.    If ALS sales reps specimen volume declined or included too many specimens only billable to less-profitable healthcare payors, the Relator or Kevin Faulkner, at David Key's instruction, would terminate the sales relationship or reduce sales rep commission rates.

117.    ALS sales rep contracts took several forms over the time that the Relator worked for the company Defendants. Some ALS sales rep contracts identified a sales rep as an employee, while other contracts identified the sales rep as an independent contractor.

118.    The Relator was the primary point of contact for ALS sales reps until Kevin Faulkner began working for the company around December 2017, at which time the responsibility was split between the Relator and Kevin Faulkner.

119.    Because the Relator assisted in the creation of ALS contracts, measured the performance of ALS sales reps, and because he was the primary point of contact for ALS sales reps, the Relator had firsthand knowledge of the formal and informal requirements for all ALS sales reps and the specifics of their working relationship with ALS, Apollo Labs, and Arbor.

120.    Regardless of whether any given ALS sales rep contract identified the sales rep as an employee or an independent contractor, all ALS sales reps were, in fact, independent contractors under the common law, as detailed in Paragraphs 115-137.

121.   ALS sales reps had no required work hours and did not receive a fixed hourly wage or salary.

122.   Until January 2019, nearly all gross compensation to ALS sales reps, other than draw, was from commissions. After January 2019, commissions were subject to change based on the volume and/or profits of testing referred.

123.   ALS sales reps were not required to report to the Relator or any other ALS, Apollo Labs, or Arbor personnel regarding the hours they worked.

124.   ALS sales reps were not supervised by the Relator or any other ALS, Apollo Labs, or Arbor personnel.

125.   ALS sales reps had no maximum or minimum quotas for work. Specimen profitability and volume were the only metrics used to measure ALS sales rep performance.

126.   All or nearly all ALS sales reps did not work on-site at Apollo Labs, Arbor, or ALS. Approximately half of ALS sales reps worked in states other than Texas.

127.   All or nearly all ALS sales reps never visited the Defendant company's physical offices as a required part of their employment.

128.   ALS sales reps did not receive some company-wide emails that other workers at Apollo Labs, Arbor, and ALS received.

129.   Other than watching a brief online HIPAA training before being added to payroll, ALS sales reps did not receive training on how to perform the job duties and/or how to do so lawfully.

130.   ALS sales reps did not receive sales "leads" from Apollo Labs, Arbor, or ALS to generate further specimen referrals.

131.    ALS sales reps generally promoted Apollo Labs and/or Arbor using their own means and methods. There were no explicit directions provided to ALS sales reps on the manner sales reps were expected to generate referrals other than HIPAA compliance.

132.    ALS sales reps did not have regularly scheduled meetings with ALS, Apollo Labs, or Arbor management.

133.    ALS sales reps were not required to have any discussions with anyone at ALS, Apollo, or Arbor, unless there was an issue with the specimens referred for testing.

134.    ALS sales reps did not have their performance evaluated, other than tracking referrals, payors, and commission rates.

135.    ALS sales reps did not typically receive employment benefits, such as healthcare, retirement plans, or paid time off or sick leave. Healthcare was briefly offered to ALS sales reps but was quickly terminated due to cost.

136.    ALS sales reps were hired, fired, and had their compensation adjusted based on whether they referred a high volume of profitable specimens for testing to Apollo Labs and/or Arbor.

137.    Defendant David Key directed the Relator not to add ALS sales reps to payroll until Apollo Labs and Arbor started receiving specimens from the sales rep.

138.    ALS sales reps contracts did not provide ALS sales reps with the tools necessary to complete sales. ALS sales reps were solely responsible for accomplishing sales, without the assistance of anyone at ALS, Apollo Labs, or Arbor, other than when coordinating the shipment of specimens or having phlebotomists to draw specimens.

139.    ALS sales reps typically did not have an Apollo Labs and/or Arbor email address and used personal email addresses or the email address of their sales company to transact

business. The Relator observed that all or substantially all communications from ALS sales reps were from their personal email accounts or the email accounts of their personal business entity.

140.    Nearly all ALS sales reps had their own company or worked for another business, regardless of whether their contract was for employment or work as an independent contractor. ALS sales reps' LinkedIn pages typically showed that they worked for other business entities.

141.    The Relator, Kevin Faulkner, and Defendants David Key and Brian Oliver all understood that many ALS sales reps had other jobs or operated their own sales entity servicing companies other than just Apollo Labs and Arbor.

142.    The Relator frequently went months without receiving a communication from any particular ALS sales rep, provided there were no issues with compensation. ALS sales reps typically communicated with only the Relator, David Key, or Kevin Faulkner when there were issues with commissions, or to renegotiate the terms of their ALS contract.

143.    None of the Defendant entities or their agents monitored or inquired into agreements between service providers and sales reps, meaning they did not know whether sales reps entered into kickback agreements with service providers or encouraged providers to overutilize services to increase profits.

144.    Apollo Labs had customer service staff that would respond to inquiries from medical provider accounts referred by sales reps, but there was no regularly scheduled account maintenance where Apollo Labs employees would contact providers' offices regarding their business.

145.    ALS sales rep contracts typically existed in three forms: 1) "straight commission W-2 with draw;" 2) "commissioned 1099;" or 3) "salaried W-2."

146.    "Straight commission W-2 with draw" ALS sales reps were regarded as employees in their contracts with ALS and in filings with the U.S. Internal Revenue Service ("IRS"), received commissions, and received regular draw.

147.    "Commissioned 1099" ALS sales reps were regarded as independent contractors in their contracts with ALS and in filings with the IRS, received commissions, and did not receive a draw. Between 2018 and 2020, several ALS sales reps were "Commissioned 1099" ALS sales reps.

148.    "Salaried W-2" ALS sales reps were regarded as employees in their contracts with ALS and in IRS filings, received salaries that approximated a percent of the profits their accounts generated, and typically did not receive a regular draw. Some ALS sales reps were converted into "salaried W-2" starting in 2019.

149.    The expectations, responsibilities, and working conditions of ALS sales reps that were "straight commission W-2 with draw;" "commissioned 1099;" and "salaried W-2" employees did not materially differ from one another.

