**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ET AL.<br>ex rel. RAYBURN ALEX THOMPSON,<br><br>    Plaintiffs<br><br>v.<br><br>APOLLO PATH, LLC D/B/A APOLLO<br>LABORATORIES; APOLLO<br>LABORATORIES SERVICES, LLC; ARBOR<br>DIAGNOSTICS, INC.; KORENVAES<br>MANAGEMENT, LLC; DAVID KEY;<br>BRIAN OLIVER; and MAX KORENVAES,<br><br>    Defendants. | Civil Action No. 3:20-cv-2917-D |

**RELATOR'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**Table of Contents**

Table of Authorities .................................................................................................... ii

I.      PROCEDURAL, FACTUAL, AND LEGAL BACKGROUND ........................................2

        A.  Procedural Background ...............................................................................2

        B.  Factual Background ....................................................................................3

        C.  The False Claims Act .................................................................................4

        D.  The Anti-Kickback Statute .........................................................................5

        E.  The EKRA ..................................................................................................7

II.     THE RELATOR'S CLAIMS SHOULD NOT BE DISMISSED ....................................8

        A.  The FAC plausibly pleads FCA violations ................................................8

              i.   The AKS and EKRA prohibit the defendants' kickback scheme, and
                   therefore the FAC plausibly pleads falsity ........................................9

              ii.  The FAC plausibly alleges that the Defendants acted with the requisite
                   scienter .............................................................................................16

              iii. The FAC plausibly alleges causation .................................................18

        B.  The FAC plausibly pleads a conspiracy claim ..........................................21

        C.  The FAC satisfies Rule 9(b)'s pleading requirements ...............................23

III.    CONCLUSION.....................................................................................................25

## Table of Authorities

*Bingham v. BayCare Health Sys.*, No. 8:14-CV-73-T-23JSS, 2016 WL 8739056
(M.D. Fla. Dec. 16, 2016) ................................................................................................10

*Bingham v. HCA, Inc.*, 783 F. App'x 868 (11th Cir. 2019) ..........................................10

*Collins v. Bauer*, No. 3:11-CV-00887-B, 2012 WL 443010 (N.D. Tex. Jan. 23, 2012)
*report and recommendation adopted*, No. 3:11-CV-00887-B, 2012 WL 444014
(N.D. Tex. Feb. 10, 2012) ............................................................................................22, 23

*GF Indus. of Missouri, LLC v. Lehigh Valley Genomics, LLC*, No. CV 22-227, 2024 WL
1889797 (E.D. Pa. Apr. 30, 2024) .................................................................................16

*H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239 (5th Cir. 1978) ........................22

*Hilliard v. Ferguson*, 30 F.3d 649 (5th Cir. 1994) ........................................................22

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) .............................................6

*United States v. Bollinger Shipyards, Inc.,* 775 F.3d 255 (5th Cir. 2014) ............5, 18, 24

*United States v. Catholic Health Initiatives*, 312 F.Supp.3d 584 (S.D. Tex. 2018) ......16

*United States v. Cooper,* 38 F.4th 428 (5th Cir. 2022) ...................................................13

*United States v. Hodge*, 933 F.3d 468 (5th Cir. 2019), as revised (Aug. 9, 2019) ........19

*United States v. Job*, 387 F.App'x. 445 (5th Cir. 2010) (unpublished) ...........................6

*United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024) ..................................13, 14, 25

*United States v. Marlin Med. Sols. LLC,* 579 F. Supp. 3d 876 (W.D. Tex. 2022) ...........9

*United States v. Medoc Health Servs. LLC*, Civil Action No. 3:17-cv-02977-M, 2020 U.S. Dist.
LEXIS 120351 (N.D. Tex. July 2, 2020) .................................................................6, 21, 22

*United States v. Polin*, 194 F.3d 863 (7th Cir. 1999) .....................................................12

*United States v. Prof'l Compounding Ctrs. of Am.*, 664 F. Supp. 3d 722 (W.D. Tex. 2023) ........19

*United States ex rel. Reddell v. DynCorp Int'l, LLC*, No. 1:14-CV-86, 2019 WL 12875471
(E.D. Tex. Mar. 20, 2019) ..............................................................................................21

*United States v. Robinson*, 505 F. App'x 385 (5th Cir. 2013) ........................................6

*United States v. Schena*, 2022 WL 1720083 (N.D. Cal. May 28, 2022) ...............................13, 17

*United States v. Shoemaker*, 746 F.3d 614 (5th Cir. 2014) ...................14, 15, 16, 17, 25

*United States v. St. Junius*, 739 F.3d 193 (5th Cir. 2013)..............................................................7

*United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013) .....................................................12, 20

*United States v. Wilks*, No. CR 21-63-SDD-SDJ, 2023 WL 1978903
(M.D. La. Feb. 13, 2023) ................................................................................................12, 14, 25

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006)........................................2

*United States, ex rel. Chandler v. Cook County, Illinois*, 277 F.3d 969 (7th Cir. 2002) ............2, 15

*United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365 (5th Cir. 2017) ........................2, 24

*United States ex rel. Everest Principals, LLC v. Abbott Labs.*, Inc., No. 3:20-cv-286-W(AGS),
622 F.Supp.3d 920 (S.D. Cal. Aug. 18, 2022) ................................................................................19

*U.S. ex rel. Fair Lab'y Pracs. Assocs. v. Quest Diagnostics Inc.*, No. 05 CIV. 5393 RPP,
2011 WL 1330542 (S.D.N.Y. Apr. 5, 2011)...................................................................................10

*United States ex rel. Fitzer v. Allergan, Inc.*, No. 1:17-cv-00668-SAG, 2022 WL 3599139
(D. Md. Aug. 23, 2022)....................................................................................................................19

*United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24 EAJ, 2012
WL 4344199 (M.D. Fla. Sept. 21, 2012) ........................................................................................19

*United States ex rel. Goodman v. Arriva Med., LLC*, No. 3:13-cv-0760, 2020 U.S. Dist. LEXIS
119678 (M.D. Tenn. July 8, 2020)....................................................................................................7

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89 (3d Cir. 2018)............19

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009)...................................23

*United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145 (2d Cir. 2024)................................18

*United States ex rel. Langer v. Zimmer Biomet Holdings, Inc.*, No. CV 21-11293, 2024 WL
3633536 (D. Mass. Aug. 2, 2024)....................................................................................................12

*U.S. ex rel. Lutz v. Mallory*, 988 F.3d 730 (4th Cir. 2021) ....................................................12, 25

*U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158 (S.D. Tex. June
12, 2014) ...........................................................................................................................................9

*United States ex rel. Perri v. Novartis Pharms. Corp.*, No. CV 15-6547, 2019 WL 6880006, (D.N.J. Feb. 21, 2019)................................................................................................................11

*United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004)................................18

*United States ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445 (4th Cir. 2011) ..............................2

*United States ex rel. Wheeler v. Union Treatment Centers, LLC*, No. CV SA-13-CA-4-XR, 2019 WL 571349 (W.D. Tex. Feb. 12, 2019).............................................................................19

