# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX REL. RAYBURN ALEX THOMPSON; | §<br>§<br>§ | |
| STATE OF TEXAS EX REL. RAYBURN ALEX THOMPSON; | §<br>§<br>§ | Civil Action No. 3:20-cv-02917-D |
| STATE OF OKLAHOMA EX REL. RAYBURN ALEX THOMPSON; | §<br>§<br>§ | *JURY TRIAL DEMANDED* |
| STATE OF TENNESSEE EX REL. RAYBURN ALEX THOMPSON; | §<br>§<br>§ | <u>RELATOR'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u> |
| COMMONWEALTH OF MASSACHUSETTS EX REL. RAYBURN ALEX THOMPSON | §<br>§<br>§<br>§ | |
| **Plaintiff – Relator** | §<br>§ | |
| v. | §<br>§ | |
| APOLLO PATH, LLC D/B/A APOLLO LABORATORIES; APOLLO LABORATORIES SERVICES, LLC; ARBOR DIAGNOSTICS, INC.; DOUBLE HELIX MANAGEMENT, LLC; KORENVAES MANAGEMENT, LLC; DAVID KEY; BRIAN OLIVER; and MAX KORENVAES | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| **Defendants.** | §<br>§<br>§<br>§<br>§ | |

---

## FALSE CLAIMS ACT FIRST AMENDED COMPLAINT
## <u>AND DEMAND FOR JURY TRIAL</u>

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................... 4

II.    JURISDICTION AND VENUE ................................................................. 6

III.   FILING UNDER SEAL ............................................................................ 7

IV.    PARTIES ................................................................................................... 7

       A.     Relator Rayburn "Alex" Thompson III ......................................... 7

       B.     Defendant Apollo Laboratories Services, LLC ............................ 8

       C.     Defendant Apollo Path, LLC D/B/A Apollo Laboratories .......... 9

       D.     Defendant Arbor Diagnostics, Inc. ............................................. 10

       E.     Defendant Double Helix Management, LLC ............................... 10

       F.     Defendant Korenvaes Management, LLC ................................... 11

       G.     Defendant David Key .................................................................. 13

       H.     Defendant Brian Oliver ............................................................... 13

       I.     Defendant Max Korenvaes .......................................................... 14

V.     RELEVANT LAW ................................................................................. 14

       A.     The False Claims Act ................................................................. 14

              i.     Federal False Claims Act ................................................. 14

              ii.    Texas Medicaid Fraud Prevention Act ............................ 16

              iii.   The Oklahoma Medicaid False Claims Act ..................... 19

              iv.    The Tennessee False Claims Act and Medicaid False Claims Act ............... 19

              v.     The Massachusetts False Claims Act .............................. 21

       B.     The Medicare Program ............................................................... 21

       C.     The Medicaid Program ............................................................... 22

       D.     The TRICARE Program .............................................................. 22

       E.     The VA Program ......................................................................... 23

       F.     The Anti-Kickback Statute ......................................................... 23

       G.     The Eliminating Kickbacks in Recovery Act of 2018 ............... 26

       H.     The Common Law Test for an Employee-Employer Relationship ........ 26

       I.     Liability for Parent Companies and Controlling Companies ................... 27

VI.    DEFENDANTS' WRONGDOING ......................................................... 28

       A.     The Relator Observed Defendants Compensating Independent Contractor Sales
              Representatives in Violation of the AKS ..................................... 28

              i.     The Relator was responsible for retaining and coordinating with ALS sales
                     reps to facilitate the transfer of specimens to Apollo and Arbor in exchange
                     for commissions ................................................................ 28

      ii.     ALS sales reps were independent contractors. ............................................. 32

      iii.    David Key expressed concerns to the Relator regarding the significant legal risks involved, which the Defendants knowingly disregarded for their own financial gain........................................................................................... 39

   B.   Illegal Kickbacks Paid to ALS Sales Reps Based On Specimen Volume.............. 41

   C.   Violations of the EKRA and AKS by Arbor, Apollo Labs, and ALS Resulting in the Submission of False Claims to Government Healthcare Programs. ........................ 48

   D.   Korenvaes Management, David Key, Brian Oliver, and Max Korenvaes Orchestrated, Controlled, and Actively Engaged in the Scheme............................. 50

      i.     Through Korenvaes Management, the individual Defendants controlled the business operations and financial maneuvers of the Defendant entities, including the calculated decision to violate the AKS and EKRA. ............. 50

      ii.    The Defendants' operations and finances were deeply interconnected, particularly with regard to the retention, utilization, and payment of ALS sales reps. ....................................................................................... 52

VII.    CAUSES OF ACTION ............................................................................. 58

VIII.   CONCLUSION AND PRAYER FOR RELIEF ............................................... 67

IX.    DEMAND FOR JURY TRIAL ...................................................................... 69

# I.   INTRODUCTION

1.      This is a case about two medical laboratory startups that, in their desperation to carve out a share of the competitive healthcare market, flagrantly embraced illegal kickback schemes.  Their financiers, entrenched in the cutthroat world of private equity, brazenly prioritized profits over legality, resorting to unlawful kickbacks with independent contractors in a reckless attempt to maximize profits.  In healthcare, these kickback schemes are not just unethical – they are the legal "third rail," a bright line that ethical providers dare not cross.  Yet the architects of these laboratories, driven by sheer greed, trampled this legal boundary.  The Defendants wagered that they could exploit the system, fraudulently billing Medicare, Medicaid, and other payers for services obtained through unlawful means.  As with most schemes rooted in deception, it was only through the courage of an insider that this fraud was finally brought to light.

2.      At the heart of this action is Defendants' deliberate strategy of engaging independent contractor sales representatives ("sales reps") to procure blood and toxicology specimens for testing at Apollo Path, LLC d/b/a Apollo Laboratories ("Apollo Labs"), and its "sister lab," Arbor Diagnostics, Inc. ("Arbor").  The Defendants paid these sales reps with commissions based on the volume and profitability of specimens funneled to Apollo and Arbor.  This practice was a knowing violation of anti-kickback laws, which prohibit illegal remuneration schemes involving independent contractors rather than employees.  The law draws this line to prevent waste, fraud, and abuse – conditions that inevitably flourish in such unregulated arrangements.  However, such Defendants tried to camouflage their conduct through artful reclassification of these sales reps on paper, their true status as independent contractors renders the entire operation unlawful.

3.      The Defendants' policy of soliciting, contracting with, and compensating commissioned independent contractor sales reps rendered Apollo Labs' claims for payment legally false. These claims – submitted to Medicare, Medicaid, Tricare, and the Veterans Administration ("VA") (collectively, "Government Healthcare Programs") – were tainted by illegal remuneration under the AKS. The Defendants' claims to Government Healthcare Programs were similarly rendered legally false due to their violations of the EKRA irrespective of how their employment status was formally labelled.

4.      The Defendants' false claims to Government Healthcare Programs is rooted in Defendants' false certifications of compliance with applicable federal and state law required to submit CMS-1500 claims forms or their electronic equivalents for laboratory services. Defendants and their agents knowingly falsely certified compliance because they knowingly conspired to and did in fact solicit, pay, and/or approve the payment of volume- and profit-based commissions to Apollo Laboratories Services, LLC ("ALS") independent contractor sales reps in violation of the AKS and/or EKRA.

5.      The misconduct alleged in this complaint began no later than 2015, when Apollo Labs launched its operations, and persisted through December 2019 when the Relator stopped working for the Defendants. Based on information and belief, this unlawful activity continues unabated to the present day.

6.      The Relator brings this action against Apollo Labs, ALS, Arbor, Double Helix Management, LLC ("Double Helix"), Korenvaes Management LLC ("Korenvaes Management"), David Key, Brian Oliver, and Max Korenvaes (collectively, the "Defendants") to recover damages and civil penalties for violations of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., the Medicare and Medicaid Anti-Kickback Statute ("AKS"), 42 U.S.C. §§

1320a-7a and 1320a-7b, the Eliminating Kickbacks in Recovery Act of 2018 ("EKRA"), 18

U.S.C. § 220, the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, the

Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053.1(B), the Tennessee False

Claims Act, TN Code § 4-18-103(a), the Tennessee Medicaid False Claims Act, TN Code § 71-

5-181, and the Massachusetts False Claims Act, M.G.L. c. 12, §§ 5B(a)(1)-(10).

## II.   JURISDICTION AND VENUE

7.     This action arises under the FCA, 31 U.S.C. § 3729 *et seq*., the EKRA, 18 U.S.C.

§ 220, and the AKS, 42 U.S.C. §§ 1320a-7a and 1320a-7b. This Court has jurisdiction over this

case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to

28 U.S.C. § 1345 and 28 U.S.C. § 1331. Supplemental jurisdiction for any non-federal claims

arise under 28 U.S.C. § 1367, since these claims are so related to the federal claims that together

they form part of the same case or controversy under Article III of the U.S. Constitution.

8.     At times material to the time frames set forth in this Complaint, all Defendant

business entities regularly conducted substantial business within the State of Texas, generating

significant revenue within the State of Texas, and Reside in the State of Texas.  At times material

to the time frames set forth in this Complaint, all Defendant individuals regularly conducted

substantial business within the State of Texas, made and/or are making significant revenue

within the State of Texas, and/or Reside in the State of Texas.  All Defendants are thus subject to

personal jurisdiction in the State of Texas.

9.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because, at times

material to the time frames set forth in this Complaint, the Defendants conducted and conduct

business throughout this District.

### III.    FILING UNDER SEAL

10.    Under the FCA, the original Complaint was filed in camera and remained under seal for a period of at least sixty (60) days and was not served on Defendants until this Court ordered service of the Complaint.

11.    As required by the FCA and relevant state statutes, on or around the date that the original Complaint was filed, the Relator voluntarily submitted, prior to the filing of the original Complaint, a confidential pre-filing disclosure statement (subject to the attorney-client, work product and common-interest privileges) to the Government containing materials, evidence, and information in their possession pertaining to the allegations contained in this Complaint.

12.    The Relator is an original source of the information underlying this Complaint and that information has been provided to the Government prior to filing this Complaint. The Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government.

13.    To the Relator's knowledge, the information underlying the allegations and transactions in Relator's original Complaint have not otherwise been publicly disclosed.

### IV.    PARTIES

14.    The real parties in interest as Plaintiffs are the United States of America, the State of Texas, State of Oklahoma, State of Tennessee, and the Commonwealth of Massachusetts.

15.    A diagram illustrating the relationship between the parties and associated entities and persons is appended as Exhibit 1. *See* Exhibit 1.

### A. Relator Rayburn "Alex" Thompson III

16.    Relator Rayburn "Alex" Thompson III is a resident of the state of Tennessee. Between January 2016 to December 2019, he served as Vice President of Marketing and

Channel Sales at Apollo Labs. In this capacity, he performed a variety of human resources functions related to ALS sales reps: finding prospective sales reps, retaining sales reps and sending and receiving their contracts, preparing payroll, and creating sales rep commission reports. Additionally, he handled human resource matters for Arbor and other entities under the control of Korenvaes Management, often liaising with their personnel regarding payroll matters for Apollo Labs, ALS, and Arbor.

17.     As of the filing of the original Complaint, the Relator had approximately eight years of experience in the medical laboratory industry. Prior to his role at Apollo Labs, he served as a Channel Sales Manager for General Genetics Corporation from July 2013 to September 2015, performing human resource functions for sales representatives related to genetics testing. Before that, from April 2012 to March 2013, he worked for another laboratory, Solstas Lab Partners. The Relator holds a bachelor's degree in political science and geography from the University of Tennessee, Knoxville.