150.    Prior to the date the Relator started with ALS in January 2016, until approximately January 2019, the majority of sales rep compensation was structured as "straight commission W-2 with draw."

151.    Most sales reps received $400 per month as a draw, divided into two payments around the fifteenth and thirtieth of each month.

152.    On paychecks for "straight commission W-2 with draw" sales reps, commission based on a percentage of sales was labeled as a "bonus."

153.    Around the time that the Relator was hired by the Defendants, Defendant David Key explained to the Relator that he worked with persons at Korenvaes Management to arrange the type of compensation ALS sales reps received.

154.    David Key explained to the Relator that he wanted ALS sales reps to be independent contractors, because it would be appealing to sales reps with existing books of business in other aspects of medical sales.

155.    David Key explained to the Relator that the "straight commission W-2 with draw" was a compromise between salaried employees and commissioned independent contractor sales reps.

156.    Most prospective ALS sales reps requested independent contractor status since they operated their own LLCs, were already employed with other non-sales, full-time positions, and/or conducted unrelated medical sales business with other companies.

157.    Despite management knowing that hiring commissioned independent contractors was illegal under the AKS, the Defendants eventually granted ALS sales reps official independent contractor status if a sales rep repeatedly requested official independent contractor status and had proven to be essential to Apollo Labs' and/or Arbor's business based on specimen volume and profitability.

158.    Once the Defendants began allowing some ALS sales reps official independent contractor status as "commissioned 1099s," they became more lenient about granting other ALS sales reps commissioned 1099s status.

159.    In all or nearly all instances where the Relator added or changed an ALS sales rep to commissioned 1099s, he received written authorization from David Key, via email, to do so.

160.    The Relator recalls that around early 2018, David Key sent him one or more emails directing the Relator to change ALS sales reps Genoa Price and Joe Jester in the Defendant's human resources systems from straight commission W-2 with draw to officially being commissioned 1099s.

161.    Certain ALS sales reps like Genoa Price, who generated $80,000 per month in Medicare business, successfully negotiated with ALS and David Key for official independent contractor status.

162.    The volume of business and the preferred payor, Medicare, that constituted a large bulk of Genoa Price's referrals and generated consistent reimbursement for testing specimens.

163.    Genoa Price received a straight commission rate, as high as 40 percent minus COG, with no draw, while working officially as an independent contractor.

164.    ALS commissioned 1099 sales reps did not receive draw payments and therefore did not have draw deducted from their commissions in commission reports created by the Relator.

165.    The EKRA was passed October 24, 2018, increasing the scope of sales rep agreements that are illegal and imposing harsh punishment on those who commit such violations.

166.    Shortly after the EKRA was passed, David Key told the Relator that, due to the EKRA, ALS sales reps would have to go back to being W-2 with draw for "safe harbor" status.

167.    Later in 2018, David Key explained to the Relator that they may convert commissioned ALS sales reps to salaried part-time employees to protect themselves from liability under the EKRA.

168.    The Relator recalls that around December 2018, David Key emailed the Relator and asked him to create a spreadsheet containing the commissions for all ALS sales reps that

were still sending specimens to Apollo Labs and Arbor for a six month period, June through November 2018 so they could become EKRA compliant by converting ALS sales reps into salaried employees.

169.    The Relator sent David Key a spreadsheet, which David Key used to establish the salaries that would be paid to ALS sales reps once they were converted to salaried employees.

170.    The Excel spreadsheet lists ALS independent contractor sales reps in one column and their commissions from June 2018 through November 2018 in successive columns, with the second to last column showing the average commission for each sales rep over this period.

171.    The first row of the last column of the Excel spreadsheet states "Salaries" and the column sets proposed salaries for each sales rep that approximates the average monthly commission for the independent contractors during the June to November 2018 period.

172.    For example, the average monthly commission for ALS sales rep Genoa Price from June 2018 through November 2018 is $10,969.49 and the salary stated is $11,000; the average monthly commission for ALS sales rep Margaret Howe was $1,907.35 and the salary stated is $2,000; the average for ALS sales rep Jeff Joyner is $1,111.54 and the salary stated is $1,000.

173.    The suggested salary for ALS rep Stephanie Jehnke in the Excel spreadsheet is considerably lower than its six-month average because she lost one of her accounts that referred specimens to Apollo Labs and/or Arbor during this period.

174.    The actual work responsibilities and expectations of ALS sales reps did not change as a result of this change to salaried employee status, only the characterization of payments made to ALS sales reps.

175.    David Key directed the Relator to allow Genoa Price to return to a fixed-rate 1099 ALS sales rep contract when she requested it in or around early 2019, but after she had already been converted into a salaried employee.

176.    Genoa Price receives commissions from referring specimens to Apollo Labs and/or Arbor as an official independent contractor since 2019.

177.    Even after January 2019, "salaried W-2" ALS sales rep salaries were subject to salary modifications based on the profits or lack thereof associated with their accounts.

178.    David Key and Kevin Faulkner justified salary reductions based on decreased profitability of certain sales reps who were referring lower specimen volume.

179.    As a result, ALS sales rep "salaries" were defacto commissions, fulfilling the same function and subject to modification, similar to ALS sales rep compensation prior to 2019.

180.    The Relator reported primarily to Defendant David Key, but also communicated with Defendant Brian Oliver regarding matters pertaining to company finances, including the payment of ALS sales rep commissions for specimens tested at both Apollo Labs and Arbor.

### A. Illegal Kickbacks from Apollo Labs to ALS Sales Reps

181.    Defendants Apollo Labs and Arbor—directly or through ALS—paid commissions to ALS sales reps when such specimens were successfully billed to Government Healthcare Programs and private insurance.

182.    Specimens referred by ALS sales reps for testing reimbursable by Government Healthcare Programs was tested and billed by Defendant Apollo Labs, but was sometimes sent through Defendant Arbor because providers referred their testing to Arbor, not Apollo Labs.

183.    Specimens referred by ALS sales reps for testing reimbursable by commercial insurance was typically sent—directly or through Defendant Apollo Labs—to Defendant Arbor for testing and billing.