## **Other Authorities**

Eliminating Kickbacks in Recovery Act of 2018, 18 U.S.C. § 220

False Claims Act, 31 U.S.C. § 3729

Medicare and Medicaid Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7a and 1320a-7b

Plaintiff-Relator Rayburn "Alex" Thompson III ("Relator") respectfully files this opposition to the motion to dismiss (Doc. No. 55) (the "Motion") the Relator's First Amended Complaint (Doc. No. 52) ("FAC") filed by Defendants Apollo Path, LLC D/B/A Apollo Laboratories; Apollo Laboratories Services, LLC ("Apollo Labs"); Arbor Diagnostics, Inc. ("Arbor"); Korenvaes Management, LLC ("Korenvaes Management"); David Key; Brian Oliver; and Max Korenvaes (collectively, "Defendants").[1]  As set forth in extensive detail in the FAC, the Defendants – acting in concert to maximize their profits – devised a scheme whereby they engaged independent contractor sales representatives ("sales reps") to procure blood and toxicology specimens for testing at Apollo and Arbor.  In exchange for directing such specimens, the sales reps were paid based on the volume and profitability of the testing once claims for reimbursement were submitted to and paid by Medicare, Medicaid, Tricare, and the Veterans Administration ("VA") (collectively, "Government Healthcare Programs").  The Defendants' scheme knowingly violated the Medicare and Medicaid Anti-Kickback Statute ("AKS"), 42 U.S.C. §§ 1320a-7a and 1320a-7b, and the Eliminating Kickbacks in Recovery Act of 2018 ("EKRA"), 18 U.S.C. § 220, causing claims for reimbursement from Government Healthcare Programs to be legally false and thereby actionable under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, as well as state law analogues.[2]

The Defendants' Motion distorts both the allegations in the FAC and the proper interpretation of the AKS, EKRA, and FCA.  Contrary to the Defendants' arguments, the FAC

---

[1] Defendant Double Helix Management, LLC ("Double Helix") did not join the Motion, which was filed by Defendants prior to Double Helix being served.  The arguments set forth in this opposition apply with equal force to Double Helix.

[2] The Motion does not address the Relator's state law claims, some of which contain substantive differences to the federal FCA.

articulates extensive factual allegations that firmly support the claims made therein.  Further, numerous federal courts, including those in the Fifth Circuit, have held that the payment of independent contractor sales reps in exchange for volume-based commissions, as the Defendants have done, constitutes a violation of the AKS and EKRA and is actionable under the FCA.  As explained below, despite varying levels of involvement, each Defendant actively participated in, and conspired to engage in, the illicit scheme to submit false claims to Government Healthcare Programs.  For these reasons, the Relator respectfully requests that the Court deny the Motion.

## I.    PROCEDURAL, FACTUAL, AND LEGAL BACKGROUND

### A.  Procedural Background

The Relator initiated this action by filing his original complaint under seal on September 22, 2020.  (Doc. No. 1).  After an extensive investigation spanning nearly four years, the federal government filed a notice declining to intervene (Doc. No. 3).[3]  Subsequently, the Court ordered the unsealing of the original complaint.  (Doc. No. 4).  Following the Defendants' initial responsive pleading, the Relator exercised his right to amend, filing the FAC.  (Doc. No. 52).

---

[3] The Defendants assert that the federal and state governments "refused" to intervene, subtly suggesting that the Court should infer something negative about the merits of the case from the government's decision not to participate.  However, as the Seventh Circuit has pointed out, "[t]here is no reason to presume that a decision by the Justice Department not to assume control of the suit is a commentary on its merits.  The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney."  *United States, ex rel. Chandler v. Cook County, Illinois*, 277 F.3d 969, 974 n. 5 (7th Cir. 2002); *see also United States ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 457 (4th Cir. 2011); *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 fn. 17 (11th Cir. 2006).  If any inference is to be drawn, it is that the government, having invested nearly four years of resources to pursue these claims, clearly does not view them as lacking merit.  Had the claims been devoid of legal or factual basis, the Justice Department could have sought dismissal under 31 U.S.C. § 3730(c)(2)(A).  *See* 31 U.S.C. § 3730(c)(2)(A).

### B.  Factual Background

Apollo and Arbor are medical laboratories that provide blood and toxicology testing services.  FAC ¶¶ 2, 26, 29 34.  The Relator was interviewed by David Key and Brian Oliver, among others, at Korenvaes Management for employment at ALS (and later Double Helix), to retain sales reps tasked with directing specimens to Apollo and Arbor for testing.  FAC ¶¶ 16, 127, 293, 302.

The sales reps retained by the Defendants to direct specimens to Apollo and Arbor were independent contractors.  FAC ¶¶ 133-180.  Their compensation was tied to the volume of specimens referred, with profitability – whether the testing involved blood or urology – serving as another determinant.  FAC ¶¶ 115-18, 197, 238.  Commissions were modified based on a sales rep's success in securing high volumes of profitable specimens, with the Defendants at times concealing these arrangement by misclassifying sales reps as W-2 "employees."  FAC ¶¶ 193-95.  These sales reps were not remunerated to market Apollo and Arbor's services.  FAC ¶¶ 128-30.  For a sales rep to be added to payroll, it was often contingent on their submitting a sufficient volume of reimbursed claims.  FAC ¶¶ 153, 214-16, 212-13, 237.  Under David Key's direction, sales reps with existing books of business were deliberately recruited because they could redirect specimens to Apollo and Arbor in exchange for illicit kickbacks.  FAC ¶¶ 107-09, 129-30; 170.

Government Healthcare Programs reimbursed Apollo for urology and toxicology testing associated with specimens referred by these independent contractor sales reps.  FAC ¶¶ 212-16, 230-31, 239.  The Relator tracked these transactions, preparing detailed reports for David Key and Brian Oliver that documented the specimens, claims submitted for testing, the medical practice sending the specimen, insurers, reimbursement figures, and sales rep commissions.

FAC ¶¶ 196, 201-15.  This kickback scheme persisted from at least 2015 through at least December 2019, when the Relator stopped working for the Defendants.  FAC ¶ 5.

The individual Defendants would regularly meet at the offices of Korenvaes Management to conduct business on behalf of the Defendant entities.  FAC ¶¶ 254-60.  At these meetings, the Defendants collectively established key policies, including the decision to pay independent contractors with a percentage of successfully billed claims and to disregard healthcare regulations when compliance would undercut profitability.  FAC ¶¶ 42-47, 55, 59-60, 236, 256-60, 265-67, 301-06.

In or around August 2018, David Key informed the Relator that the Defendants needed to reclassify all sales reps to W-2 employees to avoid the federal government pursuing them for violating federal health care laws.  FAC ¶¶ 181-84, 258.  However, the Defendants later reverted the classification of sales reps back to 1099 independent contractors when these sales reps resisted the change and it became apparent that W-2 "employee" status would adversely impact profitability.  FAC ¶¶ 181-84, 190-95, 259.