### B. Defendant Apollo Laboratories Services, LLC

18.     Defendant ALS is a Texas limited liability company with a principal place of business at 3824 Cedar Springs Road #110, Dallas, Texas 75219. ALS is wholly owned and managed by a holding company, AP Lab Investments LLC, which also wholly owns and manages Apollo Labs.

19.     Brian Oliver serves as the CFO of ALS.

20.     David Key holds the title of Partner at ALS and oversees the company's operations, including the compensation structure for ALS sales reps, effectively functioning as its Chief Operating Officer.

21.     ALS solicits and contracts with independent contractor sales reps, compensating them, in part, based on the volume and profits generated from specimen testing referred to Apollo Labs or Abor.  In exchange for such illegal commissions ALS sales reps directed specimens to Apollo Labs, which then billed Government Healthcare Programs for testing services.  ALS sales reps were similarly paid commissions for specimens referred to Arbor for testing, which were billed to private insurance companies, violating the EKRA.

22.     The Relator, under the direction of the Defendants' directors, officers, and stakeholders, including David Key and Brian Oliver, directly managed ALS sales rep agreements and commissions from January 2016 to December 2019.

**C. Defendant Apollo Path, LLC D/B/A Apollo Laboratories**

23.     Defendant Apollo Labs is a Texas limited liability company with a principal place of business at 3824 Cedar Springs Road #110, Dallas, Texas 75219.  Defendant Apollo Labs is wholly owned by a holding company, AP Lab Investments LLC, which also wholly owns and manages ALS.

24.     Max Korenvaes is the CEO and manager of Apollo Labs.

25.     Brian Oliver is the CFO of Apollo Labs.

26.     Apollo Labs specializes in urine toxicology and clinical testing of blood, serum, and plasma specimens, receiving test specimens from physicians across the country via ALS sales representatives, as well as from Arbor.

27.     Apollo Labs is CLIA accredited, qualifying it for reimbursement under Medicare and Medicaid programs.  Its NPI number is 1740675297.

28.     Apollo Labs submitted claims to the federal and state governments for blood and toxicology testing referred by ALS independent contractor sales reps, who were compensated

based on specimen volume and the profits generated from billing Government Healthcare Programs.

29.     Apollo Labs also directed test specimens from commissioned ALS independent contractor sales reps to Arbor, for which Arbor billed to commercial insurance providers. The sales reps were compensated based on the volume and profits derived from these referrals.

30.     Nearly all, if not all, of the testing referred to Apollo Labs originated from commissioned ALS sales reps or Arbor.

**D.  Defendant Arbor Diagnostics, Inc.**

31.     Defendant Arbor is a Texas nonprofit corporation with a principal place of business at 3824 Cedar Springs Road #427, Dallas, Texas 75219. Arbor is wholly owned by Artemis Healthcare, LLC, and its NPI number is 1104277961.

32.     Brian Oliver is the former President of Arbor.  Max Korenvaes exerts partial control over Arbor's operations.  Arbor employs approximately 120 people.

33.     David Key is the CEO and COO of Arbor.

34.     Arbor received test specimens from ALS sales reps, who were compensated based on specimen volume, in violation of the EKRA. Specifically, ALS sales reps received a percentage of profits for specimens referred to Arbor for testing, after those specimens were successfully billed.

**E.  Defendant Double Helix Management, LLC**

35.     Defendant Double Helix Management, LLC is a Texas limited liability company with a principal place of business at 3824 Cedar Springs Road #427, Dallas, Texas 75219.

36.     Brian Oliver is a manager at Double Helix.

37.     David Key, Brian Oliver, Max Korenvaes, and Korenvaes Management exerted significant control over Double Helix's operations, including but not limited to the employment of the Relator, his co-worker, Kevin Faulkner,[1] and other individuals employed by Double Helix to benefit Apollo, ALS, and Arbor.

38.     Double Helix, in concert with Apollo and Arbor, conspired to and caused the submission of legally false claims to Government Healthcare Programs. This was facilitated by agreements to pay independent contractor sales reps based on specimen volume that are illegal under the AKS and EKRA. These sales reps were paid commissions tied to the number of specimens referred to Apollo and Arbor, resulting in the submission of false claims to Government Healthcare Programs under the FCA.

39.     Additionally, Double Helix operates under the complete control of the Defendants, who also oversee ALS, making it effectively an "alter ego" of ALS.  For example, the Relator, initially hired by ALS, was simply informed one day that his employment was transferred to Double Helix, with other employees experiencing similar transfers between legal entities.

**F.  Defendant Korenvaes Management, LLC**

40.     Defendant Korenvaes Management is a Delaware limited liability company with a principal place of business at 3879 Maple Avenue, Suite 150, Dallas, Texas 75219.  Korenvaes Management is an SEC registered investment adviser and is wholly owned by Korenvaes LLC.

41.     Brian Oliver is the CFO of Korenvaes Management, and Harlan Korenvaes, father of Max Korenvaes, previously held the position of President.

---

[1] Kevin Faulkner was an employee who performed functions similar to those of the Relator.  He is currently the Vice President of Sales and Marketing at Apollo Labs.

42.     Max Korenvaes is a Principal at Korenvaes Management.

43.     Korenvaes Management, along with its parent company, Korenvaes, LLC and related entities such as Korenvaes Capital Management, LP, manage numerous private equity and hedge fund investments.

44.     Directors, officers, and stakeholders at Korenvaes Management, including Brian Oliver and Max Korenvaes, exert control over ALS, Apollo Labs, and Arbor, holding regular meetings at Korenvaes' offices to discuss the operations of these entities.

45.     Korenvaes Management and persons working for it collaborated with David Key in developing and implementing the unlawful commission structure for ALS sales reps. Additionally, Korenvaes Management personnel and/or agents, including Brian Oliver, Loren Sauer, and Molly Jackson participated in executing illegal commission-based payroll transactions for ALS sales reps.

46.     Through its directors, officers, and stakeholders, Korenvaes Management orchestrated the submission of legally false claims under the FCA to Government Healthcare Programs for specimen testing performed by Apollo Labs. These claims violated the FCA because the specimens tested were directed to Apollo Labs by commissioned independent contractor ALS sales reps in violation of the AKS.

47.     Korenvaes Management, by and through its directors, officers, and stakeholders that control the operations of the Defendant corporations, also violated the EKRA by approving commission structures based on specimen volumes and profits, regardless of whether the sales reps were classified as independent contractors or employees.

### G. Defendant David Key

48.     Defendant David Key is a resident of Dallas, Texas.  He represented himself as a of "partner" with Apollo Labs and ALS in his communications with the Relator.  While the Relator worked under his supervision, David Key was on Arbor's payroll.  He is now the CEO and COO of Arbor.  His LinkedIn profile identifies him as Managing Partner at KB Capital Management LLC since January 2009.

49.     David Key had direct oversight of sales and operations at Apollo Labs and ALS, and was deeply involved in Arbor's business, receiving a substantial salary for his efforts.

50.     David Key had the authority to adjust commissions for ALS sales reps based on profitability.  David Key informed the Relator that he was instrumental in creating the commission structure for ALS sales reps in collaboration with Korenvaes Management, and he approved all or nearly all commission payments, typically on a bi-monthly basis.

### H. Defendant Brian Oliver

51.     Defendant Brian Oliver is a resident of Dallas, Texas.  Brian Oliver is the CFO of Korenvaes Management and the CFO and CCO of Korenvaes Capital Management, LP.

52.      Brian Oliver also held the position of CFO at ALS, Apollo Labs, and AP Lab Investments, LLC.

53.     Brian Oliver was formerly President of Arbor and a Manager at Double Helix Management, LLC.

54.     Brian Oliver is a certified public accountant and worked as a senior associate at KPMG prior to joining Korenvaes Management.

55.     Brian Oliver exercised control over all or nearly all of the financial operations at Korenvaes Management, Korenvaes Capital Management, ALS, Apollo Labs, and Arbor.

56.     Compensation reports for ALS sales reps were routinely submitted directly to Brian Oliver by the Relator and/or David Key.

57.     Brian Oliver worked closely with David Key, Max Korenvaes, and others at Korenvaes Management, participating in and controlling the business operations of all the Defendant corporations during regular meetings held at the Korenvaes offices.

**I.  Defendant Max Korenvaes**

58.     Defendant Max Korenvaes is a resident of Dallas, Texas.  He was CEO and manager of Apollo Labs and exercised managerial responsibilities at Arbor.  He has served as a Principal at Korenvaes Management since July 2014.  He is the son of Harlan Korenvaes, the founder, president, and managing member of Korenvaes entities, including Korenvaes Management, LLC.

59.     Max Korenvaes exercises control over the operations of Apollo Labs, ALS, and Arbor as a director and officer.  Additionally, he exercises similar control over the Defendant business entities as a Principal at Korenvaes Management.

60.     Max Korenvaes was actively involved in regular meetings at Korenvaes' offices, making significant decisions related to Apollo Labs, ALS, Arbor, and Korenvaes Management, including the compensation of ALS sales reps.

61.     The relationships between the Relator, the Defendants, and related individuals and entities are shown in the attached diagram, Exhibit 1.

## V.     RELEVANT LAW

**A.  The False Claims Act**

*i.     Federal False Claims Act*

62.     The False Claims Act provides, in relevant part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]…

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1).

63.     For purposes of the False Claims Act,

(1) the terms "knowing" and "knowingly"

(A)     mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

(B)     require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

64.     A person who violates the FCA is liable to the United States Government for a civil penalty of not less than $11,665 and not more than $23,331 per claim, plus three times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).[2]

---

[2] For civil penalties assessed after June 19, 2020, whose associated violations occurred after November 2, 2015. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (Nov. 2, 2015) ("BBA"), 28 U.S.C. § 2461 note, and 28 C.F.R. § 85.5, the False Claims Act civil penalties were adjusted to $11,181 - $22,363 for penalties assessed after January 29, 2018, with respect to violations occurring after November 2, 2015; and effective March 1, 2019, the reverse false claims act penalties (under 31 U.S.C. § 3729(a)(1)(G)) were again adjusted from a

ii. **Texas Medicaid Fraud Prevention Act**

65. The Texas Medicaid Fraud Prevention Act provides that:

A person commits an unlawful act if the person:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the benefit or payment that is authorized ; . . .

(5) except as authorized under a health care program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the program; . . .

(9) conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13); . . .

(12) knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program . . .

Tex. Hum. Res. Code § 36.002.

66. The TMFPA also provides liability for a person who "knowingly engages in conduct that constitutes a violation under Section 32.039(b)." *Id.* § 36.002(13).

67. In turn, Section 32.039(b) provides liability for any person who: . . .

(1-b) solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program....;

---

minimum of $11,181 to $11,463 and from a maximum of $22,363 to $22,927. *See* 15 C.F.R. § 6.