184.    Defendants David Key and Brian Oliver relied on the Relator to create commission reports that provided detailed information about what ALS sales reps were owed in commissions, breaking down specimen-by-specimen the type of testing ordered under their accounts, the patient's primary insurance, the status of payments, and other information such as the provider's name and location that sent the specimen.

185.    The Relator typically provided David Key with these reports twice per month, often including Brian Oliver as a recipient of the email containing the Excel spreadsheets showing commissions. Such emails often stated "commission" or "bonus" in the subject line or body of the emails.

186.    In this capacity, the Relator generated detailed reports for David Key and Brian Oliver for individual sales reps as well as consolidated reports covering all sales reps. Consolidated reports also typically show specimen numbers, the number of specimens referred, the date specimens were received, information about the medical practice specimens were received from, primary insurance, financial group information, payouts from insurers, and commissions owed to particular sales reps.

187.    Because payors could take weeks to pay out claims on which the ALS sales reps were entitled to commissions, the Relator had to track changes to payments every pay period, including for prior months.

188.    One Excel report sent to Brian Oliver and David Key provides extensive detail on specimens referred by ALS sales reps to Apollo Labs over an eight-month period from July 2016 to early February 2017.

189.    The first tab, "Reports (DOS)," of the July 2016 to February 2017 report shows, *inter alia*, the number of specimens referred by each ALS sales rep to Apollo Labs, the state-by-state breakdown of where such testing was ordered from, the relative value of blood testing compared with toxicology testing, and a breakdown of each payor—including Government Healthcare Program payors—from July 2016 to early February 2017.

190.    This tab shows that during these months, Apollo Labs and Arbor were reimbursed for over $2,709,607 in testing, with over $1.2 million in reimbursements from Medicare (Medicare and Managed Medicare) alone.

191.    The first tab of this Excel report shows the following information about revenue generated from commissioned ALS sales reps:

| Sales Person | Blood | Urine | Grand Total |
|---|---|---|---|
| , | $10,408 | $9,249 | $19,657 |
| Blasingame, Greg | $71,033 | $162,499 | $233,532 |
| Carroll, Tom | $7,342 | $43,592 | $50,934 |
| Ettinger, Scott | | $28,347 | $28,347 |
| Forbes, Joshua | $35,083 | $46,085 | $81,169 |
| Gray, Terry | $246,305 | $439,360 | $685,665 |
| Huffman, Paul | $0 | $22,478 | $22,478 |
| Kahn, Fasi | $65,185 | $66,693 | $131,878 |
| Lipp, Evan | $56,498 | $167,873 | $224,370 |
| Mcada, Ronnie | | $275 | $275 |
| Michie, Dave | $5,760 | $21,282 | $27,042 |
| Patel, Punit | $10,922 | $5,062 | $15,984 |
| Pipkins, Paulette | $10,735 | $68,138 | $78,873 |
| Powell, Lori | $0 | $20,795 | $20,795 |
| Rogers, Angela | $0 | $144,508 | $144,508 |
| Scott, Thommy | | $0 | $0 |
| Taylor, Bobbi | $76,481 | $108,971 | $185,452 |
| Timmons, Tony | $24,861 | $46,807 | $71,668 |
| Viracola, Mark | $42,868 | $696,231 | $739,099 |

192.    The second tab, "(DOS) Revenue & Monthly Avgs," provides a month-by-month breakdown of reimbursements for claims for services by Apollo Labs, including the monthly performance of each ALS sales rep, which insurance providers remitted payment, and which service providers were sending specimens to Apollo Labs.

193.    A detailed breakdown of reimbursements for the entire eight-month period covered by the report is on tab 3, "Payment Date Reports." Because it often took weeks for some claims to be paid, the period from July 2016 to December 2016 presents the clearest picture of the actual revenue ALS sales reps generate over a six-month period.

194.    The "Payment Date Reports" tab shows that from July 2016 to December 2016, Government Healthcare Programs – including Tricare, VA, Medicare, Medicaid, and managed Medicare/Medicaid – paid Apollo Labs approximately $1,325,904 for claims generated by ALS sales reps.

195.    The final two tabs of the July 2016 to February 2017 report shows claim-specific data, including the Specimen ID, whether the claim was for urine or blood testing, the ALS sales rep referring the specimen, the medical practice referring the specimen, the city and state the practice is located in, the primary insurance and financial group, the date the testing service was performed, the date the payment was received, and the payment amount.

196.    The "DOS Financial Accession Detail" tab shows data for over 15,000 specimens and approximately $2,761,725.93 in total payments attributable to ALS sales reps, with claim-specific data showing that approximately 48 percent of such claims paid by Government Healthcare Programs.

197.    Medicaid and Managed Medicaid for Arkansas, Oklahoma, Tennessee, and Texas paid claims totaling at least $75,000 submitted by Apollo Labs and/or Arbor tied to commissioned ALS sales reps, as shown in the "DOS Financial Accession Detail" tab.

198.    All or nearly all ALS sales reps received commissions on specimens billed to Government Healthcare Programs in the July 2016 to February 2017 report.

199.    A subsequent version of the aforementioned report was also created at a later date and circulated to the Relator and management for the Defendant entities for the remainder of February 2017 and at least part of March 2017.

200.    Some private insurers were not categorized as Managed Medicare/Medicaid payors in HC1, despite providing Managed Medicare/Medicaid services when the Relator

generated the commission reports. As such, the actual dollar amounts reimbursed by Federal Healthcare Programs are higher than noted in the July 2016 to February 2017 report and/or other, subsequent reports, since some reimbursements marked as private insurance may be managed Medicare/Medicaid claims.

201.    Commercial insurance payor specimens in the July 2016 to February 2017 report were referred to Arbor for testing and billing, since only Arbor was in-network with commercial insurance.

202.    Massachusetts Medicaid was billed for tests generated from the provider Washburn House, a Massachusetts substance abuse rehabilitation facility. Apollo Labs transacted business and engaged in prohibited conduct in Massachusetts through its ALS sales rep, Summit Diagnostics, LLC.

203.    Specifically, Summit Diagnostics referred toxicology and blood testing from Washburn House to Apollo Labs and Arbor. ALS entered into an independent contractor sales rep agreement with Summit Diagnostics on August 16, 2016, through Lori Powell, the wife of the CEO and founder of Summit Diagnostics, George Powell.