### C. The False Claims Act

The False Claims Act imposes liability on any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]…

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

4

31 U.S.C. § 3729(a)(1).  The statute defines "knowing" and "knowingly" to include: (1) "actual knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth or falsity of the information," without requiring "specific intent to defraud."  31 U.S.C. § 3729(b).  Importantly, "[k]nowledge need not be pled with particularity under Rule 9(b); it need only be pled plausibly pursuant to Rule 8." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014).

### D.  The Anti-Kickback Statute

Violations of the AKS occur when someone knowingly and willfully "***solicits or receives*** any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" in return for "in return for referring an individual to a person for the ***furnishing or arranging for the furnishing of any item or service***" or "purchasing, leasing, ordering, or arranging for or ***recommending*** purchasing, leasing, or ordering ***any good, facility, service, or item***" covered in whole or in part by a "Federal health care program."  42 U.S.C. § 1320a-7b(b)(1)(A), (B) (emphasis added).  Likewise, the AKS makes it illegal to knowingly and willingly offer or pay any remuneration to ***induce*** a person "to ***refer*** an individual to a person for the furnishing or arranging for the furnishing of ***any item or service***" or "***arrange for or recommend*** purchasing, leasing, or ***ordering any good, facility, service, or item***" where payment may be made "in whole or in part under a Federal health care program."  42 U.S.C. §1320a-7b(b)(2) (A), (B) (emphasis added).

The AKS contains a narrowly-construed "bona fide employment" exception: "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" will not violate

the AKS.  42 U.S.C. § 1320a-7b(b)(3)(B).[4]  *See United States v. Robinson*, 505 F. App'x 385,

387-88 (5th Cir. 2013) (holding "Robinson did not have sufficient control over the manner and

means of the work performed by [employees] to characterize this as a bona fide employment

relationship.").[5]

A claim for reimbursement from a federal health care program for items or services

resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA.

42 U.S.C. § 1320a-7b(g).  Courts have recognized that post-2010 amendments to the AKS render

claims tainted by kickbacks per se false.  *See United States v. Medoc Health Servs. LLC*, Civil

Action No. 3:17-cv-02977-M, 2020 U.S. Dist. LEXIS 120351, at *27 (N.D. Tex. July 2, 2020)

("After the 2010 amendments to the AKS, a claim tainted by kickbacks is per se false, regardless

---

[4] The AKS's reference to the common law definition of "employee" incorporates the "general common law of agency" to determine whether a sales representative qualifies as an employee or an independent contractor.  *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992); *United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (unpublished); *see also United States v. Job*, 387 F.App'x. 445, 455 (5th Cir. 2010) (unpublished).

[5] *Robinson* is instructive as to the relevant factors applicable to the subset of sales reps whom the Defendants improperly categorized as "employees," when they were, in fact, independent contractors:

> The evidence reflects that both Jones and Chavis were paid either a fee or a commission for each referral of a Medicare beneficiary that they provided to MMS. They did not receive regular paychecks; payments were made for referrals only. There was no evidence that Robinson provided any training or direction to either Jones or Chavis about marketing, nor was there any evidence that either Jones or Chavis ever received any payments from MMS to advertise or market MMS's products.  Moreover, the Medicare referrals were obtained from leads and sources that were not provided by MMS: Jones used her employer's database to obtain referrals, and Chavis relied on her own personal and professional contacts to obtain referrals.  There is no evidence that Robinson required Jones or Chavis to keep regular office hours.  Indeed, they did not have offices at MMS.  Thus, Robinson did not have sufficient control over the manner and means of the work performed by Jones and Chavis to characterize this as a bona fide employment relationship.

*Robinson*, 505 F. App'x at 387-88.

of any certification of compliance with the AKS, implied or otherwise."); *see also United States ex rel. Goodman v. Arriva Med., LLC*, No. 3:13-cv-0760, 2020 U.S. Dist. LEXIS 119678, at *28-29 (M.D. Tenn. July 8, 2020) ("the PPACA has rendered all claims resulting from AKS violations 'false or fraudulent claims' as a matter of law.").

The AKS does not require proof of "actual knowledge of the Anti–Kickback Statute or specific intent to violate it"; rather, it is sufficient to "prove that the defendant willfully committed an act that violated the Anti–Kickback Statute." *See United States v. St. Junius*, 739 F.3d 193, 210-11 (5th Cir. 2013) (affirming conviction under AKS for volume-based commission payments to independent contractors and holding that knowledge of the "Anti–Kickback Statute and its prohibitions" is "not required," and explaining that "[t]he prosecutor correctly explained that the Government need only prove that Ramos knowingly and willfully received commissions in exchange for referrals.").

### E. The EKRA

The EKRA makes it illegal to knowingly and willfully:

> (1) solicit[ ] or receive [ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a patient or patronage to a recovery home, clinical treatment facility, or laboratory; or
>
> (2) pay [ ] or offer [ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind [ ] to induce a referral of an individual to a recovery home, clinical treatment facility, or laboratory…

18 U.S.C. 220(a). The above prohibitions cover ***employees and independent*** contractors and are barred unless "payment is not determined by or does not vary by":

> (A) the number of individuals referred to a particular recovery home, clinical treatment facility, or laboratory;

(B) the number of tests or procedures performed; or

(C) the amount billed to or received from, in part or in whole, the health care benefit program from the individuals referred to a particular recovery home, clinical treatment facility, or laboratory.

18 U.S.C. 220(b).

## II.      THE RELATOR'S CLAIMS SHOULD NOT BE DISMISSED.

### A. The FAC plausibly pleads FCA violations.

The FAC sufficiently alleges violations of the FCA under Rule 12(b)(6).  The Defendants were required to comply with federal healthcare laws, including the AKS and EKRA, and certified their compliance when submitting claims for payment to Government Healthcare Programs.  FAC ¶¶ 4, 251-52, 309.  The Defendants mischaracterize the FAC by contending that it only alleges payment to sales reps based on sales profitability.  In fact, the FAC explicitly alleges that the Defendants paid independent contractor sales reps based on the volume of specimens referred, with profitability serving as an *additional* factor.[6]  FAC ¶¶ 115-18 ("the compensation model provided monetary rewards to sales reps in proportion to the ***volume of specimens*** they directed to Apollo Labs and Arbor, with profitability factoring into the ultimate commission payouts. . .  Commissions [ ] generally ranged from 20 to 40 percent of the revenue ***generated by each specimen*** they sent . . .") (emphasis added), 197, 238.

As discussed herein, federal courts uniformly recognize such compensation schemes as violations of the AKS and EKRA, and therefore actionable under the FCA.