(1-c) solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for purchasing, leasing, or ordering, or arranging for or recommending the purchasing, leasing, or ordering of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(1-d) offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to refer an individual to another person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program;

(1-e) offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to purchase, lease, or order, or arrange for or recommend the purchase, lease, or order of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(1-f) provides, offers, or receives an inducement in a manner or for a purpose not otherwise prohibited by this section or Section 102.001, Occupations Code, to or from a person, including a recipient, provider, employee or agent of a provider, third-party vendor, or public servant, for the purpose of influencing or being influenced in a decision regarding:

> (A) selection of a provider or receipt of a good or service under the medical assistance program;

> (B) the use of goods or services provided under the medical assistance program; or

> (C) the inclusion or exclusion of goods or services available under the medical assistance program;

Tex. Hum. Res. Code § 32.039(b). "Medical assistance program" is defined as Medicaid and "all health care and related services and benefits authorized or provided under federal law for needy individuals" of Texas. Id. § 32.003(4).

68. "Knowing" is defined by the TMFPA to include "conscious indifference to the truth or falsify of the information" and "reckless disregard of the truth or falsity of the information." *Id*. § 36.0011(a).

69.     The term "claim" includes "a written or electronically submitted request or demand that: is signed by a provider or a fiscal agent and that identifies a product or service provided or purported to have been provided to a health care recipient as reimbursable under a health care program, without regard to whether the money that is requested or demanded is paid . . ." *Id.* §36.001(1)(A).

70.     Under subparagraph (a)(1), a person who has committed an unlawful act is liable to the state for the entire amount of the payment or benefit provided under the Medicaid program directly or indirectly as a result of the unlawful act, with no obligation on the state to show that the payment or benefit is an "overpayment," or "damage," or would not have been paid "but for" the unlawful act.

71.     A person who commits an unlawful act under the TMFPA is liable to the State of Texas for treble the amount of any payment or benefit provided under the Medicaid program as a result of the unlawful act, interest on the amount of the payment or benefit, and a civil penalty between $5,500 and $11,000, as adjusted upward by statute and regulation. *See id.* § 36.052.

72.     The TMFPA provides for payment of a percentage of Texas's recovery to a private individual who brings suit on behalf of Texas under the TMFPA. *See id.* §36.110.

73.     In cases where such violation does not result in injury to persons who are elderly, disabled, or younger than eighteen years old, a person who violates the Texas Medicaid Fraud Prevention Act is liable for a civil penalty equal to:

> not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C.
> Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the
> maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that
> amount exceeds $11,000, for each unlawful act committed by the person. . . and
> two times the amount of the payment or the value of the benefit.

Tex. Hum. Res. Code § 36.052.

### iii. *The Oklahoma Medicaid False Claims Act*

74. The Oklahoma Medicaid False Claims Act provides liability for any person who:

1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3. Conspires to commit a violation of the Oklahoma Medicaid False Claims Act;

4. Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less than all of such money or property;

5. Is authorized to make or deliver a document certifying receipt of property used or to be used by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

6. Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the state who lawfully may not sell or pledge property; or

7. Knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

Okla. Stat. tit. 63, § 5053.1(B).

75. Violators shall be liable to the State of Oklahoma for a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00), plus three times the amount of damages which the state sustains because of the act of that person. *Id.*

### iv. *The Tennessee False Claims Act and Medicaid False Claims Act*

76. The Tennessee False Claims Act provides liability for any person who:

(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4) Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property;

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

(8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim; or

(9) Knowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision.

TN Code § 4-18-103(a).

77. Violators shall be liable shall to the state or to the political subdivision for three (3) times the amount of damages that the state or the political subdivision sustains because of the act of that person, plus a civil penalty of not less than two thousand five hundred dollars ($2,500) and not more than ten thousand dollars ($10,000) for each false claim. *Id.*

78. The Tennessee Medicaid False Claims Act similarly imposes liability on people and corporations who knowingly submit false claims to Tennessee's Medicaid program. TN Code § 71-5-182.

#### v. *The Massachusetts False Claims Act*

79.    The Massachusetts False Claims Act provides liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; …

(9) knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof; or

(10) is a beneficiary of an inadvertent submission of a false claim to the commonwealth or a political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment and fails to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by the later of: (i) the date which is 60 days after the date on which the false claim or receipt of overpayment was identified; or (ii) the date any corresponding cost report is due, if applicable.

Violators shall be liable to the Commonwealth or political subdivision for a civil penalty of $5,500 – $11,000 per violation, plus three times the amount of damages that the Commonwealth or a political subdivision thereof sustains because of such violation.  M.G.L. c. 12, §§ 5B(a)(1)-(10).

### B.  The Medicare Program

80.    Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.  Medicare Part B, which is relevant to the facts of this Complaint, authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures.  Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury.  CMS contracts with private insurance

companies to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund.  The private insurance companies that contract with CMS to provide these services are called Part B Carriers.

### C.  The Medicaid Program

81.    Established in 1965, Medicaid is a publicly financed program providing health and long-term care coverage for certain groups of low-income people throughout the United States.  Medicaid is a means-tested individual and state entitlement program jointly financed by states and the federal government.  Medicaid eligibility is limited to individuals who fall into five broad coverage categories: children; pregnant women; adults in families with dependent children; individuals with disabilities; and the elderly.  In addition to categorical eligibility, persons must also meet income and asset requirements, as well as immigration and residency requirements.[3]

82.    The federal government shares the states' cost of providing coverage for certain basic or mandatory services to most categorically needy Medicaid beneficiaries.  The federal government pays states for a specified percentage of program expenditures, called the Federal Medical Assistance Percentage (FMAP).  The FMAP varies by state based on criteria such as per capita income.  Thus, claims submitted to state Medicaid programs cause claims to be made to both the United States and the state.[4]

### D.  The TRICARE Program

83.    TRICARE (formerly known as CHAMPUS) is a federal health care program, as defined in the AKS, 42 U.S.C. § 1320a-7b, this is administered by DHA, a component of the

---

[3] Medicaid.gov, *Eligibility* (https://www.medicaid.gov/medicaid/eligibility/index.html)
[4] Medicaid.gov, *Financial Management* (https://www.medicaid.gov/medicaid/financial-management/index.html)

Department of Defense. TRICARE provides health care insurance for active duty military personnel, military retirees, and military dependents.

84.     The Office of the Secretary of Defense defines fraud to include, but not be limited to: "Arrangements by providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge the CHAMPUS through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits." 32 C.F.R. § 199.9(12).

85.     Fraud or abuse by a laboratory may result in the denial of the pharmacy's claims or the exclusion or suspension of the pharmacy from participation in the TRICARE program. 32 C.F.R. § 199.9(b), (f).

### E.  The VA Program

86.     The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

### F.  The Anti-Kickback Statute

87.     The Medicare and Medicaid Anti-Kickback Statute ("AKS") arose out of congressional concern that inducements may corrupt patient and professional health care decision-making, impose higher costs on federal health care programs, and divert federal funds towards goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the federal health care programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.

88.     The AKS makes it illegal to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for (A) referring an individual to a person for the furnishing

or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1).

89.     Under the AKS, it is illegal to knowingly and willingly offer or pay any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. §1320a-7b(b)(2).

90.     Any person that commits an act described in 42 U.S.C. § 1320a-7b(b)(1) or (2) is also liable for damages of not more than three times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose. 42 U.S.C. § 1320a-7a(a)(7). In addition to any other penalties that may be prescribed by law, such person shall be subject to a civil money penalty of $100,000 for each such act.

91.     A claim for reimbursement from a federal health care program for items or services resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA. 42 U.S.C. § 1320a-7b(g).

92.     The AKS contains several exceptions to the prohibition against providing compensation in exchange for referrals. One exception, "bona fide employment" exception,

provides that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" will not violate the AKS. 42 U.S.C. § 1320a-7b(b)(3)(B). *See also* 42 C.F.R. § 1001.952(d) (requirements for personal services contracts exception).

93.     Bona fide employees are exempt from the statute's prohibitions due to both the level of control that employers exercise over bona fide employees and the fact that employers are typically liable for the actions of such bona fide employees, which reduces the potential for abuse. *See* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 FR 35952-01, 35981 ("We are confident that the employer-employee relationship is unlikely to be abusive, in part because the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them.").

94.     Violations of the AKS are per se false and material. *See United States v. Medoc Health Servs. LLC*, Civil Action No. 3:17-cv-02977-M, 2020 U.S. Dist. LEXIS 120351, at *27 (N.D. Tex. July 2, 2020) ("Because the claims allegedly tainted by kickbacks and submitted in 2015 and 2016 were per se false and material, the Court need not resolve the parties' dispute about whether the Complaint adequately alleges any certification to the Government… After the 2010 amendments to the AKS, a claim tainted by kickbacks is per se false, regardless of any certification of compliance with the AKS, implied or otherwise."); *see also United States ex rel. Goodman v. Arriva Med., LLC*, No. 3:13-cv-0760, 2020 U.S. Dist. LEXIS 119678, at *28-29 (M.D. Tenn. July 8, 2020) ("The government is therefore correct that there is no contestable issue of materiality with regard to the government's AKS-based claims. Even if the defendants were permitted to engage in the discovery they have requested, and they uncovered the type of information that would support a finding of immateriality under Escobar—such as evidence of

widespread toleration of deductible waivers for diabetes supplies in the Medicare program—it would have no bearing on the government's claims, because the PPACA has rendered all claims resulting from AKS violations 'false or fraudulent claims' as a matter of law.").

### G. The Eliminating Kickbacks in Recovery Act of 2018

95.    The EKRA makes it illegal to knowingly and willfully:

(1) solicit[ ] or receive [ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a patient or patronage to a recovery home, clinical treatment facility, or laboratory; or

(2) pay [ ] or offer [ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind [ ] to induce a referral of an individual to a recovery home, clinical treatment facility, or laboratory…

18 U.S.C. 220(a).

96.    The EKRA excludes from the above section:

payment made by an employer to an employee or independent contractor (who has a bona fide employment or contractual relationship with such employer) for employment, if the employee's payment is not determined by or does not vary by—

(A) the number of individuals referred to a particular recovery home, clinical treatment facility, or laboratory;

(B) the number of tests or procedures performed; or

(C) the amount billed to or received from, in part or in whole, the health care benefit program from the individuals referred to a particular recovery home, clinical treatment facility, or laboratory.

18 U.S.C. 220(b).

97.    Violation of the EKRA are punishable by a fine "not more than $200,000, imprisoned not more than 10 years, or both, for each occurrence." 18 U.S.C. 220(a).

### H. The Common Law Test for an Employee-Employer Relationship

98.    The AKS's reference to the common law definition of employee incorporates the "general common law of agency" for the purpose of determining whether a sales representative

is an employee or an independent contractor.  *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992); *United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (unpublished); *see also United States v. Job*, 387 Fed.Appx. 445, 455 (5th Cir. 2010) (unpublished).[5]

99.     The factors applicable to the common law test for who qualifies as an employee to include, with no factor being decisive:

> "the hiring party's right to control the manner and means by which the product is accomplished . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Darden*, 503 U.S. at 323-24.

100.    Key factors include the hiring party's "right to control the manner and means of the work performed," "the method of payment," "whether the work is part of the regular business of the hiring party," and "the hiring party's control over work hours," however "all of the incidents of the relationship must be assessed and weighed" and no one factor is dispositive. *Robinson*, 505 F. App'x at 387 (internal quotations removed).