204.    Excel spreadsheets covering August 2017 through October 2017 show at least 90 specimens sent to Apollo Labs and Arbor from Washburn House over this period, due to the ALS contract with Summit Diagnostics.

205.    In or around August 2019, the Relator provided David Key a consolidated ALS sales rep report covering multiple ALS sales rep accounts. The report documents accounts for the following sales reps: Jeff Joyner, Genoa Price, Tom Carroll, Patrick Lyons, Frank Del Bosque, Mark Frank, Brandon Maxwell, Dilber Cruz, Robert Castañeda, Martin Perez, showing the

number and type of specimens referred each week to Apollo and Arbor from December 2018 through July 2019.

206.    The Relator provided David Key and/or Brian Oliver similar information in or around July 2018 in a report that breaks down the specimen data into columns for Arbor and Apollo Labs for January through June 2018.

207.    The Relator provided David Key dozens of commission reports tracking individual ALS sales reps and specimen collectors in 2017 and 2018. Commission reports for individual ALS sales reps typically contain specimen-specific information, including whether the specimen was sent to Apollo or Arbor for testing and billing, the specimen ID, whether the specimen was blood or urine, the sales person entitled to credit, the name of the practice referring the specimen, the state that the specimen was sent from, primary insurance, the date of service, the date that payment was received, and the payment amount.

208.    The reports state the calculation used to determine the ALS sales rep commission and the total amount owed to each ALS sales rep for the month based on payments received.

209.    The Relator also prepared consolidated ALS sales rep commission reports for David Key that show consolidated revenue generated from ALS sales reps, the amount of commissions each rep earned, whether specimens were sent to Apollo or Arbor, and information about the medical providers that sent the specimens.

210.    An Excel spreadsheet similar to the consolidated commission reports created by the Relator, that omits commissions paid to ALS sales reps, was created by Drew Shen using either Tableau or HC1 in or around January 2019 and was sent to Brian Oliver and David Key.

211.    The report contains a "Puredi Data" tab, labeled "paymentMonth" shows dates from July 2018 through January 2019, which suggests that the report tracks specimen payments,

including payment reversals, for those seven months. Like many commission reports, "Puredi" is a name used interchangeably with Apollo Labs and "Telcor" is synonymous for Arbor.

212.    The "Summary" tab the July 2018 through January 2019 shows that Apollo Labs generated $1,228,413.15 in net revenue, including payment reversals, from July 2018 through January 2019, and breaks down the revenue generated from each provider associated with an ALS sales rep. For example, Meridian Medical, the account submitting specimens through a single ALS sales rep, Genoa McDonald Price and/or her company, GM Price, LLC, *netted* approximately $422,589.54 in revenue from commercial and government insurers for Apollo Labs during this six to seven month period.

213.    The "Puredi Data" tab of the July 2018 through January 2019 report provides granular Apollo Labs claims data. Column A lists patient claims ID numbers. Columns B and C identify Apollo Path and Apollo Labs as testing the specimen, respectively. Column D states which provider referred the specimen. Columns F and G show claim and charge numbers, respectively. Columns Q, R, and S state patient numbers, patient names, and patient dates of birth, respectively. Columns U through Z identify any information about the insurance billed. Columns AX and AZ state claims payment amounts and the date of the payment, respectively.

214.    ALS sales rep commission reports and reports were used to make business decisions at the weekly meetings of the directors, officers, and other interested parties at the weekly meeting at Korenvaes Management's office in the Old Parkland office campus, located at Old Parkland, Woodlawn Hall, 3953 Maple Ave, Dallas, Texas.

215.    ALS sales rep commission structure was discussed and approved by the managers for all of the Defendant entities.

216. Between 2016 and December 2019, Korenvaes Management, and/or its related business entities controlled by the same control persons, maintained a debt or equity relationship with all or some of Defendants Apollo Labs, Arbor, and ALS.

217. Apollo Labs received in excess of $10 million from Government Healthcare Programs from the time that the Relator started working for ALS to the present, with nearly all such revenue attributable to specimens referred by ALS independent contractor sales reps.

### B. EKRA Violations by Defendants Arbor, Apollo Labs, and ALS

218. The EKRA implicates claims submitted to commercial insurances tainted by commissions paid to sales reps based on the volume and/or amount billed of specimens referred to Apollo Labs and Abor. Certain claims submitted to commercial insurances by Arbor and Apollo Labs violated EKRA since October 24, 2018, the date the EKRA came into effect.

219. Specimens referred by ALS sales reps for testing reimbursable by commercial insurance was typically sent—directly or through Defendant Apollo Labs—to Defendant Arbor for testing and billing.

220. Defendant ALS maintained "straight commission W-2 with draw" and "commissioned 1099" contracts with ALS sales reps through at least December 2018. These contracts resulted in ALS sales reps referring specimens to Defendants Apollo Labs and Arbor that Apollo Labs and Arbor billed or caused to be billed to commercial insurances.

221. Commissions paid on all ALS sales rep accounts for the testing of specimens billed to commercial insurances from at least November 2018 through December 2018 therefore violated the EKRA.

222. In or around August 2019, the Relator provided David Key a consolidated ALS sales rep report covering multiple ALS sales rep accounts. The report documents accounts for the

following sales reps: Jeff Joyner, Genoa Price, Tom Carroll, Patrick Lyons, Frank Del Bosque, Mark Frank, Brandon Maxwell, Dilber Cruz, Robert Castañeda, Martin Perez, showing the number and type of specimens referred each week to Apollo and Arbor from December 2018 through July 2019.

223.    The report shows that commercial insurance was billed for ALS sales rep contracts from December 2018 through July 2019.

224.    From December 2018 through at least July 2019, ALS, with David Key's approval, modified ALS sales rep salaries when the profitability of the specimens they referred for testing increased or decreased.

225.    The December 2018 through July 2019 report shows that commercial specimens were tested and billed by Defendant Arbor. Commissions and/or commissions disguised as salaries were paid to the 1099 ALS sales rep, Genoa Price, during all or part of this period.

226.    Because ALS sales rep "salaries" were subject to modification based on the volume and profits generated after January 2019, these "salaries" were actually volume and profits based commissions.