---

[6] Defendants engage in sleight of hand by contending that payments tied to profitability do not violate the AKS.  Mot. at 2, 20.  But this argument sidesteps the critical fact that all sales reps were paid based on the volume of specimens they submitted – a practice unequivocally prohibited under both the AKS and EKRA.  FAC ¶¶ 115-18, 197, 238.  Profitability, far from serving as the determinative metric, was merely one factor in calculating reimbursement based on the ***type*** of testing performed.  FAC ¶ 118.

i.    **The AKS and EKRA prohibit the defendants' kickback scheme, and therefore the FAC plausibly pleads falsity.**

The FAC plausibly alleges that the Defendants violated the AKS and EKRA by paying sales reps prohibited remuneration.  The Defendants argue they could not have violated the AKS and EKRA because Relator "never plausibly claims that any sales representative was paid above fair market value" and therefore no "remuneration" was paid to sales reps.  This argument is factually and legally misplaced.

First, the FAC explicitly alleges that sales representatives were compensated above fair market value.  FAC ¶ 234-35 ("These kickbacks did not represent the fair market value of [sales rep] services . . .").

Second, to the extent Defendants argue that cash payments to sales reps at fair market value would negate conduct otherwise violative of the AKS, this position has been consistently rejected by courts, including those within the Fifth Circuit.  For instance, in *United States v. Marlin Med. Sols. LLC*, the Southern District of Texas rejected an FCA defendant's argument that they could not have violated the AKS because payments—purportedly for investments, speaker fees, and travel expenses -- were at fair market value:

> Rowe is incorrect.  The Fifth Circuit defines remuneration broadly, as "anything of value." [ ] And as the Government rightly notes, the question of whether remuneration is a kickback rests on whether it was ***intended to induce referrals***, not on its form. [ ] Importantly, "[t]he presence of a legitimate business purpose for the arrangement or ***a fair market value payment will not legitimize a payment*** if there is also an illegal purpose."

579 F. Supp. 3d 876, 892 (W.D. Tex. 2022) (internal citations removed) (emphasis added).  *See U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158, at *8 (S.D. Tex. June 12, 2014) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of ***anything of value in any form or manner whatsoever*** and that [t]he

9

statute's language makes clear that illegal payments are prohibited beyond merely bribes, kickbacks, and rebates . . .") (internal quotations removed) (emphasis added).  In other words, the Fifth Circuit considers anything of value, including cash payments to sales reps, to be "remuneration," and no fair market value evidence will be required.

The Defendants' reliance on cases like *Bingham v. HCA, Inc.* to support their interpretation of "remuneration" is misplaced.  The *Bingham* court addressed non-cash benefits such as leases and tax savings, where fair market value was relevant:

> Black's Law Dictionary defines "remuneration" in pertinent part as "[p]ayment; compensation." Remuneration, Black's Law Dictionary (11th ed. 2019). Compensation, in turn, cannot be given unless some sort of benefit is conferred. *See, e.g.,* Compensation, Black's Law Dictionary (11th ed. 2019) ("Remuneration and other benefits received in return for services rendered"). ***In a business transaction like <u>those at issue in this case</u>, the value of a benefit can <u>only</u> be quantified by reference to its fair market value.***

783 F. App'x 868, 873 (11th Cir. 2019) (emphasis added).  The analysis in *Bingham* does not apply to the cash payments alleged here.

Other cases cited by Defendants similarly involve non-cash transactions and are inapposite.  *See Bingham v. BayCare Health Sys.*, No. 8:14-CV-73-T-23JSS, 2016 WL 8739056, at *1 (M.D. Fla. Dec. 16, 2016) (parking and tax savings to physicians at medical office buildings – not cash); *U.S. ex rel. Fair Lab'y Pracs. Assocs. v. Quest Diagnostics Inc.*, No. 05 CIV. 5393 RPP, 2011 WL 1330542, at *1 (S.D.N.Y. Apr. 5, 2011) (offering medical testing

10

services for patients at below cost in order to receive referrals – not cash).[7]  Because the

Defendants paid sales reps cash kickbacks,[8] it is undisputable that they received "remuneration."

The Defendants next misstate the scope of the AKS by arguing it applies only to

payments for referrals of "individuals," when the statute ***also*** prohibits payments for "ordering

any good, facility, service, or item."  *See* 42 U.S.C. § 1320a-7b(b)(1)(B), (2)(B).  The FAC

alleges that the Defendants paid sales reps to solicit and receive testing specimens, thereby

violating the statute.  Indeed, courts have expressly rejected the Defendants' arguments limiting

the AKS's scope to direct patient referrals, recognizing that it applies to third-party contractors

compensated for recommending healthcare services, including laboratory services specifically.

---

[7] The Defendants' interpretation of "remuneration" is fundamentally flawed, compounded by their reliance on the definition provided in the parallel civil penalties statute, 42 U.S.C. § 1320a-7a.  As courts have recognized, that definition "is explicitly limited to the civil penalties section," and does ***not*** extend to 42 U.S.C. § 1320a-7b.  *See United States ex rel. Perri v. Novartis Pharms. Corp.*, No. CV 15-6547, 2019 WL 6880006, at *12 (D.N.J. Feb. 21, 2019).  Even assuming, *arguendo*, that the definition of "remuneration" in 42 U.S.C. § 1320a–7a(i)(6) were somehow applicable, it would only serve to ***broaden*** rather than narrow the term's meaning.  That statute clearly states "remuneration includes the waiver of coinsurance and deductible amounts" as well as "transfers of items or services for free or for other than fair market value."  *See* 42 U.S.C. § 1320a–7a(i)(6).  As the *Novartis* court correctly observed, the use of the word "includes" signals that the definition "is not limited to the subsequently enumerated examples."  *Novartis Pharms. Corp.*, 2019 WL 6880006, at *12.  Rather, "[u]nder the rules of statutory interpretation, the use of the phrasing 'includes ... transfers of items ... for other than fair market value' does not rule out other forms of remuneration."  *Id.*

[8] Confined to a footnote, the Defendants falsely claim that the Relator's original complaint contains no allegations of kickbacks (unlawful remuneration) paid to sales reps.  This assertion is plainly incorrect.  The original complaint specifically outlined the calculation methodology and the precise amounts that the kickbacks paid to sales reps – details that remain unchanged in both the original complaint and the FAC.  *Compare* Doc. No. 2 (Complaint) at ¶¶ 103-06, 172, 218 *with* FAC ¶¶ 115-18, 188, 238.  While the FAC adds further details regarding the degree of control that sales reps exercised over the destination of specimens, these additional facts do not alter the core allegations.  *See, e.g.,* Doc. 2 ¶ 272 ("Defendants submitted or caused submission of claims for payment to Government Healthcare Programs that were tainted by kickbacks to independent contractor sales reps who referred specimens that were tested and billed as claims.").