**I.   Liability for Parent Companies and Controlling Companies**

101.    A defendant may be liable under the FCA if it operates under a policy that causes others to present false claims to the government.  *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004). "Where the defendant has an ongoing

---

[5] The Internal Revenue Code similarly defines "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."  26 U.S.C. 3121(d)(2).

business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes 'a course of conduct that allowed fraudulent claims to be presented to the federal government.'" *Id.*

102. If an investing entity exerts sufficient control over a business entity by appointing directors and officers that pursues its business plan resulting in the submission of false claims, the investing entity may be held liable. *See United States ex rel. Medrano v. Diabetic Care RX, LLC*, No. 15-CV-62617, 2018 WL 6978633 (S.D. Fla. Nov. 30, 2018), *report and recommendation adopted in part sub nom. United States ex rel. Medrano v. Diabetic Care RX, LLC*, No. 15-CV-62617, 2019 WL 1054125 (S.D. Fla. Mar. 6, 2019).

## VI.    DEFENDANTS' WRONGDOING

**A. The Relator Observed Defendants Compensating Independent Contractor Sales Representatives in Violation of the AKS.**

**i.    The Relator was responsible for retaining and coordinating with ALS sales reps to facilitate the transfer of specimens to Apollo and Arbor in exchange for commissions.**

103. As detailed below, Apollo Labs, Arbor, and ALS entered into agreements with independent contractor ALS sales reps where such sales reps were paid commissions based on the volume and profitability of laboratory testing specimens funneled to Apollo Labs and Arbor.

104. Although ALS sales reps typically had contractual relationships with ALS, the specimens were directed to Apollo Labs and Arbor based upon such agreements. Consequently, Apollo Labs funneled a portion of the Government Healthcare Program funds earned from testing these specimens back to ALS sales reps as commissions, calculated based on the volume and profitability of specimens they submitted.

105.     Apollo Labs and Arbor further collaborated to refer specimens to one another for testing and billing, with the specimens originating from ALS sales rep agreements.

106.     The Relator's responsibilities at ALS included various human resources functions related to the recruitment and management of ALS sales reps.  Specifically, the Relator was tasked with identifying prospective sales reps, retaining sales reps and preparing sales contracts, handling payroll, and preparing commission reports for Apollo Labs, Arbor, and Korenvaes Management.

107.     A core component of the Relator's role involved contacting established sales reps in the medical field and enticing them to contract with ALS.  These contracts incentivized the sales reps to refer testing specimens in exchange for a share of the profits associated with each specimen they directed to Apollo and Arbor.

108.     Together with David Key and Kevin Faulkner, the Relator assessed prospective ALS sales reps based on their existing capacity to begin directing specimens, evaluating their ability to direct profitable testing volume to Apollo Labs and Arbor.

109.     On several occasions, David Key personally directed the Relator to contact prospective ALS sales reps through LinkedIn, seeking to recruit individuals who could be enticed to work for ALS in exchange for volume-based compensation.

110.     ALS deliberately avoided publicizing its sales rep positions on platforms like LinkedIn, Glassdoor, Indeed.  Instead, recruitment efforts were conducted discretely due to the fact that ALS's commission model for independent contractors was unlawful under the AKS.

111.     Until January 2019, ALS also used "override reps" – individuals who earned a percentage of the commissions generated by the ALS sales reps they referred to Apollo Labs and Arbor.

112.    The use of override reps allowed for a multi-tiered volume and profits-based commission structure, adding another layer of AKS violations.

113.    Override reps had no work responsibilities beyond referring additional sales reps who would channel profitable specimen volumes to Apollo Labs and Arbor.

114.    Compensation for most ALS sales reps was structured as a percent of payor reimbursement profits, accounting for the "cost of goods" ("COG"), an estimated figure representing the expenses associated with processing specimens.

115.    The formula used to calculate sales rep commissions at Apollo Labs, Arbor, and ALS typically followed this pattern: ([payor reimbursement] – [cost of goods]) x [commission percentage for type of testing].  Thus, the compensation model provided monetary rewards to sales reps in proportion to the volume of specimens they directed to Apollo Labs and Arbor, with profitability factoring into the ultimate commission payouts.

116.    In some cases, ALS sales reps also received a bi-monthly "draw" – an advance on future commission payments, which was later deducted from their overall earnings.

117.    Commissions to ALS sales reps generally ranged from 20 to 40 percent of the revenue generated by each specimen they sent to Apollo Labs and Arbor, subtracting COG.

118.    Generally, toxicology specimens yielded higher commissions for ALS sales reps than blood specimens, as toxicology testing was more lucrative for the Defendants.

119.    Commission rates varied according to sales rep's ability to negotiate higher percentages based on the volume and profitability of the specimens they referred.  Sales reps with a demonstrated ability to generate significant profits for Apollo Labs and Arbor were generally able to secure more favorable commission rates.

120.    ALS sales reps frequently negotiated and renegotiated their commission percentages with David Key, the Relator, and Kevin Faulkner throughout the Relator's employment with the Defendants.

121.    Officially, all sales rep commission rates required David Key's approval, although there were instances where this protocol was not followed.

122.    In one instance, David Key reprimanded Kevin Faulkner for increasing an ALS sales reps' commission rates without obtaining proper authorization.

123.    David Key closely monitored the profitability of ALS sales reps, instructing the Relator to remove underperforming sales reps from the payroll.

124.    ALS sales reps had real-time access to commission and reimbursement data through Defendants' customer relationship management (CRM) software, HC1.

125.    The Relator frequently fielded questions from ALS sales reps regarding unpaid commissions and assisted them in tracking when insurance claims were paid using the HC1 platform.

126.    David Key and Kevin Faulkner, along with the Relator, regularly responded to sales rep inquiries regarding the use of HC1 and how the system tracked billed claims rather than accessioned claims.

127.    No specific qualifications or technical knowledge were required to serve as an ALS sales rep.  As long as a sales rep was able to funnel a sufficient volume of profitable specimens to Apollo Labs and Arbor, they remained on the payroll.

128.    The role of sales reps was limited to referring specimens; they were not paid to "promote" Apollo Labs or Arbor in any marketing capacity.  Their earnings were tied solely to

the volume of specimens they directed to the labs and whether they negotiated for a higher kickback percentage.

129.     ALS sales reps controlled where their specimens would be sent.

130.     ALS sales reps used their control over specimens as the foundation for their specimens-for-commissions quid pro quo arrangements with the Defendants.

131.     If sales reps did not receive the commissions they were promised, they would typically cease directing their specimens to Apollo Labs and Arbor, underscoring the contingent nature of the compensation model

132.     Sales reps who saw a decline in specimen volume or who funneled lower-profit specimens to Apollo or Arbor faced reduced commission rates or termination from the Relator or Kevin Faulkner, per instructions from David Key.

### ii.     ALS sales reps were independent contractors.

133.     Over the course of the Relator's tenure with the Defendant companies, ALS sales rep contracts evolved, with some designating the sales reps as employees, while others explicitly defined them as independent contractors.

134.     Regardless of whether a contract labeled a sales rep as an employee or an independent contractor, under applicable law, all ALS sales reps were, in fact, independent contractors, as further detailed below.

135.     Initially, the Relator served as the primary point of contact for all ALS sales reps. However, following Kevin Faulkner's arrival around December 2017, these responsibilities were shared between the Relator and Faulkner.

136.     Given the Relator's role in sourcing ALS contracts, monitoring sales reps' performance, and acting as their main point of contact, he possessed firsthand knowledge of both

the formal and informal requirements governing ALS sales reps, as well as the nuances of their working relationships with ALS, Apollo Labs, and Arbor.

137.    ALS sales reps had no fixed work hours and did not receive a regular salary or hourly wage.

138.    Until January 2019, almost all gross compensation for ALS sales reps – aside from any draw – was derived from commissions.  After that date, commissions, at times disguised as salaries, were adjusted based on the volume and/or profitability of the testing referred.

139.    ALS sales reps were not required to report their working hours to the Relator or any other personnel at ALS, Apollo Labs, or Arbor.

140.    ALS sales reps were not supervised by the Relator or any other personnel from ALS, Apollo Labs, or Arbor.

141.    ALS sales reps were free from quota requirements, with specimen profitability and referral volume serving as effectively the sole metrics for evaluating their performance.

142.    All or nearly all ALS sales reps did not work on-site at Apollo Labs, Arbor, or ALS, with approximately half of them residing and working outside the state of Texas.

143.    None or almost none of the ALS sales reps were required to visit the physical offices of the Defendant companies as a part of their job duties.

144.    ALS sales reps did not receive certain of the internal company-wide communications sent to workers at Apollo Labs, Arbor, and ALS.

145.    Beyond watching a brief online HIPAA training video prior to joining payroll, ALS sales reps did not receive formal training on how to perform their job duties or how to ensure compliance with legal requirements.

146.    ALS sales reps did not receive sales "leads" from Apollo Labs, Arbor, or ALS to generate further specimen referrals.

147.    ALS sales reps typically obtained specimens for Apollo Labs and/or Arbor using their own means and methods.  There were no explicit directions provided to ALS sales reps regarding how they were expected to supply specimens, apart from the general expectation of HIPAA compliance.

148.    ALS sales reps did not participate in regularly scheduled meetings with management from ALS, Apollo Labs, or Arbor.

149.    ALS sales reps were not obligated to engage in discussions with anyone from ALS, Apollo, or Arbor, unless there was an issue related to the specimens they referred for testing.

150.    ALS sales reps' performance was not formally evaluated, aside from the tracking of referrals, payors, and commission rates.

151.    ALS sales reps did not typically receive employment benefits, such as healthcare, retirement plans, paid time off, or sick leave.  Healthcare was briefly offered to but quickly discontinued due to cost concerns.

152.    ALS sales reps were retained, terminated, and compensated based on the volume and profitability of the specimens they referred to Apollo Labs and/or Arbor for testing.

153.    David Key directed the Relator not to add ALS sales reps to the payroll until Apollo Labs and Arbor began receiving specimen referrals from them, regardless of when they signed their W-2 or 1099 contracts or their purported start date.

154.    ALS sales reps were solely responsible for generating sales, with no assistance from ALS, Apollo Labs, or Arbor personnel, other than coordinating the shipment of specimens or, occasionally, arranging for phlebotomists to collect specimens.

155.    ALS sales reps typically did not have an Apollo Labs and/or Arbor email address and used personal email addresses or the email address of their individual sales companies to transact business.  The Relator observed that all or substantially all communications from ALS sales reps were from their personal email accounts or the email accounts of their personal business entity.

156.    Nearly all ALS sales reps operated their own business entities or worked for another company, regardless of whether their contracts identified them as employees or independent contractors.  Indeed, their LinkedIn profiles often reflected their associations with other business ventures.

157.    The Relator, along with Kevin Faulkner, David Key and Brian Oliver, was aware that many ALS sales reps had other jobs or operated their own sales entities that served companies in addition to Apollo Labs and Arbor.

158.    The Relator often went months without hearing from specific ALS sales rep unless there were issues related to their compensation.  Typically, ALS sales reps only communicated with the Relator, David Key, or Kevin Faulkner when discussing commission disputes or renegotiating the terms of their ALS contracts.

159.    Neither the Defendant entities nor their agents monitored or questioned the nature of any agreements between healthcare service providers and sales reps.  As a result, they were unaware of any kickback arrangements between ALS sales reps with healthcare providers or

their staff that may have led to overutilization of laboratory services to increase kickbacks from Apollo Labs and Arbor.

160.    Apollo Labs employed customer service personnel to address inquiries from medical providers referred by ALS sales reps.  However, there was no routine account management or maintenance performed by Apollo Labs employees (*i.e.*, no one would contact the providers' offices).

161.    ALS sales rep contracts typically existed in three forms: 1) "straight commission W-2 with draw;" 2) "commissioned 1099;" or 3) "salaried W-2."