227.    Salaries and/or commissions paid to ALS sales reps based on claims billed to commercial insurance by Defendant Arbor—sometimes  through specimens referred from Defendant Apollo Labs to Arbor—violated the EKRA from January 2019 through the date that the Relator stopped working for the Defendants and, on information and belief, is ongoing.

228.    Because the EKRA also prohibited commissions for ALS sales rep employees referring specimens covered by Government Healthcare Programs, ALS sales rep commissions that were disguised as salaries after October 24, 2018 were illegal and resulted in false claims.

**C. Korenvaes Management Established, Controlled, and Participated in the Scheme**

229.     Core directors, officers, and stakeholders for the Defendant entities, including Brian Oliver, David Key, and Max Korenvaes typically met every Wednesday at Korenvaes Management to conduct business across the Defendant entities.

230.     In an October 17, 2018 text message responding to the Relator's inquiry if he is available at "9am central" to talk, David Key responds that he cannot because he is in "our weekly meeting until early afternoon." The Relator had several conversations about with David Key about weekly meetings at Korenvaes Management, where David Key explained to the Relator that he would discuss business matters, such as regulatory issues involving Apollo Labs, with the group.

231.     Brian Oliver is the CFO of Korenvaes Management and is the CFO and CCO of Korenvaes Capital Management, LP.; he is CFO of ALS, Apollo Labs, and AP Lab Investments, LLC.; and he is President of Arbor and a Manager at the payroll company, Double Helix Management, LLC—the entity the Relator officially worked for before his employment ended. *See* Exhibit 1.

232.     Similarly, Max Korenvaes is CEO and Manager of Apollo Labs, is a Principal at Korenvaes Management, and expends effort improving Arbor. *See* Exhibit 1.

233.     Finally, David Key is a Partner with at least Apollo Labs, but the he receives a regular, annual salary on Arbor's payroll. *See* Exhibit 1.

234.     As stated in a January 28, 2016 email from Brian Oliver to the Relator, Brian Oliver manages all of the financial reports for the Defendant entities, which he personally reviews each pay period: ". . . I have very extensive reports for 3-4 entities . . . and prepare all of them." As such, Brian Oliver knows the close financial ties of Arbor and Apollo Labs and their referrals of testing to one another at cost.

235.    Apollo Labs and Arbor effectively operated as a single unit to maximize profitability, performing testing that the other lab could not complete and sharing in the profits.

236.    For example, Martin Perez, who managed Apollo Labs phlebotomists and reported to an Arbor manager, Tony Acosta, sent weekly reports to David Key and the Relator titled "Apollo_Arbor Weekly Volume."

237.    The report shows the volume of toxicology, blood, and other specimens from Arbor tested by Apollo, regardless of whether ALS sales reps were associated with the accounts, from December 31, 2018 to November 9, 2019 over multiple tabs on the Excel spreadsheet.

238.    The spreadsheet shows close financial and operational ties between Apollo labs and Arbor in compensating ALS sales reps and phlebotomists, as well as transparent communication between the two entities.

239.    David Key reviewed these reports because they show the cost of each phlebotomist associated with ALS sales rep accounts, divided by the number of specimens each phlebotomist collected. David Key closely monitored this data to ensure phlebotomists were exceeding the cost of their contract.

240.    Similar spreadsheets sent to David Key identify the same information from September 11, 2017 to December 8, 2018.

241.    A similar Excel spreadsheet sent to the Relator titled "06Jun2017 Arbor L2L Summary for Apollo Patients" shows specimens that Apollo Labs referred to Arbor as part of its lab-to-lab agreement.

242.    The first tab, labeled "CPT Code," shows, inter alia, specific CPT codes billed and the number of times those codes were billed, the average CMS rate per claim, and the total amount reimbursed for each code.

243.    Tab two, "Clinical & Tox Summary" breaks down claims into clinical bloodwork and toxicology testing, and provides detailed information about the provider ordering such testing, including the number of CPT codes billed for each provider.

244.    The third tab, "Telcor Trans GL," provides a claim by claim breakdown and includes information about payors.

245.    The fourth tab, "Telcor GL Ascession," states, among other things, the service date, payment date, the specimens number, and that the claims are from "ARBOR DIAGNOSTICS."

246.    A similar Excel spreadsheet that was sent to the Relator titled "Jul2017 Arbor L2L Summary for Apollo patients" shows specimens that Apollo referred to Arbor as part of its lab-to-lab agreement.

247.    The first tab, "Ref Phys," shows which physicians were referring testing to Apollo Labs, subsequently sent to Arbor, how many CPT codes were billed, and the amount of revenue generated from billing.

248.    The second tab, labeled "CPT Code," shows, inter alia, specific CPT codes billed and the number of times those codes were billed, the average CMS rate per claim, and the total amount reimbursed for each code.

249.    Tab three, "Clinical & Tox Summary" breaks down claims into clinical bloodwork and toxicology testing and shows how much each commercial insurance payor paid compared against each other.

250.    The fourth tab, "Telcor Trans GL," provides a claim by claim breakdown and includes information about payors. The fourth tab, "Telcor GL Ascension," states, among other

things, the service date, payment date, the specimens number, and that the claims are from "ARBOR DIAGNOSTICS," in column AE.

251.    Yet another Excel spreadsheet that tracks ten ALS sales reps for January and February 2018 and shows how many specimens each sales rep sent to Arbor and Apollo Labs each week.

252.    The spreadsheet tracks specimen referrals for Tony Simmons,[5] Kevin Khoury, Genoa Price, Troy Hollatz, Juan Rojas, Joe Jester, Mark Frank, Ron Stuart, Steve Harrison, and Craig Ball. It provides contact information for most ALS sales reps on the first tab of the spreadsheet.

253.    ALS agents, such as David Key, Kevin Faulkner, and the Relator, entered into contracts with ALS sales reps with actual authority to bind both Apollo Labs and Arbor, with the purpose of making both Arbor and Apollo Labs more profitable.

254.    For example, an April 8, 2018 contract was prepared by between ALS sales rep Maggie Howe and Arbor was conveyed to Maggie Howe through Kevin Faulkner.