11

*See U.S. ex rel. Lutz v. Mallory*, 988 F.3d 730, 738 (4th Cir. 2021) (rejecting defendants' argument that "because BlueWave sales representatives did not directly refer [ ] tests to patients, Defendants cannot be liable under the Anti-Kickback Statute" and, citing 42 U.S.C. §§ 1320a-7b(b)(1)(B), (b)(2)(B), that prohibitions "include[ ] sales representatives who are compensated for recommending a healthcare service, like the [ ] tests, to physicians."). *See also United States v. Wilks*, No. CR 21-63-SDD-SDJ, 2023 WL 1978903, at *3 (M.D. La. Feb. 13, 2023) ("subsections B [ ] notably, do not contain the word 'individual.' Subsections B apply to anyone who pays or receives a payment for recommending the purchase of a good or service covered by a federal healthcare program. This includes third party contractors who are compensated for recommending a healthcare service, like laboratory testing, to physicians.") (urine and blood testing laboratory case); *see also United States ex rel. Langer v. Zimmer Biomet Holdings, Inc.*, No. CV 21-11293, 2024 WL 3633536, at *4 (D. Mass. Aug. 2, 2024) (the AKS's prohibitions cover "sales representatives who are compensated for recommending a healthcare service . . . to physicians.") (quoting *Mallory*, 988 F.3d at 738).[9]  Accordingly, the FAC plausibly alleges that

---

[9] Even assuming Defendants' unduly narrow focus on 42 U.S.C. § 1320a-7b(b)(1)(A) and (2)(A), they offer no substantive support for their argument that the referral of laboratory specimens tied to specific patients does not constitute the referral of an "individual" "for the furnishing or arranging for the furnishing of any item or service," as set forth in  42 U.S.C. § 1320a-7b(b)(1)(A), (2)(A).  In truth, as alleged, the Defendants received specimens tied to particular "individuals" and submitted, or caused the submission of, claims to the government for testing services linked to those same "individuals."  FAC ¶¶ 225, 231.  This interpretation is consistent with the Eleventh Circuit's rejection of the argument that a non-physician cannot "refer an individual" under § 1320a–7b(b)(2)(A).  *See United States v. Vernon*, 723 F.3d 1234, 1254 (11th Cir. 2013) (rejecting defendant's argument that Medfusion could not "*refer an individual*" under § 1320a–7b(b)(2)(A) simply because the individual making the referral was not a physician, holding: "the plain language of the statute is not limited to payments to physicians") (emphasis in original); *see also United States v. Polin*, 194 F.3d 863, 866 (7th Cir. 1999) (rejecting the argument that § 1320a-7b(b)(2)(A) and (B) address "different and non-overlapping" conduct, and affirming that defendant's contention that "only the physician is capable of making a referral" under 42 U.S.C. § 1320a-7b(b)(2)(A) is "clearly a perversion of the Act").

the Defendants violated the AKS by providing remuneration to sales reps in exchange for "ordering any good, facility, service, or item," 42 U.S.C. § 1320a-7b(b)(1)(B), (2)(B), and subsequently submitting false claims.

Courts have likewise dismissed the Defendants' "plain language" argument that a direct interaction between sales representatives and patients is necessary to constitute a violation of the EKRA. In *United States v. Schena*, the Northern District of California held that EKRA extends to scenarios where referrals are secured indirectly from physicians. 2022 WL 1720083, at *3-4 (N.D. Cal. May 28, 2022) (analyzing whether "EKRA applies to situations where a marketer obtains a referral of patients by securing them indirectly from physicians, rather than working with individual patients directly," and concluding it does). *Id.* Here, the FAC alleges that Defendants paid remuneration to sales reps to induce referrals to laboratories, thereby violating EKRA and submitting false claims after certifying their compliance with the statute.

The Defendants next contend that the AKS and EKRA do not prohibit the compensation arrangements in this case because, as they argue, "a plaintiff needs to provide some detail about how the sales representative improperly influenced those who make healthcare decisions," Mot. at 16. However, Defendants' reliance on *United States v. Marchetti*, 96 F.4th 818, 831 (5th Cir. 2024), is misplaced, as they misinterpret both the holding and its applicability to the FAC.

---

The Defendants' reliance on *United States v. Cooper* in a footnote is entirely misplaced and irrelevant to this case. 38 F.4th 428, 432–33 (5th Cir. 2022). In *Cooper*, the defendant was accused of ***allowing patients to refer themselves*** to doctors and pharmacies covered by Tricare in violation of § 1320a-7b(b)(2)(A). *Cooper*, 38 F.4th at 432 ("The government counters that the payments Cooper made to TRICARE beneficiaries were to induce them to *refer themselves* to doctors and pharmacies") (emphasis in original). The court ultimately applied ***the rule of lenity***, interpreting the statute in favor of the criminal defendant due to ambiguity in the language of § 1320a-7b(b)(2)(A). *Cooper*, 38 F.4th at 432-34 ("the rule of lenity would nevertheless break the tie in Cooper's favor."). In contrast, this civil case involves sales reps – controlled by the Defendants – determining where patient specimens would be sent. FAC ¶¶ 107-09, 210, 231. Thus, *Cooper's* reasoning is inapplicable here.

In *Marchetti*, the Fifth Circuit addressed a scenario analogous to this case: where a "[m]edical service provider pays [a] salesman, [and a] salesman makes [the decision] about [the] service provider, [and the] salesman is never overruled." *See Marchetti*, 96 F.4th 818 at 827-28. Under such circumstances, the court affirmed that ***a violation of federal healthcare laws may be found***. *Id.* ("Considering all the evidence, a rational trier of fact could infer that Marchetti knew that redirection of referrals to Althea violated the AKS.") (affirming conviction). The court further clarified that establishing a violation only requires showing that the sales rep influenced the "selection of services," which may occur through methods such as "exploit[ing] [ ] personal access." *See id.* at 826 n.6 (5th Cir. 2024) (citing and quoting *United States v. Shoemaker*, 746 F.3d 614, 629 (5th Cir. 2014)).

This interpretation is consistent with other circuit and district court decisions addressing the applicability of AKS and EKRA to sales representatives compensated for recommending healthcare services. For instance, the Fourth Circuit in *Mallory* held that the AKS encompasses "sales representatives who are compensated for ***recommending*** a healthcare service, like the [blood] tests, to physicians." 988 F.3d 730, 738 (4th Cir. 2021) (emphasis added). Similarly, in *Wilks* and *Zimmer Biomet* the courts applied these prohibitions to "third party contractors who are compensated for ***recommending*** a healthcare service, like laboratory testing, to physicians." 2023 WL 1978903, at *3 (emphasis added); *Zimmer Biomet*, 2024 WL 3633536, at *4 (same). No "improper influence" is required beyond the impropriety of sales reps receiving illegal remuneration for directing specimens to the Defendants.