162.    "Straight commission W-2 with draw" ALS sales reps were classified as employees in their contracts with ALS and in filings with the U.S. Internal Revenue Service ("IRS").  They received commissions as well as regular draws.

163.    "Commissioned 1099" ALS sales reps were classified as independent contractors, received commissions, and were not typically paid a draw.  Several ALS sales reps fell into this category between 2018 and 2020.

164.    "Salaried W-2" ALS sales reps were classified as employees in internal company records and in filings with the IRS, received salaries based on a percentage of the profits generated by their accounts, and typically did not receive regular draw.  Some ALS sales reps were transitioned into this category starting in 2019.

165.    Despite these varying contract structures, the expectations, responsibilities, and working conditions of ALS sales reps were largely the same across all three categories, without significant oversight or control by Defendants over sales reps' work.

166.    Prior to the Relator's employment with ALS in January 2016 and continuing until approximately January 2019, the majority of sales rep were compensated under a "straight commission W-2 with draw" structure.

167.    Under this structure, most sales reps received a monthly draw of $400, paid in two installments around the fifteenth and thirtieth of each month.

168.    On paychecks for sales reps paid under a "straight commission W-2 with draw" arrangement, commissions for specimens was labeled as a "bonus."

169.    Around the time of the Relator's hiring by the Defendants, David Key explained to the Relator that he worked with individuals at Korenvaes Management to establish the compensation model ALS sales reps.

170.    David Key further explained to the Relator that he preferred independent contractor status for ALS sales reps, as it would be appealing to those who already had established books of business.

171.    David Key explained to the Relator that the "straight commission W-2 with draw" was a "compromise" between salaried employees and commissioned independent contractor sales reps, a compromise that he reached with the individuals at Korenvaes Management's offices who controlled the Defendant entities.

172.    Most prospective ALS sales reps requested independent contractor status because they operated their own LLCs, were employed full-time in other non-sales roles, and/or conducted unrelated medical sales business with other companies.

173.    Despite management's awareness that retaining commissioned independent contractors was illegal under the AKS, the Defendants eventually granted official independent

contractor status to ALS sales reps who repeatedly requested it and demonstrated significant value to Apollo Labs and/or Arbor through specimen volume and profitability.

174.    Once the Defendants began allowing some ALS sales reps to operate as official independent contractors under "commissioned 1099s" status, they became more lenient in granting this status to other sales reps.

175.    In all or nearly all instances where the Relator modified the status of an ALS sales rep to "commissioned 1099," he did so with written authorization from David Key, typically communicated via email.

176.    The Relator recalls that around early 2018, David Key emailed him with instructions to update the status of ALS sales reps Genoa Price and Joe Jester from "straight commission W-2 with draw" to "commissioned 1099" in the Defendant's human resources systems.

177.    Certain high-performing ALS sales reps, such as Genoa Price, who generated approximately $80,000 per month in Medicare business, successfully negotiated with ALS and David Key for official independent contractor status.

178.    A significant portion of Genoa Price's referrals involved Medicare, providing consistent reimbursement for the testing of specimens and contributing to her negotiating leverage.

179.    Genoa Price operated as an official independent contractor under a straight commission arrangement, receiving as high as 40 percent minus COG, without a monthly draw.

180.    ALS sales reps commissioned under the "commissioned 1099" model did not receive draw payments, and therefore no draw amounts were deducted from their commissions in commission reports.

### iii. David Key expressed concerns to the Relator regarding the significant legal risks involved, which the Defendants knowingly disregarded for their own financial gain.

181.    The EKRA was passed October 24, 2018, expanding the scope of illegal sales representatives and imposed harsher penalties for violations.

182.    In the months before after the EKRA's passage, David Key informed the Relator that due to federal law and to avoid potential legal scrutiny, ALS sales reps would need to transition to W-2 employee status with a draw to show compliance with "safe harbor" provisions of the law.

183.    Later in 2018, David Key explained to the Relator that converting commissioned ALS sales reps to part-time salaried employees could further shield the companies from regulatory liability.

184.    In December 2018, in direct response these concerns over potential legal scrutiny, David Key asked the Relator, via email, to create a spreadsheet detailing the commissions for all ALS sales reps who were still referring specimens to Apollo Labs and Arbor for a six month period, from June through November 2018, to at least facially comply with federal law by converting the ALS sales reps to salaried employees.

185.    The Relator provided David Key with the requested spreadsheet, which Key used to determine the salaries to be offered to ALS sales reps once they converted to salaried employees.

186.    The Excel spreadsheet listed ALS independent contractor sales reps in one column with their commissions from June 2018 through November 2018 in subsequent columns, culminating in an average commission figure for each sales rep.

187.    The final column of the spreadsheet, titled "Salaries," proposed salaries for each sales rep that closely approximated their average monthly commission during the June-to-November 2018 period.

188.    For example, the average monthly commission for sales representative Genoa Price from June 2018 through November 2018 was $10,969.49, and the proposed salary stated was set at $11,000.  Similarly, Margaret Howe's average monthly commission was $1,907.35, and the proposed salary was $2,000.  Jeff Joyner's average monthly commission was $1,111.54, with a proposed salary of $1,000.

189.    The proposed salary for ALS sales rep Stephanie Jehnke was considerably lower than her six-month commission average due to the loss of one of her accounts that had previously referred specimens to Apollo Labs and/or Arbor during this period.

190.    The actual job responsibilities and performance expectations of ALS sales reps did not change as a result of their transition to salaried employee status; only the classification of their compensation was altered.

191.    In or around early 2019, David Key directed the Relator to revert Genoa Price back to a fixed-rate 1099 sales rep contract at her request, despite her prior conversion to salaried employee status.

192.    Since 2019, Genoa Price has operated as an official independent contractor, receiving commissions for referring specimens to Apollo Labs and/or Arbor.

193.    Even after January 2019, the "salaried W-2" ALS sales reps continued to experience adjustments to their "salaries" based on the profits and volume associated with their accounts.

194.     David Key and Kevin Faulkner justified these salary reductions by citing the decreased profitability of certain sales reps who were referring fewer specimens.

195.     As a result, the "salaries" of ALS sales reps functioned de facto as commissions, subject to the same modifications and fulfilling the same purpose as their compensation prior to 2019.  Accordingly, such "salaries" merely projected purported compliance with federal healthcare laws while still engaging in prohibited volume-based kickbacks.

196.     The Relator primarily reported to David Key, but also communicated with Brian Oliver regarding on matters related to company finances, including the payment of volume and profits-based commissions to ALS sales rep for specimens tested at both Apollo Labs and Arbor.

**B.  Illegal Kickbacks Paid to ALS Sales Reps Based On Specimen Volume.**

197.     Apollo Labs and Arbor, either directly or through ALS, compensated ALS sales reps with volume-based commissions for specimens that were successfully billed to Government Healthcare Programs and private insurers.

198.     Specimens referred by ALS sales reps for testing reimbursable by Government Healthcare Programs was tested and billed by Apollo Labs, though some were routed through Arbor when providers specifically referred their testing to Arbor instead of Apollo Labs.

199.     Specimens referred by ALS sales reps for testing covered by commercial insurance were sent—either directly or through Apollo Labs—to Arbor for testing and billing.

200.     ALS sales reps funneled specimens reimbursable by Government Healthcare Programs to Apollo Labs in part because they could use the same process to have specimen testing billable to private insurers tested by Arbor.

201.     David Key and Brian Oliver relied on the Relator to produce commission reports that meticulously itemized the commissions owed to ALS sales reps.  These reports broke down,

specimen-by-specimen, the type of tests ordered, the patient's primary insurer, the payment status, and other relevant information, including the name and location of the provider submitting the specimen.

202. The Relator routinely provided David Key with these reports bi-monthly, often including Brian Oliver at Key's direction. These reports typically had subject lines or content containing terms like "commission" or "bonus."

203. In this capacity, the Relator generated comprehensive reports for David Key and Brian Oliver which detailed individual sales reps' performance as well as consolidated summaries. The reports included the number of specimens, the date received, the submitting medical practice, primary insurance, financial group data, insurance payouts, and commissions due to each to sales rep.

204. Given that insurers often took weeks to process claims for which ALS sales reps were entitled to commissions, the Relator had to monitor payment adjustments for each pay period, including for previous months.

205. One detailed Excel report, sent to Brian Oliver and David Key, details the specimens referred by ALS sales reps to Apollo Labs over an eight-month period from July 2016 to early February 2017.

206. The first tab of this report, titled "Reports (DOS)," provided an in-depth analysis of the specimens referred by ALS sales rep to Apollo Labs, including a breakdown by state, the relative value of blood testing versus toxicology testing, and the payor mix, which included Government Healthcare Programs from July 2016 to early February 2017.

207.  This tab revealed that during this period, Apollo Labs and Arbor were reimbursed more than $2,709,607 for testing, with over $1.2 million of that amount coming from Medicare (including Medicare and Managed Medicare).

208.  The first tab of the Excel report further delineated the revenue generated from commissioned ALS sales reps:

| Sales Person | Blood | Urine | Grand Total |
|---|---|---|---|
| , | $10,408 | $9,249 | $19,657 |
| Blasingame, Greg | $71,033 | $162,499 | $233,532 |
| Carroll, Tom | $7,342 | $43,592 | $50,934 |
| Ettinger, Scott | | $28,347 | $28,347 |
| Forbes, Joshua | $35,083 | $46,085 | $81,169 |
| Gray, Terry | $246,305 | $439,360 | $685,665 |
| Huffman, Paul | $0 | $22,478 | $22,478 |
| Kahn, Fasi | $65,185 | $66,693 | $131,878 |
| Lipp, Evan | $56,498 | $167,873 | $224,370 |
| Mcada, Ronnie | | $275 | $275 |
| Michie, Dave | $5,760 | $21,282 | $27,042 |
| Patel, Punit | $10,922 | $5,062 | $15,984 |
| Pipkins, Paulette | $10,735 | $68,138 | $78,873 |
| Powell, Lori | $0 | $20,795 | $20,795 |
| Rogers, Angela | $0 | $144,508 | $144,508 |
| Scott, Thommy | | $0 | $0 |
| Taylor, Bobbi | $76,481 | $108,971 | $185,452 |
| Timmons, Tony | $24,861 | $46,807 | $71,668 |
| Viracola, Mark | $42,868 | $696,231 | $739,099 |
| **Grand Total** | **$663,481** | **$2,098,245** | **$2,761,726** |

209.  The second tab, "(DOS) Revenue & Monthly Avgs," provided a month-by-month breakdown of reimbursements for services rendered by Apollo Labs, detailing the performance of each ALS sales rep, the insurance providers remitting payments, and the medical practices submitting specimens.

210.  The promise of these commissions, and their subsequent payment, was the reason that ALS sales reps continuously sent Apollo and Arbor specimens for testing.

211.  Tab 3, "Payment Date Reports," offered a detailed overview of reimbursements over the eight-month period, with the clearest data spanning July 2016 to December 2016, highlighting the actual revenue generated by ALS sales reps during that time.

212.    The "Payment Date Reports" tab indicated that between July 2016 and December 2016, Government Healthcare Programs – including Tricare, VA, Medicare, Medicaid, and managed Medicare/Medicaid – paid Apollo Labs $1,325,904 for ALS sales rep claims.

213.    The final two tabs of the report contained claim-specific data, including the Specimen ID, whether specimen was for urine or blood testing, the ALS sales rep referring the specimen, the medical practice submitting the specimen, the location of the practice, the primary insurance, the financial group, the testing service date, the payment received date, and the amount of payment.