255.    Like other contracts for ALS sales reps, the contract provides for commissions based on a percent of revenue, minus cost of goods.

256.    Regardless of whether ALS sales reps had formal contracts with Arbor, ALS sales rep specimens were referred for testing and billing to Arbor and sales reps received commissions on these amounts.

257.    Key management at the Defendant Corporations maintained email addresses at multiple entities they represented, but consolidated lists of contact information was maintained.

---

[5] The Relator believes the name "Tony Simmons" in the spreadsheet is a typo should state "Tony Timmons."

As shown in one spreadsheet, Brian Oliver has email addresses for Arbor, Double Helix, and Medpath; David Key has email addresses for Arbor, Apollo Labs, and Neuropath; Max Korenvaes has email accounts for Apollo Labs and Double Helix.

258.    The Relator, who was never an employee of Apollo Labs or Arbor, was responsible for creating joint advertisements for Apollo and Arbor that ALS sales reps were encouraged to use. David Key approved these advertisements, including one for Apollo Labs stating Apollo Labs "will accept most commercial insurance," despite Apollo needing to refer all commercial payor testing to Arbor.

259.    Many employees at the Defendant entities had the payor of their work paychecks change from one entity to another, without having their job responsibilities change.

260.    The Relator was hired to work at ALS, then was paid by Qtech Healthcare Management LLC, and finally Double Helix Management, LLC, the entity that the Relator accepted a severance agreement from.

261.    The Relator was not given any explanation for being moved from one entity to another, only receiving a notice from Brian Oliver that the payor of his paychecks would change.

262.    In examining payroll, the Relator noticed that Brant Cook, an ALS employee hired to manage the phlebotomists, was also moved from ALS payroll, to Qtech Healthcare Management LLC payroll, and then to Double Helix.

263.    Brant Cook was responsible for managing the supply chains for both Arbor and Apollo Labs. Nelson "Tony" Acosta was an employee on Arbor's payroll with oversight responsibilities for Apollo Labs phlebotomists.

264.    Agents of Korenvaes Management operated directly in core business functions at ALS, Apollo Labs, and/or Arbor.

265.    Molly Jackson, an individual with a Korenvaes email address, who was not on payroll for Arbor, Apollo Labs, or Double Helix, and who reported directly to Brian Oliver at Korenvaes, was responsible for helping run payroll for Double Helix and assisted the Relator if there was need for an urgent wire transfer.

266.    Likewise, Loren Sauer, a former Family Office Controller at Korenvaes Management according to her LinkedIn profile, fulfilled the same role as Molly Jackson when the Relator first started working for the Defendant entities.

267.    Terri Lawler worked for Miller Consulting Group and was hired by Korenvaes Management to perform human resources tasks related to the Defendant entities.

268.    When the Relator was first hired, he also interviewed at Korenvaes Management's office, meeting with David Key, Brian Oliver, Harlan Korenvaes, among others.

269.    On the same day, that the Relator met with Korenvaes Management, he observed that a potential sales rep, Lee Akey also met with Brian Oliver, David Key, and Harlan Korenvaes.

270.    Harlan Korenvaes interviewed the Relator during his interview process, directly asking him questions, before the Relator was hired.

## VII.    CAUSES OF ACTION

### COUNT I: FALSE OR FRAUDULENT CLAIMS
### 31 U.S.C. Sec. 3729(a)(1)(A)
### Against all defendants

271.    The Plaintiff-Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

272.    The Defendants knowingly or in deliberate ignorance or reckless disregard of the truth presented or caused to be presented false or fraudulent claims for payment or approval, in

violation of the False Claims Act, 31 U.S.C. Sec. 3729(a)(1)(A). Specifically, Defendants submitted or caused submission of claims for payment to Government Healthcare Programs that were tainted by kickbacks to independent contractor sales reps who referred specimens that were tested and billed as claims.

273.    Defendants falsely certified or caused that it be certified that the claims were for services satisfied all prerequisites for payment, including compliance with the False Claims Act. The government relied on those statements and paid the fraudulent invoices. The misrepresentations were material as the term is defined in the False Claims Act and interpreted by the courts.

274.    By virtue of the false or fraudulent claims Defendants knowingly presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim. The U.S. government, unaware of the falsity of the claims and/or statements and in reliance on the accuracy thereof, was damaged.

## COUNT II: FALSE STATEMENTS MATERIAL TO FALSE CLAIMS
### 31 U.S.C. Sec. 3729(a)(1)(B)
### Against all Defendants

275.    The Plaintiff-Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

276.    Defendants knowingly or in deliberate ignorance or reckless disregard of the truth made, used or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. Sec. 3729(a)(1)(B). Certifications on CMS-1500 claims forms and/or their electronic equivalents were false because the Defendants knowingly paid or approved the payment of profits-based commissions to

independent contractor ALS sales reps that referred specimens in violation of the AKS or, separately, the EKRA.

277.    Defendants falsely certified compliance with all applicable laws and regulations when submitting or causing to be submitted CMS-1500 claims forms and/or their electronic equivalents. The government relied on those statements and paid the fraudulent invoices. The misrepresentations were material as the term is defined in the False Claims Act and interpreted by the courts.

278.    By virtue of the false records or statements Defendants made, used or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim. The U.S. government, unaware of the falsity of the claims and/or statements and in reliance on the accuracy thereof, was damaged.

## COUNT III: REVERSE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(G)
### Against all Defendants

279.    The Plaintiff-Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

280.    The Defendants made or used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased, or knowingly caused concealment, avoidance, or the decrease of, an obligation to pay or transmit money to the United States.

281.    For a significant amount of time, Defendants knew or should have known that Apollo Labs and/or its agents responsible for billing the Government Healthcare Programs misrepresented compliance with material applicable regulations and, as a result, were paid moneys to which they were not entitled due to violations of the AKS. The Defendants knowingly

concealed, avoided, or decreased, or knowingly caused concealment, avoidance, or the decrease of, the Defendant's obligation to pay or transmit money to the United States in the form of AKS fines and monies owed on claims that were false as a result of non-compliance with the AKS.