The Defendants ignore that the FAC explicitly alleges that sales reps were ***not paid to market*** Apollo's and Arbor's services, but were instead ***paid based upon the volume of specimens*** they funneled to Apollo and Arbor, because sales reps exercised sufficient influence

and/or control over where testing was sent, as illustrated by the Defendants' preference for targeting sales reps with existing books of business that could be quickly redirected in exchange for kickbacks.  FAC ¶¶ 107-09, 128-30, 170, 234.  This is sufficient to state a violation.  *See Shoemaker*, 746 F.3d at 629 ("Garner was not asking for a brochure bearing his company's name to be distributed to TLMC staff; rather, enough evidence showed that he wanted Chandler to exploit his personal access [to referral sources] and to ensure that [they] favored Garner's company when it chose nursing services.  ***This conduct is an archetypal example of the undue influence prohibited by the statute***.") (emphasis added).[10]  Indeed, as detailed in the FAC, the Defendants preferred to retain sales reps with established books of business to direct to Apollo and Arbor for this very reason.  FAC ¶ 170.  *See also Shoemaker*, 746 F.3d at 629 (noting that a "relevant decisionmaker' status is not "an independent, substantive requirement of the statute," and finding that to require such "would be tantamount to re-writing the statutory text . . .").  The FAC further alleges that David Key directed the Relator to withhold initial payments to sales reps until a sufficient volume of specimens were funneled to Apollo and Arbor.  FAC ¶ 153.

The Defendants' contention that the FAC merely alleges an improper compensation structure to sales reps' contracts, and "nothing else" (Mot. at 16-17), egregiously mischaracterizes the FAC.  Not only does the FAC set forth that sales reps were provided a *quid pro quo* of money in exchange for specimens that were actually tested and billed to the government, but also that such sales reps were in-fact paid based on the volume of such testing actually ***billed successfully to the government***.  FAC ¶¶ 214-16, 212-13, 237.  It further

---

[10] There is no requirement, as the Defendants suggest, that they must "improperly corrupt[ ]" the decision-making of medical services providers.  Mot. at 16.  The only requirement is that illegal remuneration be paid to those who exercise sufficient influence over the ordering of items or services.  *See generally United States v. Shoemaker*, 746 F.3d 614, 629 (5th Cir. 2014).

specifies the amounts of compensation paid by the Defendants as a result of false claims reimbursed by the Government Healthcare Programs during particular time periods. FAC ¶¶ 188, 214, 226, 230. Rather than addressing these factual allegations, which must be accepted as true on a motion to dismiss, the Defendants state in conclusory fashion that sales reps were merely "providing marketing services." In reality, the "role of the sales reps was limited to referring specimens [and] they were not paid to promote Apollo Labs or Arbor in any marketing capacity." FAC ¶ 128. Instead, they were paid for directing testing to Apollo and Arbor and were only paid after the testing was reimbursed. FAC ¶¶ 107-08, 117, 153, 230. *See GF Indus. of Missouri, LLC v. Lehigh Valley Genomics, LLC*, No. CV 22-227, 2024 WL 1889797, at *14 (E.D. Pa. Apr. 30, 2024) ("courts have distinguished between an 'intent to induce 'referrals,' which is illegal, and the intent to compensate advertisers, which is permissible.") (*citing United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014)).

Accordingly, the FAC clearly pleads violations of the AKS and EKRA, and by extension, falsity. *See, e.g., United States v. Catholic Health Initiatives*, 312 F.Supp.3d 584 (S.D. Tex. 2018) (holding that legal falsity can be implied when a party submits a claim to the government while failing to disclose violations of statutes, regulations, or contract requirements that are material conditions of payment).

> ### ii. The FAC plausibly alleges that the Defendants acted with the requisite scienter.

The FAC plausibly alleges that the Defendants acted with the requisite scienter, making dismissal at this stage inappropriate. Despite the Defendants' selective excerpting of case law, the terms "knowing" and "knowingly" are defined by the FCA to include: (1) "actual knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the information;" or

(3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). Importantly, the statute does "[not require] proof of specific intent to defraud." *Id*.

First, Defendants argue that there can be no scienter where no underlying violation of the AKS or EKRA exists. However, as discussed above, the Defendants' conduct here is "an archetypal example of the undue influence prohibited by the statute," as shown in numerous similar cases. *See United States v. Shoemaker*, 746 F.3d 614, 629 (5th Cir. 2014); *Mallory*, 988 F.3d 730; *Schena*, 2022 WL 1720083 at *3-4 (recognizing that indirect laboratory referrals fall within the scope of EKRA). The existence of underlying violations of the AKS and EKRA therefore precludes the Defendants' argument.

Second, the Defendants appear to argue that the AKS and EKRA are ambiguous, suggesting that such ambiguity negates the possibility that they acted knowingly. This argument is both legally incorrect and inconsistent with the factual allegations in the FAC. The FAC clearly demonstrates Defendants acted with "actual knowledge," "in deliberate ignorance of the truth or falsity," or "in reckless disregard of the truth or falsity" regarding whether the claims they submitted were false due to violations of the AKS and EKRA. *See* 31 U.S.C. § 3729(b); *United States v. Bollinger*, 775 F.3d at 261 (holding that "knowledge may be pled generally" and it is reversable error to draw inferences of knowledge in favor of the Defendants at the pleading stage); *Shipyards, Inc.*, 775 F.3d 255, 261 (5th Cir. 2014).

For example, the FAC includes specific allegations that the Defendants were aware of and approved the volume- and profits-based kickbacks paid to sales reps during their regular meetings at Korenvaes Management. FAC ¶¶ 254-59. The FAC also details that the Defendants understood their compensation arrangements with independent contractor sales reps, and that such payments were contingent upon successful billing. FAC ¶¶ 256, 264-67. Further,

17

Defendants knew that the AKS and EKRA prohibited such commission-based payments, yet they did not return money unlawfully obtained money from Government Healthcare Programs, nor did they comply with the law when doing so would have undermined profitability.  FAC ¶¶ 256-60.  Notably, after instructing the Relator to convert sales reps to W-2 employee status to facially comply with the law and stave off the government, the Defendants reverted the sales reps back to independent contractor status, further evidencing scienter.  FAC ¶¶ 184, 190-195, 259.

This substantial circumstantial evidence is more than sufficient to support the FAC's allegations that the Defendants acted with requisite scienter.  *See United States v. Bollinger Shipyards, Inc*., 775 F.3d at 261 (reversing and remanding dismissal of FCA claim because "the district court did not consider the circumstantial evidence and general allegations of Bollinger's knowledge and intent."); *United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 160 (2d Cir. 2024) (discussing how concealment is probative of scienter); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004) (denying motion to dismiss where defendant did not directly submit fraudulent claims but was aware that its kickback scheme would lead a third party to submit false claims to government) (defendant "created and pursued a marketing scheme that it knew would, if successful, result in the submission by Mercy and others similarly situated of compliance certifications required by Medicare that Zimmer knew would be false.").

### iii.    The FAC plausibly alleges causation.

The Defendants persist in misconstruing both the allegations in the FAC and the applicable law in their assertion that the FAC fails to sufficiently plead causation.  As an initial matter, the Defendants improperly rely on non-binding case law outside of the Fifth Circuit to argue that but-for causation is required.  In reality, the Fifth Circuit has explicitly ***rejected*** a strict but-for causation standard, instead favoring a more relaxed proximate cause test, which focuses

on the "scope of risk and foreseeability" of the result. *See United States v. Hodge*, 933 F.3d 468, 475 (5th Cir. 2019), as revised (Aug. 9, 2019) (noting that proximate cause "is a common-law concept focused on the scope of risk and foreseeability."), *cert denied*, 141 S. Ct. 131.