214.    The "DOS Financial Accession Detail" tab accounted for over 15,000 specimens and $2,761,725.93 in total payments attributed to ALS sales reps, with roughly 48% of the claims paid by Government Healthcare Programs.

215.    Medicaid and Managed Medicaid for Arkansas, Oklahoma, Tennessee, and Texas paid claims totaling at least $75,000 submitted by Apollo Labs and/or Arbor tied to commissioned ALS sales reps, as recorded in the "DOS Financial Accession Detail" tab.

216.    All or nearly all ALS sales reps earned commissions from specimens billed to Government Healthcare Programs during the period covered by the July 2016 to February 2017 report.

217.    A subsequent version of this report was created and circulated to the Relator and management for the Defendant entities, covering the remainder of February 2017 and part of March 2017.

218.    Some private insurers were not categorized as Managed Medicare/Medicaid payors in HC1, despite reimbursing for testing services.  As a result, the total reimbursements by Federal Healthcare Programs were higher than indicated in the July 2016 to February 2017 report

and subsequent reports, as some reimbursements labeled as private insurance were actually managed Medicare/Medicaid claims.

219.    Specimens referred by ALS sales reps for commercial insurance payors during the July 2016 to February 2017 period were sent to Arbor for testing and billing, as only Arbor was in-network with commercial insurers.

220.    Massachusetts Medicaid was billed for tests conducted for Washburn House, a substance abuse rehabilitation facility, through its ALS sales rep, Summit Diagnostics, LLC.

221.    Specifically, Summit Diagnostics referred toxicology and blood testing from Washburn House to Apollo Labs and Arbor under an independent contractor sales agreement signed on August 16, 2016, with sales rep Lori Powell.

222.    Excel spreadsheets covering August 2017 through October 2017 show that at least 90 specimens were sent to Apollo Labs and Arbor from Washburn House during that period as a result of the ALS contract with Summit Diagnostics.

223.    In or around August 2019, the Relator provided David Key with a consolidated ALS sales rep report covering multiple accounts, detailing specimen referrals from December 2018 through July 2019 for various sales representatives, including: Jeff Joyner, Genoa Price, Tom Carroll, Patrick Lyons, Frank Del Bosque, Mark Frank, Brandon Maxwell, Dilber Cruz, Robert Castañeda, and Martin Perez.

224.    In July 2018, the Relator furnished David Key and/or Brian Oliver with a similar report, detailing specimen data for Arbor and Apollo Labs for January through June 2018.

225.    Throughout 2017 and 2018, the Relator provided David Key with dozens of commission reports for individual ALS sales reps and specimen collectors, which included specimen-specific data such as whether the specimen was tested and billed by Apollo or Arbor,

the specimen ID, specimen type, the commission-eligible salesperson, the practice submitting the specimen, the state of origin, primary insurance, date of service, payment receipt, and payment amount.

226. These reports included the formulas used to calculate the ALS sales rep's commission and the total amount owed to each sales rep based on payments received.

227. The Relator also prepared consolidated commission reports for David Key, summarizing revenue generated by ALS sales reps, the commissions earned, and whether specimens were sent to Apollo or Arbor, as well as information about the medical providers that submitted the specimens.

228. A similar Excel spreadsheet, omitting the commissions paid to ALS sales reps, was created by Drew Shen using Tableau or HC1 around January 2019 and sent to Brian Oliver and David Key.

229. The "Puredi Data" tab of this report, labeled "payment Month," covers the period from July 2018 to January 2019, suggesting it tracked specimen payments, including payment reversals, for these seven months. "Puredi" was often used interchangeably with Apollo Labs, while "Telcor" referred to Arbor.

230. The "Summary" tab of the July 2018 through January 2019 report revealed that Apollo Labs generated $1,228,413.15 in net revenue, including payment reversals, from July 2018 through January 2019, breaking down the revenue generated from each ALS sales rep's account. For example, Meridian Medical, through ALS sales rep, Genoa McDonald Price and/or her company, GM Price, LLC, generated $422,589.54 in net revenue for Apollo Labs from commercial and government insurers during this period.

231. The "Puredi Data" tab of the July 2018 through January 2019 report provided granular claims data, listing patient claims ID numbers, testing entities, the providers submitting the specimen, claim and charge numbers, patient details, insurance information, payment amounts, and payment dates.

232. ALS sales rep commission reports were used to inform business decisions at weekly meetings of directors, officers, and other key stakeholders at Korenvaes Management's office in the Old Parkland office campus in Dallas, Texas.

233. ALS sales rep commission structure was discussed and approved by the managers of all Defendant entities.

234. Once sales reps began funneling the specimens they controlled to Apollo and Arbor, they were paid substantial kickbacks, ranging from tens of thousands to hundreds of thousands of dollars, with little to no ongoing effort.

235. These kickbacks did not represent the fair market value of their services, with the amount of money paid to sales reps varying depending on the health care services provider's testing requests, rather than the services of the sales rep. Some sales reps were paid nearly ten times as much as other sales reps, largely as passive income once specimen shipping processes were established.

236. Between 2016 and December 2019, Korenvaes Management, and/or related entities, controlled by the same individuals, maintained financial relationships – whether debt or equity – with Apollo Labs, Arbor, and ALS.

237. Apollo Labs is estimated to have received more than $10 million from Government Healthcare Programs during the Relator's tenure at ALS, with nearly all of that revenue tied to specimens referred by ALS independent contractor sales reps.

**C. Violations of the EKRA and AKS by Arbor, Apollo Labs, and ALS Resulting in the Submission of False Claims to Government Healthcare Programs.**

238.    The EKRA applies to claims submitted to both Government Healthcare Programs and commercial insurance payors that are tainted by commissions paid to sales reps based on the volume of specimens or the amount billed.

239.    Since the enactment of the EKRA on October 24, 2018, certain claims submitted by Arbor and Apollo Labs to Government Healthcare Programs and commercial insurers violated EKRA due to these volume-based commission payments.

240.    ALS sales reps typically referred specimens reimbursable by commercial insurance to Arbor for testing and billing, either directly or through Apollo Labs.

241.    After EKRA's effective date, the Defendants maintained contracts with sales reps, compensating them based on the volume of specimens they directed to Defendants.  The transmission of such specimens led Apollo Labs and Arbor to submit or cause to be submitted claims related to testing specimens to both commercial insurers and Government Healthcare Programs.

242.    All commissions paid on sales rep accounts for the testing of specimens billed to commercial insurance after October 24, 2018, thus constituted violations of EKRA.

243.    Similarly, commissions paid for the testing of specimens billed to Government Healthcare Programs after October 24, 2018, violated both EKRA and the AKS.

244.    In or around August 2019, the Relator provided David Key a detailed ALS sales rep report covering multiple accounts.  The report documented the number and type of specimens referred weekly to Apollo Labs and Arbor from December 2018 through July 2019.

245.    The report reflected that ALS sales reps referred specimens for which commercial insurance was billed during that time frame.

246.    Between December 2018 and at least July 2019, ALS, with David Key's approval, adjusted ALS sales reps' salaries based on the profitability of the specimens they referred for testing.

247.    The December 2018 to July 2019 report shows that Arbor tested and billed for commercial specimens referred by ALS sales reps.  During this period, commissions or commissions disguised as salaries were paid to ALS independent contractor sales rep Genoa Price.

248.    Since ALS sales rep "salaries" were set and adjusted according to the volume and profitability of the specimens they referred after January 2019, these "salaries" were, in fact, volume and profit-based commissions.

249.    The compensation paid to ALS sales reps, whether in the form of salaries or commissions, based on claims billed to Government Healthcare Programs and commercial insurers by Arbor, violated EKRA from October 24, 2018, through the time the Relator ceased working for the Defendants, and, on information and belief, continues to this day.

250.    The EKRA also prohibits volume-based commissions for ALS employees referring specimens covered by Government Healthcare Programs.  Therefore, after October 24, 2018, ALS's practice of disguising commissions as salaries was illegal.

251.    Since the Defendants began testing blood and urine specimens, they and their agents falsely certified their compliance with all applicable federal and state laws in the process of submitting CMS-1500 claims forms and their electronic equivalents for laboratory services to Government Healthcare Programs.

252. These certifications were false due to the Defendants' violations of AKS and EKRA in soliciting and compensating sales reps based on the volume of specimens they referred to Apollo and Arbor, which were subsequently reimbursed by Government Healthcare Programs.

253. Upon information and belief, the Defendants have continued submitting such false claims to Government Healthcare programs up to the present day.

### D. Korenvaes Management, David Key, Brian Oliver, and Max Korenvaes Orchestrated, Controlled, and Actively Engaged in the Scheme.

#### i. Through Korenvaes Management, the individual Defendants controlled the business operations and financial maneuvers of the Defendant entities ███████████████████████████████████████.

254. David Key informed the Relator that core executives, officers, and stakeholders of the Defendant entities – including Brian Oliver, David Key, Max Korenvaes, and an attorney associated with Korenvaes Management – frequently convened at Korenvaes Management to conduct business on behalf of the interconnected Defendant entities. For example, in an October 17, 2018 text message in response to the Relator's request for a 9 a.m. meeting, David Key declined, stating that he was engaged in their "weekly meeting until early afternoon," referring to the recurring gatherings held at Korenvaes Management offices.

255. On several occasions, David Key relayed to the Relator details of discussions that took place during these meetings.

256. Among the information shared by David Key, the following topics were particularly noteworthy:

    a. The meetings were attended by Brian Oliver, Max Korenvaes, David Key, and an attorney representing Korenvaes Management;

    b. ████████████████████████████████████████ ████████████████████████████████

c. ███████████████████████████████████████████

████████████████████████████████████████████

███████████████

d. The core business operations and finances of Apollo Labs, Arbor, ALS, and

Double Helix were regularly addressed.

257. ████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

258. ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

259. ████████████████████ in early 2019, ████████████████████████████

████████████ Key informed the Relator that the decision had been made to revert the sales

representatives back to independent contractor status. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

260. ███████████████████████████████████████████

███████████████████████████████████████

### ii. The Defendants' operations and finances were deeply interconnected, particularly with regard to the retention, utilization, and payment of ALS sales reps.

261. The individual named Defendants in this complaint held overlapping roles across the Corporate Defendants. For example, Brian Oliver served as CFO of Korenvaes Management, Korenvaes Capital Management, LP., ALS, Apollo Labs, and AP Lab Investments, LLC, while simultaneously holding the title of President at Arbor and serving as Manager at Double Helix. *See* Exhibit 1.

262. Similarly, Max Korenvaes was the CEO and Manager of Apollo Labs, a Principal at Korenvaes Management, and actively involved in Arbor's operations. *See* Exhibit 1. Max Korenvaes was also included in internal emails regarding the confidential operations of all corporate Defendants.

263. Likewise, David Key held the title of "Partner" at Apollo Labs and ALS but was compensated through Arbor's payroll. *See* Exhibit 1. He is now also CEO and COO of Arbor.

264. In a January 28, 2016 email, Brian Oliver informed the Relator that he personally managed all financial reports for the Defendant entities, reviewing each pay period: ". . . I have very extensive reports for 3-4 entities . . . and prepare all of them." As such, Oliver was acutely aware of the close financial ties between Arbor and Apollo Labs, including their referral of testing services to one another.

265. These financial reports were used during meetings at Korenvaes Management to jointly oversee and control the operations of the Defendant Corporations.