282.    Likewise, for a significant amount of time, Defendants knew or should have known that ALS employees' commissions, sometimes disguised as salaries, paid to refer specimens to Defendants Apollo Labs and Arbor, violated the EKRA. The Defendants knowingly concealed, avoided, or decreased, or knowingly caused concealment, avoidance, or the decrease of, the Defendant's obligation to pay or transmit money to the United States in the form of EKRA fines and monies owed on claims that were false as a result of non-compliance with the EKRA.

283.    Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were made or done knowingly, as defined in 31 U.S.C. § 3729(b)(1). Failure to return any overpayment such as the claims on which Defendants received any overpayment from the Government Healthcare Programs constitutes a reverse false claim under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act.

### COUNT IV: ANTI-KICKBACK VIOLATIONS
### 42 U.S.C. §§ 1320a-7a and 1320a-7b
### Against all Defendants

284.    The Plaintiff-Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

285.    From at least January 2016 to December 2019, the Defendants knowingly and willingly offered or paid renumeration directly or indirectly, overtly or covertly in cash or in kind to ALS independent contractor sales reps to purchase or order, or recommend for purchasing or

ordering a service covered in whole or in part under a federal health care program in violation of 42 U.S.C. § 1320a-7b(b)(2).

286.    The actions of ALS, Apollo Labs, Arbor, and the individual defendants managing the operations of ALS, Apollo Labs, and Arbor, including providing ALS sales reps with profits-based commissions for referring specimens for testing, constituted illegal kickbacks under 42 U.S.C. §1320a-7b(b)(2). Commissions disguised as salaries after October 24, 2018 were similarly kickbacks violating the AKS to the extent such violations are not covered by the EKRA. Because Defendant Korenvaes Management continued its control and management over the aforementioned defendants with knowledge of the fraudulent conduct, Korenvaes Management is also liable for such violations.

287.    Defendants' actions as detailed above constituted illegal kickbacks under 42 U.S.C. § 1320a-7a(a)(7).

288.    As a result thereof, the federal government has sustained damages.

## COUNT V: TEXAS MEDICAID FRAUD PREVENTION ACT VIOLATIONS
### Tex. Hum. Res. Code § 36.001 *et seq.*
### Against All Defendants

289.    The Plaintiff-Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

290.    Defendants' acts and practices, as described more fully above, violated the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code § 36.001 *et seq.*

291.    Defendants' acts and practices, as described more fully above, knowingly caused to be presented false or fraudulent claims for payment or approval, in violation of the TMFPA. Tex. Hum. Res. Code § 36.002(1).

292.    Defendants knowingly concealed or failed to disclose information that permitted a payment under the Medicaid program that is not authorized, in violation of the TMFPA. Tex. Hum. Res. Code § 36.002(2).

293.    Defendants' acts and practices, as described more fully above, knowingly paid, charged, solicited, accepted, or received money as a condition to the provision of a service or product paid for, in whole or in part, under the Medicaid program, in violation of the TMFPA. Tex. Hum. Res. Code § 36.002(5).

294.    The actions of ALS, Apollo Labs, Arbor, and the individual defendants managing the operations of ALS, Apollo Labs, and Arbor, including providing ALS sales reps with profits-based commissions for referring specimens for testing, constituted illegal kickbacks resulting in such claims being false under the TMFPA. Because Defendant Korenvaes Management continued its control and management over the aforementioned defendants with knowledge of the fraudulent conduct, Korenvaes Management is also liable for such violations.

295.    As a result thereof, the State of Texas has sustained damages.

### COUNT VI: OKLAHOMA MEDICAID FALSE CLAIMS ACT VIOLATIONS
#### Okla. Stat. tit. 63, § 5053.1
#### Against All Defendants

296.    The Plaintiff-Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

297.    Defendants' acts and practices, as described more fully above, violated the Oklahoma Medicaid False Claims Act by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval. Okla. Stat. tit. 63, § 5053.1(1).

298.    Defendants' acts and practices, as described more fully above, violated the Oklahoma Medicaid False Claims Act by knowingly making, using, or causing to be made or

used, a false record or statement material to a false or fraudulent claim. Okla. Stat. tit. 63, § 5053.1(2).

299.    Defendants' acts and practices, as described more fully above, violated the Oklahoma Medicaid False Claims Act by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state. Okla. Stat. tit. 63, § 5053.1(7).

300.    The actions of ALS, Apollo Labs, Arbor, and the individual defendants managing the operations of ALS, Apollo Labs, and Arbor, including providing ALS sales reps with profits-based commissions for referring specimens for testing, constituted illegal kickbacks resulting in such claims being false under the Oklahoma Medicaid False Claims Act. Because Defendant Korenvaes Management continued its control and management over the aforementioned defendants with knowledge of the fraudulent conduct, Korenvaes Management is also liable for such violations.

301.    As a result thereof, the State of Oklahoma has sustained damages.

### COUNT VII: TENNESSEE FALSE CLAIMS ACT AND MEDICAID FALSE CLAIMS ACT VIOLATIONS
**TN Code § 4-18-103, AND § 71-5-182**
**Against All Defendants**

302.    The Plaintiff-Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

303.    Defendants' acts and practices, as described more fully above, violated the Tennessee False Claims Act by knowingly presenting or causing to be presented to an officer or employee of Tennessee or of any political subdivision thereof, a false claim for payment or approval. TN Code § 4-18-103(a)(1).

304.    Defendants' acts and practices, as described more fully above, violated the Tennessee False Claims Act by knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision. TN Code § 4-18-103(a)(2).

305.    Defendants' acts and practices, as described more fully above, violated the Tennessee False Claims Act by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision. TN Code § 4-18-103(a)(7).

306.    The actions of ALS, Apollo Labs, Arbor, and the individual defendants managing the operations of ALS, Apollo Labs, and Arbor, including providing ALS sales reps with profits-based commissions for referring specimens for testing, constituted illegal kickbacks resulting in such claims being false under the Tennessee Medicaid False Claims Act. Because Defendant Korenvaes Management continued its control and management over the aforementioned defendants with knowledge of the fraudulent conduct, Korenvaes Management is also liable for such violations.