In the context of Medicare kickback causation, the U.S. District Court for the Western District of Texas has embraced the "substantial factor" test:

> [I]f the government proves that a kickback arrangement existed and that the kickback arrangement was ***a substantial factor*** in bringing about [a party's] submissions to Medicare and that [the] submissions were a normal consequence of the situation created by the kickback arrangement," a defendant may be found to have "caused" the submissions.

*United States ex rel. Wheeler v. Union Treatment Centers, LLC*, No. CV SA-13-CA-4-XR, 2019 WL 571349, at *5 (W.D. Tex. Feb. 12, 2019) (quoting *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24 EAJ, 2012 WL 4344199, at *8 (M.D. Fla. Sept. 21, 2012)) (emphasis added). Indeed, the Western District of Texas has explicitly rejected the reasoning of the primary authority on which the Defendants rely, *United States ex rel. Cairns*:

> This Court is neither bound nor persuaded by the Eighth Circuit's reasoning [in *United States ex rel. Cairns*], which has been rejected by numerous courts. *See, e.g.*, *United States ex rel. Greenfield v. Medco Health Sols., Inc.*,880 F.3d 89 (3d Cir. 2018); *United States ex rel. Fitzer v. Allergan, Inc.*, No. 1:17-cv-00668-SAG, 2022 WL 3599139, at *10 (D. Md. Aug. 23, 2022) ("This Court declines to adopt the but-for cause standard endorsed by Cairns[.]"); *United States ex rel. Everest Principals, LLC v. Abbott Labs.*, Inc., No. 3:20-cv-286-W(AGS), 622 F.Supp.3d 920, 933-34 (S.D. Cal. Aug. 18, 2022) (acknowledging the split of authority, but requiring only a "'link' at this stage of the proceedings").

*United States v. Prof'l Compounding Ctrs. of Am.*, 664 F. Supp. 3d 722, 741 n.4 (W.D. Tex. 2023). Thus, under 42 U.S.C § 1320a-7b(g), the Relator need only allege that illegal remuneration was a "substantial factor" in causing false claims.

Here, the FAC sufficiently alleges that the volume- and profits-based commission arrangements (*i.e.*, kickbacks) were a "substantial factor" in inducing sales reps to refer

specimens they directed to Apollo and Arbor, with the resulting submissions being both

"proximate" and "foreseeable."  FAC ¶ 107-09, 117, 153, 210, 230-31.  Moreover, even under

the stricter but-for causation standard incorrectly advanced by the Defendants, the FAC would

still suffice.  The Defendants' promise and payment of volume-based commissions (*i.e.,*

kickbacks) to sales reps was the but-for cause of such specimens being falsely billed to

Government Healthcare Programs.  *Id.*

The Defendants also erroneously argue that the Relator must allege knowledge that sales

reps were the "but-for cause of the decision of independent physicians" to "make referrals of

patient specimens," including knowledge of "kickback[s] between healthcare providers and sales

representatives."  Mot. at 16, 20.  This argument misrepresents the requirements of the AKS.

Contrary to the Defendants' contentions, the AKS does not require that kickbacks be paid

directly physicians or that physicians' decision-making be "corrupted" to constitute a violation.

Instead, it suffices to allege that remuneration was exchanged for recommending items, services,

or patients.  *See Mallory*, 988 F.3d at 738 (holding that the AKS prohibits remuneration for

"***arranging for or recommending purchasing***" healthcare services, which includes

compensating sales representatives for recommending healthcare services) (emphasis added);

*Vernon*, 723 F.3d at 1254 (11th Cir. 2013) (noting that "the plain language of the statute is not

limited to payments to physicians").  Accordingly, the FAC adequately pleads causation.

The Defendants' arguments specific to Korenvaes Management, LLC, David Key, Brian

Oliver, and Max Korenvaes fare no better.  As detailed in the FAC, these Defendants took

affirmative actions to approve sales rep contracts, including adjusting compensation percentages

for high performers, discussing and disregarding regulatory risks associated with retaining

independent contractor sales reps, and approving and facilitating payments to these sales reps as

kickbacks.  FAC ¶¶ 256-60, 265-67.  These actions further substantiate the causation allegations and demonstrate the Defendants' central role in the kickback arrangements.

**B.  The FAC plausibly pleads a conspiracy claim.**

The FAC sufficiently pleads a conspiracy claim against the Defendants.  To establish a conspiracy under the FCA, Relators must demonstrate: (1) "the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government]" and (2) "at least one act performed in furtherance of that agreement."  *United States ex rel. Reddell v. DynCorp Int'l, LLC*, No. 1:14-CV-86, 2019 WL 12875471, at *15 (E.D. Tex. Mar. 20, 2019).  Notably, Relators are not required to detail how the agreement was formed but only to allege facts permitting the Court to reasonably infer its existence.  *Id.* (noting that "Relators are not required to show how the agreement came to be, only that it existed," and, at the pleading stage, factual allegations are sufficient if the Court may "infer that Defendants had an agreement to engage in the fraudulent courses of conduct.").

Here, the FAC alleges in detail that the Defendants conspired to submit legally false claims to the Government.  The Court may infer the existence of an agreement from the fact that the Defendants collectively determined key policies at the offices of Korenvaes Management, including the decisions to pay commissions to independent contractors and to disregard compliance with applicable laws.  FAC ¶¶ 256-60, 265-67, 301-06.  *See United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 659 (N.D. Tex. 2020) ("There is no serious question that the Complaint adequately alleges that the Defendants had an agreement; the Complaint is replete with examples of the Defendants working together to achieve their ends.").[11]

---

[11] For the reasons discussed in prior sections, the Defendants' argument that the Relator's conspiracy claim fails due to an alleged lack of a plausible FCA violation is without merit.  The FAC clearly pleads an FCA violation, supported by underlying violations of the AKS and EKRA.

Defendants' reliance on the intracorporate conspiracy doctrine to evade liability is unavailing.  While the doctrine posits that "a legal entity cannot conspire with its officers or agents" (*Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir.1994)), it does not shield defendants who conspire with entities or individuals outside of ***the same legal structure***.  *Medoc*, 470 F. Supp. at 659 (rejecting the application of the doctrine when a complaint alleged that corporate defendants conspired with external entities) ("The Defendants ignore, however, that the Complaint also alleges that the Medoc Defendants conspired with others [ ] such as the Total RX Defendants").

Here, the FAC alleges facts demonstrating that not all Defendants operated under a single legal entity.  For instance, while individuals like David Key and entities such as Apollo Labs may have exercised control over ALS, the FAC alleges that several defendants, including Korenvaes Management and other individuals, maintained distinct corporate identities.  *See* FAC, Exhibit 1.  These allegations preclude a finding that the intracorporate conspiracy doctrine applies at this stage.  See *Medoc*, 470 F. Supp. 3d at 659.