266.    Brian Oliver was also aware of potential legal risks stemming from the Defendants' reliance on sales reps to direct specimens to Apollo Labs and Arbor.

267.    For example, Brian Oliver once warned the Relator with words to the effect of: "be careful with" or "keep an eye on" an ALS sales rep, Terry Gray, and his company, Greystone Medical, intimating that the relationship between Mr. Gray's company, Apollo Labs, and Arbor posed regulatory legal risks.

268.    Apollo Labs and Arbor functioned as a single entity to maximize profits, with each lab performing testing that the other could not bill, while sharing the financial gains.

269.    Martin Perez, who managed Apollo Labs' phlebotomists and reported to Arbor manager Tony Acosta, sent weekly reports to David Key and the Relator titled "Apollo_Arbor Weekly Volume."

270.    The report documented the volume of toxicology, blood, and other specimens from Arbor that were tested by Apollo, regardless of whether ALS sales reps were associated with the accounts, from December 31, 2018, to November 9, 2019, across multiple tabs in an Excel spreadsheet.

271.    This spreadsheet highlighted the close financial and operational ties between Apollo Labs and Arbor, particularly in compensating ALS sales reps and phlebotomists, as well as the transparent communication between the two entities.

272.    David Key closely reviewed these reports, focusing on the costs associated with each phlebotomist in relation to the number of specimens collected, ensuring that the revenue generated exceeded the cost of their contracts.

273.    Similar spreadsheets, sent to David Key, tracked the same data from September 11, 2017, to December 8, 2018.

274.     Another Excel spreadsheet titled "06Jun2017 Arbor L2L Summary for Apollo Patients," sent to the Relator, detailed specimens referred from Apollo Labs to Arbor as part of their lab-to-lab agreement.

275.     The first tab, labeled "CPT Code," listed specific CPT codes billed, the frequency of billing, the average CMS rate per claim, and the total amount reimbursed for each code.

276.     The second tab, "Clinical & Tox Summary," categorized claims into clinical bloodwork and toxicology tests, providing detailed information on the ordering providers and the number of CPT codes billed per provider.

277.     The third tab, "Telcor Trans GL," offered a claim-by-claim breakdown, including payor details.

278.     The fourth tab, "Telcor GL Ascension," recorded the service and payment dates, specimen number, and identified that the claims originated from "ARBOR DIAGNOSTICS."

279.     A similar Excel spreadsheet sent to the Relator, titled "Jul2017 Arbor L2L Summary for Apollo patients," revealed specimens referred from Apollo Labs to Arbor as part of their lab-to-lab agreement.

280.     The first tab, "Ref Phys," identified the physicians submitting tests to Apollo Labs, the number of CPT codes billed, and the revenue generated from those claims.

281.     The second tab, labeled "CPT Code," detailed the specific CPT codes billed, their frequency, the average CMS rate per claim, and the total reimbursement for each code.

282.     The third tab, "Clinical & Tox Summary," compared the amounts paid by different commercial insurance payors for clinical and toxicology testing.

283.    The fourth tab, "Telcor Trans GL," contained claim-by-claim data, including payor information.  This tab also indicated that claims were from "ARBOR DIAGNOSTICS," found in column AE.

284.    Yet another spreadsheet tracked ten ALS sales reps for January and February 2018, showing the weekly number of specimens referred by each sales rep to Arbor and Apollo Labs.

285.    This spreadsheet tracked referrals for Tony Simmons,[6] Kevin Khoury, Genoa Price, Troy Hollatz, Juan Rojas, Joe Jester, Mark Frank, Ron Stuart, Steve Harrison, and Craig Ball, and included contact information for most ALS sales reps on the first tab.

286.    ALS agents, including David Key, Kevin Faulkner, and the Relator, entered into contracts with ALS sales reps with authority to bind both Apollo Labs and Arbor, all with the intent to increase the profitability of both entities.

287.    For example, an April 8, 2018 contract between ALS sales rep Maggie Howe and Arbor was communicated to Howe via Kevin Faulkner.

288.    Like other ALS sales rep contracts, this agreement compensated the sales rep based on a percent of revenue, minus the cost of goods.

289.    Even in cases where ALS sales reps did not have formal contracts with Arbor, their referred specimens were tested and billed by Arbor, with the sales reps receiving commissions based on testing reimbursement.

290.    Key personnel from the Defendant Corporations maintained email addresses across multiple entities, but consolidated lists of contact information were maintained.  For

---

[6] The Relator believes the name "Tony Simmons" in the spreadsheet is a typo and should state "Tony Timmons."

instance, Brian Oliver held email addresses for both Arbor and Double Helix; David Key maintained addresses for both Arbor and Apollo Labs; and Max Korenvaes used addresses for Apollo Labs and Double Helix.

291.    Although the Relator was never employed by Apollo Labs or Arbor, he was responsible for creating joint advertisements for both entities, which were made available for ALS sales reps.  David Key approved these advertisements, including one for Apollo Labs that misleadingly claimed Apollo Labs "will accept most commercial insurance," despite referring all such testing to Arbor.

292.    Several employees across the Defendant entities saw the payor of their wages shift from one entity to another, without any changes to their job responsibilities.

293.    The Relator, initially hired by ALS, was paid by Qtech Healthcare Management LLC, and later by Double Helix Management, LLC, which ultimately provided his severance agreement.

294.    The Relator received no explanation for these payroll shifts, only receiving notice from Brian Oliver that the payor of his wages would change.

295.    Upon reviewing payroll records, the Relator discovered that Brant Cook, an ALS employee he hired to manage phlebotomists, had been transferred from the ALS payroll to that of Qtech Healthcare Management LLC payroll, and later to Double Helix.

296.    Brant Cook was responsible for managing the supply chains at both Arbor and Apollo Labs.  Meanwhile, Nelson "Tony" Acosta, an employee on Arbor's payroll, was tasked with supervising Apollo Labs' phlebotomists.

297.    Korenvaes Management's agents were actively involved in core business operations across ALS, Apollo Labs, and Arbor.

298. Molly Jackson, who had a Korenvaes email address but was not on the payroll of Arbor, Apollo Labs, or Double Helix, reported directly to Brian Oliver at Korenvaes. She managed Double Helix's payroll and assisted the Relator with urgent wire transfers when necessary.

299. Similarly, Loren Sauer, formerly a Family Office Controller at Korenvaes Management (according to his LinkedIn profile), fulfilled the same duties as Molly Jackson when the Relator first began working with the Defendant entities.

300. Terri Lawler, an employee of Miller Consulting Group, was hired by Korenvaes Management to handle human resources tasks for the Defendant entities.

301. Korenvaes Management's attorney drafted the ALS sales rep contracts, which established the commission-based compensation structure, for both W-2 and 1099 employees.

302. When the Relator was first hired, he interviewed at Korenvaes Management's offices, meeting with David Key, Brian Oliver, Harlan Korenvaes, and others.

303. Korenvaes Management's knowledge and control over the use of independent contractors by Apollo and Arbor is further demonstrated by such independent contractors being similarly interviewed by Korenvaes Management.

304. For example, in or around January 2016, certain prospective independent contractor sales reps, operating through MD Global, also interviewed at Korenvaes Management's offices, attended by key control persons across the Defendant entities. David Key later informed the relator that MD Global and the meeting attendees "hit it off."

305. On the same day that the Relator met with Korenvaes Management, he observed Lee Akay, a potential commissioned sales rep, meeting with Brian Oliver, David Key, and Harlan Korenvaes.

306.     During the Relator's interview process, Harlan Korenvaes personally interviewed him, asking direct questions about the nature of his future work for Arbor and Apollo, prior to his eventual hiring.

## VII.   CAUSES OF ACTION

### COUNT I: FALSE OR FRAUDULENT CLAIMS
#### 31 U.S.C. Sec. 3729(a)(1)(A)
#### Against all defendants

307.     The Plaintiff-Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

308.     The Defendants, acting knowingly, or in deliberate ignorance or reckless disregard of the truth, submitted or caused to be submitted false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).  Specifically, Defendants submitted or caused the submission of claims for payment to Government Healthcare Programs tainted by kickbacks that violated the AKS and/or EKRA.  These kickbacks were provided to independent contractor sales reps who referred specimens that were subsequently tested and billed to such Government Healthcare Programs.

309.     Defendants falsely certified, or caused to be certified, that the claims met all prerequisites for payment, including compliance with the AKS, EKRA, and FCA.  The government relied upon these misrepresentations and, as a result, paid Defendants' fraudulent claims.  These misrepresentations were material as the term is defined in the False Claims Act and as interpreted by the courts.

310.     By knowingly submitting or causing the submission of these false claims, the United States suffered actual damages and is entitled to recover treble damages, in addition to

Case 2:20-cv-02974-D Document 62 Filed 10/21/24 Page 59 of 70 PageID 2390

civil monetary penalties for each false claim. The U.S. government, being unaware of the falsity of the claims or statements and relying on their purported accuracy, incurred financial harm.

### COUNT II: FALSE STATEMENTS MATERIAL TO FALSE CLAIMS
**31 U.S.C. Sec. 3729(a)(1)(B)**
**Against all Defendants**

311.    The Plaintiff-Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

312.    Defendants, acting knowingly, or in deliberate ignorance or reckless disregard, made, used or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B). Specifically, the certifications on CMS-1500 claim forms, or their electronic equivalents, were false because Defendants knowingly paid, approved, and/or caused to be paid volume-based commissions to independent contractor ALS sales reps who referred specimens, in violation of the AKS and/or the EKRA.

313.    Defendants falsely certified compliance with all applicable laws and regulations when submitting or causing the submission of CMS-1500 claims forms, or their electronic equivalents. The government relied upon the false certifications and paid the fraudulent invoices. The false certifications were material as the term is defined in the False Claims Act and interpreted by the courts.

314.    As a result of the false records or statements made or used, or caused to be made or used, by the Defendants, the United States has suffered actual damages and is entitled to recover treble damages, in addition to a civil monetary penalty for each false claim. The government, unaware of the falsity of the claims or statements, and relying on their supposed accuracy, sustained financial harm.

Page **59** of **70**

## COUNT III: REVERSE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(G)
**Against all Defendants**

315.    The Plaintiff-Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

316.    The Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased their obligation to pay or transmit money owed to the United States.

317.    For a significant period, Defendants knew that Apollo Labs and/or its agents responsible for billing the Government Healthcare Programs misrepresented compliance with material applicable regulations and, as a result, were paid moneys that they were not entitled to due to their violations of the AKS, EKRA, and FCA.  Defendants knew that sales reps' commissions, sometimes disguised as salaries, violated the AKS and EKRA.  Defendants knowingly concealed, avoided, or decreased, or knowingly caused concealment, avoidance, or the decrease of, the Defendant's obligation to pay or transmit to the United States the monies owed as a result of these falsely submitted claims.

318.    These false records, statements, or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the United States were done knowingly, as defined in 31 U.S.C. § 3729(b)(1).  Failure to return overpayments from the Government Healthcare Programs constitutes a reverse false claim under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act.

## COUNT IV: CONSPIRACY TO VIOLATE 31 U.S.C. § 3729(a)(1)
### 31 U.S.C. § 3729(a)(1)(C)
**Against all Defendants**

319.    The Plaintiff-Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

320.    Defendants entered into an agreement whereby Apollo Labs and/or Arbor would submit false claims for laboratory testing services referred by commissioned sales reps, in violation of the AKS and/or EKRA.