307.    The Tennessee Medicaid False Claims Act similarly imposes liability on people and corporations who knowingly submit false claims to Tennessee's Medicaid program. TN Code § 71-5-182. Defendants are similarly liable under the Tennessee Medicaid False Claims Act for the same reasons they are liable under the Tennessee False Claims Act.

308.    As a result thereof, the State of Tennessee has sustained damages.

## COUNT VIII: MASSACHUSETTS FALSE CLAIMS ACT VIOLATIONS
### M.G.L. c. 12, §§ 5B
### Against All Defendants

309.    The Plaintiff-Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

310.    Defendants' acts and practices, as described more fully above, violated the Massachusetts False Claims Act by knowingly presenting or causing to be presented a false claim for payment or approval. M.G.L. c. 12, §§ 5B(a)(1).

311.    Defendants' acts and practices, as described more fully above, violated the Massachusetts False Claims Act by knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved. M.G.L. c. 12, §§ 5B(a)(2).

312.    Defendants' acts and practices, as described more fully above, violated the Massachusetts False Claims Act by knowingly making, using or causing to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof. M.G.L. c. 12, §§ 5B(a)(9).

313.    The actions of ALS, Apollo Labs, Arbor, and the individual defendants managing the operations of ALS, Apollo Labs, and Arbor, including providing ALS sales reps with profits-based commissions for referring specimens for testing, constituted illegal kickbacks resulting in such claims being false under the Massachusetts False Claims Act. Because Defendant Korenvaes Management continued its control and management over the aforementioned defendants with knowledge of the fraudulent conduct, Korenvaes Management is also liable for such violations.

314.    As a result thereof, the State of Massachusetts has sustained damages.

## VIII.    CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, the Relator prays that judgment be entered in favor of the United States, the State of Texas, State of Oklahoma, State of Tennessee, the Commonwealth of Massachusetts, and the Relator against the Defendants jointly and severally as follows:

1.    On Counts I through III, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the federal False Claims Act committed by the Defendants;

2.    On Counts I through III, enter a judgment against the Defendants jointly and severally for three times the amount of damages sustained by the United States of America because of the acts of the Defendants;

3.    On Count IV, enter a judgment against the Defendants jointly and severally for damages sustained by the United State of America because of the acts of the Defendants described herein, multiplied as permitted by the Anti-Kickback Statute, as well as civil penalties, as permitted by the Anti-Kickback Statute, including disgorgement of all moneys Defendants received as a result of claims submitted in violation of the Anti-Kickback Statue;

4.    On Count V, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the Texas Medicaid Fraud Prevention Act;

5.    On Counts V, enter judgment against the Defendants jointly and severally for all amounts paid to Defendants by the State of Texas because of the acts of the Defendants described herein, multiplied, as permitted under the Texas Medicaid Fraud Prevention

Act;

6.      On Count VI, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the Oklahoma Medicaid False Claims Act;

7.      On Counts VI, enter judgment against the Defendants jointly and severally for the damages sustained by the State of Oklahoma because of the acts of the Defendants described herein, multiplied, as permitted under the Oklahoma Medicaid False Claims Act;

8.      On Count VII, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the Tennessee False Claims Act;

9.      On Counts VII, enter judgment against the Defendants jointly and severally for the damages sustained by the State of Tennessee because of the acts of the Defendants described herein, multiplied, as permitted under the Tennessee False Claims Act;

10.      On Count VIII, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the Massachusetts False Claims Act;

11.      On Counts VIII, enter judgment against the Defendants jointly and severally for the damages sustained by the Commonwealth of Massachusetts because of the acts of the Defendants described herein, multiplied, as permitted under the Massachusetts False Claims Act;

12.      Award the Relator a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

13.     Award the Relator a percentage of the proceeds of recoveries under the Texas,

Oklahoma, Tennessee, and Massachusetts False Claims Acts;

14.     Award the Relator his costs and reasonable attorneys' fees and costs for

prosecuting this action; and

15.     All other relief as may be required or authorized by law in the interest of justice.

## IX.     DEMAND FOR JURY TRIAL

The Relator, on behalf of themselves, the United States, the State of Texas, State of

Oklahoma, State of Tennessee, and the Commonwealth of Massachusetts, demand a jury trial on

all claims alleged herein.

Date: September 18, 2020                         Respectfully submitted,


                                                Relator Rayburn "Alex" Thompson
                                                III by his Counsel

                                                */s/ Cory S. Fein*
                                                Cory S. Fein
                                                Texas Bar No. 06879450
                                                CORY FEIN LAW FIRM
                                                712 Main Street, Suite 800
                                                Houston, TX 77002
                                                (281) 254-7717
                                                (530) 748 - 0601 (fax)
                                                cory@coryfeinlaw.com


                                                Jeffrey A. Newman, Esq.
                                                Massachusetts BBO # 370450
                                                Jeffrey Newman Law
                                                One Story Terrace
                                                Marblehead, Ma. 01945
                                                Tel: 617-823-3217
                                                Fax: 781-639-8688
                                                Jeff@JeffNewmanLaw.com
                                                *Pro Hac Vice* to be filed

# Exhibit 1

## ORGANIZATIONAL CHART OF THE PARTIES AND RELATED ENTITIES AND PERSONS



# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America, States of Texas, Oklahoma, Tennessee and Massachusetts, ex. rel. Sealed Plaintiff

## DEFENDANTS

Apollo Path, LLC, Apollo Laboratories Services, LLC, Arbor Diagnostics, Inc., Korenvaes Mngmnt LLC, David Key, Brian Oliver, Max Korenvaes

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dallas County, Texas
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Cory Fein, Cory Fein Law Firm, cory@coryfeinlaw.com
712 Main St. #800, Houston, TX 77002

Attorneys *(If Known)*

RECEIVED
SEP 2 2 2020

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☒ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 USC 3729

Brief description of cause:
Violation of False Claims Act and similar state statutes due to fraud on Medicare, Medicaid

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*

JUDGE _____   DOCKET NUMBER _____

DATE
09/18/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE



Service Bea
712 Main St., Suite 800
Houston, TX 77002

CERTIFIED MAIL

7019 2970 0001 3542 23A5

$010.20

RECEIVED

SEP 2.2 2020

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

United States District Court
1100 Commerce St.
Room 1452
Dallas TX 75242