Even assuming the doctrine could theoretically apply, several well-established exceptions undermine its applicability here.  One exception arises when conspirators possess "an independent stake in achieving the object of the conspiracy." *Collins v. Bauer*, No. 3:11-CV-00887-B, 2012 WL 443010, at *7 (N.D. Tex. Jan. 23, 2012), *report and recommendation adopted*, No. 3:11-CV-00887-B, 2012 WL 444014 (N.D. Tex. Feb. 10, 2012) (citing *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 244 (5th Cir.1978).  In this case, the FAC demonstrates that the stakes of the Defendants differ significantly.  For example, Korenvaes Management, an SEC-registered investment adviser (*see* FAC ¶ 40), has distinct motivations compared to Apollo and Arbor, which operate as medical laboratories (*see* FAC ¶¶ 21, 34).

Similarly, individual defendants with ownership interests in certain corporate entities stand to benefit disproportionately from the alleged conspiracy. *See* Certificate of Interested Persons/Disclosure Statement (Doc. No. 44).

Another exception exists when "conspirators are acting for their own personal purposes." *Collins*, 2012 WL 443010, at *7. As alleged, Korenvaes Management's decisions were driven by objectives separate from those of the medical laboratories and their personnel. At a minimum, these allegations raise factual questions that preclude dismissal of the conspiracy claim based on the intracorporate conspiracy doctrine. Accordingly, the FAC plausibly alleges a conspiracy claim.

### C. The FAC satisfies Rule 9(b)'s pleading requirements.

The FAC presents extensive factual allegations that comfortably satisfy the heightened pleading requirements of Rule 9(b).

The Fifth Circuit has clarified that Rule 9(b)'s requirements, particularly in the FCA context, are not rigid but instead remain flexible to accommodate the statute's remedial purposes. As the court explained, the requirement to plead the "time, place, contents, and identity" of the alleged fraud "is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act." *See United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 371-72 (5th Cir. 2017) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009)) (internal quotations removed). To withstand a motion to dismiss under 9(b), a relator need only "alleg[e] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* (reversing and remanding after finding the lower court had applied "too rigid an application of Rule 9(b)" to an FCA claim). Moreover, the Fifth Circuit has

emphasized "[k]nowledge need not be pled with particularity under Rule 9(b); it need only be pled plausibly pursuant to Rule 8." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d at 260.

Here, the FAC plainly alleges that Defendants knowingly engaged or assented to engaging sales reps to channel blood and toxicology specimens to Apollo and Arbor. In exchange for these referrals, Defendants paid these sales reps *quid pro quo* kickbacks based on referral volume after receiving payments from Government Healthcare Programs. FAC ¶¶ 117, 212-13, 256-60, 265-67, 301-06. The FAC also delineates the roles of the Defendants in this scheme. Apollo, ALS, Arbor, Double Helix, Brian Oliver, and David Key (and those acting at Key's direction) worked directly with sales reps to solicit, process, approve, and remit kickbacks. FAC ¶¶ 21-22, 26-29, 34, 38-39, 48-50, 55-57, 117, 212-13. Meanwhile, other Defendants, such as Korenvaes Management and Max Korenvaes, participated in meetings at Korenvaes Management's offices where they facilitated and approved the scheme, including the deliberate decision to reclassify sales reps as independent contractors despite knowledge that such arrangements violated the AKS. FAC ¶¶ 45-47, 59-60, 256-60, 265-67, 301-06.

The FAC easily meets Rule 9(b)'s requirement to provide "reliable indicia that lead to a strong inference that claims were actually submitted." *Colquitt*, 858 F.3d at 371-72. Under the Defendants' kickback scheme, sales reps were compensated only after claims were submitted. FAC ¶¶ 115-17. The FAC identifies specific sales reps who were paid commissions for specimens they directed to Apollo and Arbor, as well as millions of dollars in Government Healthcare Program reimbursements tied to these specimens. FAC ¶¶ 212-16, 230-31. This includes, for example, a spreadsheet that identifies specific "patient claims ID numbers, testing entities, the providers submitting the specimen, claim and charge numbers, patient details, insurance information, payment amounts, and payment dates." FAC ¶ 231. The fact that these

sales reps were paid for successfully billed claims does more than create a "strong inference" that the claims were submitted to the government – it conclusively demonstrates that kickbacks were paid based on the volume of specimens directed.  FAC ¶¶ 153, 212-16, 230-31.

Defendant's recurring argument that the FAC is deficient because it fails to allege that sales reps "exercise[d] unlawful influence over a referral decision" fundamentally misrepresents the law.  The AKS prohibits referrals of items and services, including laboratory testing, in exchange for volume-based commissions.  *See Marchetti*, 96 F.4th at 831 (holding that an arrangement where "[m]edical service provider pays salesman, salesman makes choice about service provider, salesman is never overruled" violates the AKS) (affirming conviction); *Shoemaker*, 746 F.3d at 629.  *See also Lutz*, 988 F.3d 730 (prohibitions "include[ ] sales representatives who are compensated for recommending a healthcare service, like the [blood] tests, to physicians."); *Wilks*, 2023 WL 1978903, at *3 ("Subsections B apply to anyone who pays or receives a payment for recommending the purchase of a good or service covered by a federal healthcare program.  This includes third party contractors who are compensated for recommending a healthcare service, like laboratory testing, to physicians.").

Thus, the FAC not only satisfies Rule 9(b)'s requirements but also provides compelling factual allegations that substantiate Defendants' violations of the AKS and FCA.

## III.    CONCLUSION.

For the reasons set forth in detail above, the Relator respectfully requests that the Court deny the Motion.  Should the Court be inclined to grant the Motion in whole or in part, the Relator respectfully requests the opportunity to replead, as necessary.

Date:  November 25, 2024                    Respectfully submitted,

**Rayburn "Alex" Thompson III**

By his Attorneys,

*/s/  Evan A. Johnson*
Christopher R. O'Hara (BBO #548611)
*Admitted Pro Hac Vice*
Seth J. Robbins (BBO#655146)
*Admitted Pro Hac Vice*
Evan A. Johnson (BBO #699582)
*Admitted Pro Hac Vice*
Todd & Weld LLP
One Federal Street
Boston, MA 02110
(617) 720-2626
cohara@toddweld.com
srobbins@toddweld.com
ejohnson@toddweld.com

Jeffrey A. Newman, Esq.
Massachusetts BBO # 370450
Jeffrey Newman Law
One Story Terrace
Marblehead, Ma. 01945
Tel: 617-823-3217
Fax: 781-639-8688
Jeff@JeffNewmanLaw.com
*Admitted Pro Hac Vice*

Cory S. Fein
Texas Bar No. 06879450
CORY FEIN LAW FIRM
712 Main Street, Suite 800
Houston, TX 77002
(281) 254-7717
(530) 748 - 0601 (fax)
cory@coryfeinlaw.com

26