321.    Specifically, Defendants agreed during meetings at the offices of Korenvaes Management, and through subsequent conversations, that Apollo Labs and Arbor would generate substantial volumes of blood and toxicology specimen testing through commissioned sales reps, typically contracted by ALS.  Defendants pursued these commission arrangements for their collective financial gain knowingly, as defined in 31 U.S.C. § 3729(b)(1), with knowledge or reckless disregard that such arrangements were illegal.  The basis for this includes, but is not limited to, the Relator being told by David Key that attendees at the group meetings at Korenvaes Management were advised about applicable federal health care laws and that the payment structure for ALS sales reps did not comply with applicable law.

322.    Each Defendant took action in furtherance of the conspiracy to violate federal healthcare laws, submit false claims to Government Healthcare Programs, and engage in reverse false claims violations.

323.    Among other acts, ALS, in furtherance of the conspiracy, through Double Helix employees, entered into contracts with sales reps that included illegal remuneration provisions based on specimen volume.  Apollo Labs submitted false claims to Government Healthcare Programs tainted by AKS and/or EKRA violations.  Arbor, operated jointly with Apollo Labs,

accepted, tested, and billed for specimen testing referred by independent contractors paid illegal commissions. Korenvaes Management facilitated these efforts by helping retain commissioned sales representatives, assisting with illegal payments to sales reps, advising the Defendants about legal risks, and drafting contracts containing the payment of illegal remuneration. Each individual Defendant similarly took actions to facilitate illegal payments to sales reps for referred specimens.

324. The conspiracy to violate 31 U.S. Code § 3729(a)(1)(A), (B), and/or (G) caused the United States to sustain actual damages , for which it is entitled to recover treble damages, in addition to civil monetary penalties for each false claim submitted.

## COUNT V: TEXAS MEDICAID FRAUD PREVENTION ACT VIOLATIONS
### Tex. Hum. Res. Code § 36.001 *et seq.*
### Against All Defendants

325. The Plaintiff-Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

326. Defendants' acts and practices, as described more fully above, violated the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code § 36.001 *et seq.*

327. Defendants' acts and practices, as described more fully above, knowingly caused to be presented false or fraudulent claims for payment or approval, in violation of the TMFPA. Tex. Hum. Res. Code § 36.002(1).

328. Defendants knowingly concealed or failed to disclose information that permitted a payment under the Medicaid program that is not authorized, in violation of the TMFPA. Tex. Hum. Res. Code § 36.002(2).

329. Defendants' acts and practices, as described more fully above, knowingly paid, charged, solicited, accepted, or received money as a condition to the provision of a service or

product paid for, in whole or in part, under the Medicaid program, in violation of the TMFPA. Tex. Hum. Res. Code § 36.002(5).

330. Defendants each conspired with one another to violate Tex. Hum. Res. Code §§ 36.002 (1), (2), and/or (5), as described more fully above. Tex. Hum. Res. Code § 36.002(9).

331. The conduct of ALS, Apollo Labs, Arbor, and the individual defendants managing their operations, including the provision of volume- and profit-based commissions for referring specimens, constituted illegal kickbacks rendering the claims false under the TMFPA. Furthermore, Defendant Korenvaes Management, by continuing its control over the Defendants with knowledge of such fraudulent acts, is also liable for these violations.

332. As a result thereof, the State of Texas has sustained damages.

### COUNT VI: OKLAHOMA MEDICAID FALSE CLAIMS ACT VIOLATIONS
**Okla. Stat. tit. 63, § 5053.1**
**Against All Defendants**

333. The Plaintiff-Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

334. Defendants' acts and practices, as described more fully above, violated the Oklahoma Medicaid False Claims Act by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval. Okla. Stat. tit. 63, § 5053.1(1).

335. Defendants' acts and practices, as described more fully above, violated the Oklahoma Medicaid False Claims Act by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. Okla. Stat. tit. 63, § 5053.1(2).

336. Defendants also violated the Oklahoma Medicaid False Claims Act by knowingly making, using, or causing to be made or used, a false record or statement material to an

obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state. Okla. Stat. tit. 63, § 5053.1(7).

337. The Defendants conspired to violate the Oklahoma Medicaid False Claims Act, as set forth in the preceding allegations. Okla. Stat. tit. 63, § 5053.1(3).

338. The actions of ALS, Apollo Labs, Arbor, and the individual defendants managing the operations of ALS, Apollo Labs, and Arbor, including providing ALS sales reps with volume- and profit-based commissions for referring specimens for testing, constituted illegal kickbacks resulting in such claims being false under the Oklahoma Medicaid False Claims Act. Because Defendant Korenvaes Management continued its control and management over the aforementioned defendants with knowledge of the fraudulent conduct, Korenvaes Management is also liable for such violations.

339. As a result thereof, the State of Oklahoma has sustained damages.

### COUNT VII: TENNESSEE MEDICAID FALSE CLAIMS ACT VIOLATIONS
**TN Code § 4-18-103**
**Against All Defendants**

340. The Plaintiff-Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

341. Defendants' acts and practices, as described more fully above, violated the Tennessee False Claims Act by knowingly presenting or causing to be presented to an officer or employee of Tennessee or of any political subdivision thereof, a false claim for payment or approval. TN Code § 4-18-103(a)(1).

342. Defendants' acts and practices, as described more fully above, violated the Tennessee False Claims Act by knowingly making, using, or causing to be made or used a false

record or statement to get a false claim paid or approved by the state or by any political subdivision. TN Code § 4-18-103(a)(2).

343. Defendants' acts and practices, as described more fully above, violated the Tennessee False Claims Act by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision. TN Code § 4-18-103(a)(7).

344. Defendants each conspired with one another to commit a violation of the Tennessee False Claims Act, as set forth in detail above. TN Code § 4-18-103(a)(3).

345. The actions of ALS, Apollo Labs, Arbor, and the individual defendants managing the operations of ALS, Apollo Labs, and Arbor, including providing ALS sales reps with volume- and profit-based commissions for referring specimens for testing, constituted illegal kickbacks resulting in such claims being false under the Tennessee False Claims Act. Because Defendant Korenvaes Management continued its control and management over the aforementioned defendants with knowledge of the fraudulent conduct, Korenvaes Management is also liable for such violations.

346. The Tennessee Medicaid False Claims Act similarly imposes liability on people and corporations who knowingly submit false claims to Tennessee's Medicaid program. TN Code § 71-5-182. Defendants are similarly liable under the Tennessee Medicaid False Claims Act for the same reasons they are liable under the Tennessee False Claims Act.

347. As a result thereof, the State of Tennessee has sustained damages.

## COUNT VIII: MASSACHUSETTS FALSE CLAIMS ACT VIOLATIONS
### M.G.L. c. 12, § 5B
### Against All Defendants

348.    The Plaintiff-Relator repeats and realleges each allegation in each of the preceding paragraphs as if fully set forth herein.

349.    Defendants' acts and practices, as described more fully above, violated the Massachusetts False Claims Act by knowingly presenting or causing to be presented a false claim for payment or approval. M.G.L. c. 12, § 5B(a)(1).

350.    Defendants' acts and practices, as described more fully above, violated the Massachusetts False Claims Act by knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved. M.G.L. c. 12, § 5B(a)(2).

351.    Defendants' acts and practices, as described more fully above, violated the Massachusetts False Claims Act by knowingly making, using or causing to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof. M.G.L. c. 12, § 5B(a)(9).

352.    Defendants conspired to violate the Massachusetts False Claims Act, as set forth in detail above.  M.G.L. c. 12, § 5B(a)(3).

353.    The actions of ALS, Apollo Labs, Arbor, and the individual defendants managing the operations of ALS, Apollo Labs, and Arbor, including providing ALS sales reps with volume- and profit-based commissions for referring specimens for testing, constituted illegal kickbacks resulting in such claims being false under the Massachusetts False Claims Act. Because Defendant Korenvaes Management continued its control and management over the

aforementioned defendants with knowledge of the fraudulent conduct, Korenvaes Management is also liable for such violations.

354.    As a result thereof, the State of Massachusetts has sustained damages.

## VIII.    CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, the Relator prays that judgment be entered in favor of the United States, the State of Texas, State of Oklahoma, State of Tennessee, the Commonwealth of Massachusetts, and the Relator against the Defendants jointly and severally as follows:

1.    On Counts I through IV, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the federal False Claims Act committed by the Defendants;

2.    On Counts I through IV, enter a judgment against the Defendants jointly and severally for three times the amount of damages sustained by the United States of America because of the acts of the Defendants;

3.    On Count V, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the Texas Medicaid Fraud Prevention Act;

4.    On Counts V, enter judgment against the Defendants jointly and severally for the damages sustained by the State of Texas because of the acts of the Defendants described herein, multiplied, as permitted under the Texas Medicaid Fraud Prevention Act;

5.    On Count VI, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the Oklahoma Medicaid False Claims Act;

6.      On Counts VI, enter judgment against the Defendants jointly and severally for the damages sustained by the State of Oklahoma because of the acts of the Defendants described herein, multiplied, as permitted under the Oklahoma Medicaid False Claims Act;

7.      On Count VII, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the Tennessee False Claims Act;

8.      On Counts VII, enter judgment against the Defendants jointly and severally for the damages sustained by the State of Tennessee because of the acts of the Defendants described herein, multiplied, as permitted under the Tennessee False Claims Act;

9.       On Count VIII, enter judgment holding the Defendants jointly and severally liable for the maximum civil penalties permitted for each violation of the Massachusetts False Claims Act;

10.      On Counts VIII, enter judgment against the Defendants jointly and severally for the damages sustained by the Commonwealth of Massachusetts because of the acts of the Defendants described herein, multiplied, as permitted under the Massachusetts False Claims Act;

11.      Award the Relator a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

12.      Award the Relator a percentage of the proceeds of recoveries under the Texas, Oklahoma, Tennessee, and Massachusetts False Claims Acts;

13.      Award the Relator his costs and reasonable attorneys' fees and costs for prosecuting this action; and

14.     All other relief as may be required or authorized by law in the interest of justice.

## IX.     DEMAND FOR JURY TRIAL

The Relator, on behalf of himself, the United States, the State of Texas, State of

Oklahoma, State of Tennessee, and the Commonwealth of Massachusetts, demand a jury trial on

all claims alleged herein.

Respectfully submitted,

**Relator Rayburn "Alex" Thompson III,**

By his Counsel,

*/s/ Evan A. Johnson*
Christopher R. O'Hara (BBO #548611)
*Admitted Pro Hac Vice*
Seth J. Robbins (BBO#655146)
*Admitted Pro Hac Vice*
Evan A. Johnson (BBO #699582)
*Admitted Pro Hac Vice*
Todd & Weld LLP
One Federal Street
Boston, MA 02110
(617) 720-2626
cohara@toddweld.com
srobbins@toddweld.com
ejohnson@toddweld.com

Jeffrey A. Newman, Esq.
Massachusetts BBO # 370450
Jeffrey Newman Law
One Story Terrace
Marblehead, Ma. 01945
Tel: 617-823-3217
Fax: 781-639-8688
Jeff@JeffNewmanLaw.com
*Admitted Pro Hac Vice*

Cory S. Fein
Texas Bar No. 06879450
CORY FEIN LAW FIRM
712 Main Street, Suite 800
Houston, TX 77002
(281) 254-7717
(530) 748 - 0601 (fax)
cory@coryfeinlaw.com

Dated: October 21, 2024