IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | § | |
| *ex rel.* RAYBURN ALEX THOMPSON, | § | |
| | § | |
| Plaintiffs-Relator, | § | |
| | § | |
| VS. | § | Civil Action No. 3:20-CV-2917-D |
| | § | |
| APOLLO PATH, LLC D/B/A | § | |
| APOLLO LABORATORIES, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this *qui tam* action, plaintiff-relator Rayburn Alex Thompson ("Thompson") sues defendants Apollo Path, LLC d/b/a Apollo Laboratories ("Apollo Path"), Apollo Laboratories Services, LLC ("Apollo Labs"), Arbor Diagnostics, Inc. ("Arbor"), Korenvaes Management, LLC ("Korenvaes Management"), Double Helix Management, LLC ("Double Helix"), David Key ("Key"), Brian Oliver ("Oliver"), and Max Korenvaes ("Korenvaes") (collectively, "defendants," unless the context indicates otherwise) on behalf of the United States of America ("United States"), the States of Texas, Oklahoma, and Tennessee, and the Commonwealth of Massachusetts.  Thompson asserts federal-law claims under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and supplemental state-law claims. Defendants move to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted and under Rule 9(b) for failure to plead fraud with the requisite particularity.  Thompson opposes the motion.  For the reasons that follow, the court grants

the motion, declines to exercise supplemental jurisdiction over the pendent state-law claims, and grants Thompson leave to replead.

I

This lawsuit arises out of defendants' presentment of reimbursement claims to government healthcare programs and private insurance companies for tests performed on blood and toxicology specimens.[1]

Defendants are a consortium of four interrelated companies, one investment firm, and three executives. The four interrelated companies are Apollo Path, Apollo Labs, Arbor, and Double Helix. Apollo Labs and Arbor are medical laboratories that test blood and toxicology specimens. Apollo Labs bills government healthcare programs for its services, while Arbor bills private insurance companies. Apollo Path is a managing entity that is responsible, in pertinent part, for procuring blood and toxicology specimens for testing by Apollo Labs and Arbor. Double Helix, which operates under the complete control of the other defendants, is Apollo Path's "alter ego." Am. Compl. (ECF No. 52) ¶ 39. The investment firm is Korenvaes Management. It is responsible for helping Apollo Path procure specimens.

The three executives are Key, Oliver, and Korenvaes. Key is Arbor's Chief Executive Officer ("CEO") and Chief Operating Officer. During the relevant period, he was a salaried

---

[1]The court recounts the background facts favorably to Thompson as the nonmovant. In deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (addressing Rule 12(b)(6) standard)).

employee of Arbor who had direct oversight of sales and operations at Apollo Path and Apollo Labs. Oliver is Korenvaes Management's Chief Financial Officer ("CFO"). He was previously the CFO of Apollo Path and Apollo Labs, the president of Arbor, and a manager at Double Helix. Korenvaes is a principal at Korenvaes Managment. He was previously the CEO of Apollo Labs and a manager at Apollo Labs and Arbor. Korenvaes exercised control over the operations of Apollo Path, Apollo Labs, and Arbor as a director and officer.

Plaintiff-relator Thompson is a former employee of Apollo Path. From January 2016 to December 2019 he served as Vice President of Marketing and Channel Sales, a role in which he performed various human resources functions. During his tenure at Apollo Path, Thompson observed and participated in a scheme that he now alleges resulted in defendants' presenting or causing to be presented false claims to the government.

According to Thompson, the scheme involved paying sales representatives a "kickback" based on the volume and profitability of laboratory testing specimens funneled to Apollo Labs and Arbor. This enabled defendants' consortium to profit from reimbursements that the government and private insurers paid for the services that the laboratories performed. First, Thompson recruited established sales representatives in the medical field to contract with Apollo Path. These sales representatives then contracted to funnel specimens to Apollo Labs and Arbor in exchange for a share of the funds earned by billing government healthcare programs and private insurance companies for tests performed on the specimens. Next, Apollo Labs and Arbor tested the specimens and billed its services to government healthcare programs and private insurance companies, respectively. Finally,

Apollo Path compensated the sales representatives with a percentage of the resulting reimbursements.

In 2020 Thompson filed the instant *qui tam* action on behalf of the United States and various states and a commonwealth. Thompson asserts that defendants' sales-representative scheme violates the Medicare and Medicaid Anti-Kickback Statute ("AKS"), 42 U.S.C. §§ 1320a-7a, 1320a-7b, and the Eliminating Kickbacks in Recovery Act of 2018 ("EKRA"), 18 U.S.C. § 220. Based on these alleged violations, Thompson asserts FCA claims under 31 U.S.C. §§ 3729(a)(1)(A), (B), (C), and (G), and supplemental state-law claims under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, *et seq.*, the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.1, the Tennessee Medicaid False Claims Act, TN Code § 4-18-103, and the Massachusetts False Claims Act, M.G.L. c. 12, § 5B.

As required by law, the complaint was filed under seal to enable the United States to decide whether to intervene. After the United States declined to intervene, the court in May 2024 ordered that the complaint be unsealed and served on defendants. After defendants were served, they moved to dismiss. But their motion became moot when Thompson filed an amended complaint.

Defendants now move to dismiss under Rule 12(b)(6) for failure to state a claim on which relief can be granted and under Rule 9(b) for failure to plead fraud with the requisite

particularity.[2] Thompson opposes the motion. The United States has filed a statement of interest with the court's leave. The court has heard oral argument.

II

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the plaintiff's] complaint by 'accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (second alteration in original) (internal quotation marks omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting Rule

---

[2]On January 13, 2025 defendant Double Helix joined defendants' motion to dismiss.

8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

III

The court considers first whether Thompson has pleaded a plausible FCA claim.

A

"The FCA imposes liability on anyone who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval,' or 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) (quoting 31 U.S.C. § 3729(a)(1)(A), (B)).[3] "In determining whether liability attaches under the FCA, this court asks (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Id.*

The parties dispute whether Thompson has plausibly alleged that the claims that defendants presented or caused to be presented were false. "FCA claims can be either legally

---

[3]Thompson asserts claims under FCA § 3729(a)(1)(A), (B), (C), and (G): (A) covers any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (B) covers any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (C) covers any person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); and (G) covers any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government."

false or factually false. A claim is factually false when the information provided to the government for reimbursement is inaccurate. A claim is legally false when a claimant falsely certifies compliance with a statute or regulation." *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 Fed. Appx. 368, 373 (5th Cir. 2016) (per curiam) (cleaned up). Thompson alleges that defendants presented or caused to be presented claims that were legally false because they falsely certified compliance with the AKS and the EKRA. To plausibly plead FCA falsity, Thompson therefore must plausibly plead that defendants violated the AKS and/or the EKRA.[4]

B

"To successfully plead an AKS violation, [Thompson] must allege that [] defendant[s] '(1) knowingly and willfully (2) solicited or received, or offered or paid remuneration (3) in return for, or to induce, referral [of an individual] or program-related business.'" *United States v. Medoc Health Servs. LLC*, 470 F.Supp.3d 638, 648 (N.D. Tex. 2020) (Lynn, C.J.). To successfully plead an EKRA violation, Thompson must allege that defendants (1) knowingly and willfully (2) offered or paid remuneration (3) to induce a referral of an

---

[4]The court will assume *arguendo* that Thompson has statutory standing to sue under the FCA based on alleged AKS and EKRA violations. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining that statutory standing is not jurisdictional). The parties appear to assume that Thompson has statutory standing to sue under the FCA based on defendants' alleged EKRA violation. And although the parties disagree about whether Thompson has statutory standing to sue under the FCA based on defendants' alleged AKS violations, that dispute turns on a question of first impression in the Fifth Circuit that the court need not reach in light of its conclusion that Thompson has not plausibly pleaded FCA falsity.

individual to a laboratory for services performed by the laboratory that were covered in whole or part by a health care benefit program. *See* 18 U.S.C. § 220(a); *see also United States v. Schena*, 2023 WL 3170050, at *4 (N.D. Cal. Apr. 29, 2023).

C

In pertinent part, the parties dispute whether Thompson has plausibly alleged that defendants acted "to induce referrals."[5]

Defendants contend that Thompson cannot plausibly allege that defendants acted to induce referrals. They reason that, under Fifth Circuit precedent, Thompson's allegations that defendants paid sales representatives volume- and profitability-based commissions is insufficient to plead a violation of the AKS and the EKRA, and Thompson must allege instead that the sales representatives improperly influenced the clinicians who sent samples to Apollo Labs and Arbor, such as by paying them a kickback or substituting their own judgment for that of the clinician. Defendants maintain that Thompson has admitted that he cannot allege any facts about the relationship between the sales representatives and the clinicians.

Thompson responds that he has plausibly alleged that defendants paid sales representatives to induce referrals. According to Thompson, it is sufficient that the sales

---

[5]The parties also disagree about whether Thompson has adequately alleged that defendants "caused" claims to be presented, that defendants paid "remuneration" to the sales representatives, and that defendants acted with scienter. The court need not reach these issues considering its conclusion that Thompson has not plausibly alleged that defendants acted "to induce referrals," and therefore has not plausibly pleaded FCA falsity.

representatives influenced the referring clinicians by recommending that they send specimens to Apollo Labs and Arbor. Thompson maintains that he has alleged that defendants' sales representatives were compensated, not to market defendants' services, but for their capacity to influence referring clinicians.

The United States's statement of interest expresses no view on this issue.

D

The court turns first to the question of when a defendant's payments to a third party to procure referrals from clinicians are payments made to "induce referrals" within the meaning of the AKS and the EKRA.

The Fifth Circuit's decision in *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024), controls.[6] In *Marchetti* the panel addressed whether a medical laboratory's payments

---

[6]Thompson appears to rely on several non-binding decisions for the proposition that *Marchetti* does not apply to this case to the extent he is proceeding under § 1320a-7b(b)(2)(B). According to these decisions, AKS claimants proceeding under § 1320a-7b(b)(2)(B) need not establish that the defendant paid remuneration with the intent "to induce referrals" because while § 1320a-7b(b)(2)*(A)* prohibits paying remuneration to induce the third party "to refer an individual," § 1320a-7b(b)(2)*(B)* prohibits paying remuneration to induce the third party to "arrange for or recommend purchasing . . . or ordering any . . . service." *See United States v. Mallory*, 988 F.3d 730, 738 (4th Cir. 2021); *United States ex rel. Langer v. Zimmer Biomet Holdings, Inc.*, 743 F.Supp.3d 282, 292 (D. Mass. Aug. 2, 2024); *United States v. Wilks*, 2023 WL 1978903, at *2-3 (M.D. La. Feb. 13, 2023). But *Marchetti* plainly considered and rejected this argument. As *Marchetti* explained:

> The (A)/(B) distinction is trickier. The government is right that *Miles* considered only (b)(2)(A) and not (b)(2)(B). The panel in *Miles* explicitly left open the idea that the provisions in (b)(2)(B) might capture the conduct in that case. Maybe payments from [the laboratory] to [the third party] could be payments to "recommend purchasing" [the laboratory's]

of a percentage of Medicare reimbursements to third parties with established relationships with clinicians in exchange for the funneling of medical samples to the laboratories were made to "induce referrals" within the meaning of the AKS.[7] *Id.* at 825-27. The panel held that such payments are made "to induce referrals" when the payer intends for the third party to improperly influence healthcare decision-makers. *Id.* at 827.

According to the *Marchetti* panel, the "key relationship" is between the third party and the healthcare decision-makers. *Id.* It is not enough that the third party had "relationships with" or "access to" healthcare decision-makers. *Id.* The "relevant inquiry" is whether the third party "improperly influenced" healthcare decision-makers. *Id.* In particular, a court must determine whether the relationship between the third party and the healthcare decision-

---

> services. But it is unclear how much scope this additional level of removal adds to the AKS. *Shoemaker*—a case about (b)(2)(B)—leaves room for permissible advertising. Since the (A)/(B) distinction cannot be read so broadly as to subsume permissible advertising, the government still needs to prove something about [the third party's] exercising undue influence on patients' selection of services.

*Marchetti*, 96 F.4th at 825 n.6 (citations omitted).

[7]Because the statutes use almost identical phrasing for the inducement element and relate to the same topic, the court for purposes of determining the meaning of "induce a referral of an individual" in EKRA will interpret EKRA *in pari materia* with AKS. *Compare* 18 U.S.C. § 220(a)(2) *with* 42 U.S.C. § 1320a-7b(b)(2)(A); *see Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (explaining when it is appropriate to read statutes *in pari materia*); *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1111 (5th Cir. 2024) (same); *see also GF Indus. of Mo., LLC v. Lehigh Valley Genomics, LLC*, 2024 WL 1889797, at *14 (E.D. Pa. Apr. 30, 2024) (interpreting AKS *in pari materia* with EKRA for purposes of inducement element).

makers is "more like the relationship in [*United States v. Shoemaker*, 746 F.3d 614 (5th Cir. 2014)] and less like the one in [*United States v. Miles*, 360 F.3d 472 (5th Cir. 2004)]." *Id.*

*Shoemaker*, *Miles*, and *Marchetti* itself are therefore illustrative of when the nature of the relationship between the third party and the healthcare decision-maker permits the inference that the payer intended to improperly influence the healthcare decision maker.[8] In *Shoemaker* a nursing services provider intended to induce referrals under the AKS when it paid the chairman of a local hospital's board of trustees a fee for every hour of nursing that the provider billed to the hospital. *See Shoemaker*, 764 F.3d at 627-31. The court explained that the provider's intent to improperly influence the healthcare decision-maker was evidenced by his desire that the chairman exploit his personal access to the hospital's executives:

---

[8]Thompson suggested at oral argument that *Shoemaker*, *Miles*, and *Marchetti* are inapposite at the Rule 12(b)(6) stage because they reviewed the sufficiency of the evidence presented at trial, not, as here, the adequacy of the pleadings. The argument appears to be that the legal propositions in these decisions are confined by the procedural posture of the cases that announce them, so that although AKS claimants must present some evidence at trial of the relationship between the third party and the healthcare decision-maker, at the pleading stage AKS claimants need not allege facts about that relationship. The court declines to accept this reasoning given the similarities between the standards that govern the sufficiency of pleadings and of proof at trial. *Compare Marchetti*, 96 F.4th at 824 ("[W]e review the evidence and all reasonable inferences in the light most favorable to the prosecution and to determine whether any rational trier of fact could have found [for the prosecution].") *with Bramlett*, 855 F.Supp.2d at 618 ("In deciding a Rule 12(b)(6) motion to dismiss, the court . . . accept[s] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. . . . [and asks whether] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

> [S]ufficient evidence established that the payments to [the chairman] aimed to induce him to 'recommend' [the provider's] company. That is, in paying [the chairman], [the provider] was not asking for a brochure bearing his company's name to be distributed to [the hospital's] staff; rather, enough evidence showed that he wanted [the chairman] to exploit his personal access to [the hospital's] executives, including Shoemaker, and to ensure that [the hospital] favored [the provider's] company when it chose nursing services. This conduct is an archetypal example of the undue influence prohibited by the statute.

*Id.* at 629 (citation omitted).

By contrast, in *Miles* a home health services provider did not intend to induce referrals under the AKS when it paid a public relations firm a fee for every Medicare referral that resulted from its advertisements of the provider to local medical offices. *See Miles*, 360 F.3d at 479-81. The court explained that the evidence reflected, not an illicit intent to improperly influence a doctor's independent judgment, but a permissible intent to advertise:

> [The public relations firm] supplied promotional materials to Houston-area doctors describing [the provider's] home health care services. *After* a doctor had decided to send a patient to [the provider], the doctor's office contacted [the firm], which then supplied the necessary billing information to [the provider] and collected payment. There was no evidence that [the firm] had any authority to act on behalf of a physician in *selecting* the particular home health care provider. Indeed, at least one defense witness testified at trial that [the firm] had no role in selecting the particular home health care provider but that the decision was made by the doctor's staff from among ten agencies, including [the provider].

*Id.* at 480.

And in *Marchetti* the laboratory did not intend to induce referrals under the AKS when it paid a third party a percentage of the Medicare reimbursement for each medical

specimen that it funneled to the laboratory. *See Marchetti*, 96 F.4th at 826-27. The court explained that the laboratory's intent to influence the healthcare decision-makers could not be inferred without "any detail on the key relationship: the relationship between [the third party] and relevant decisionmakers." *Id.* The laboratory did intend to induce referrals under the AKS, however, when it paid another third party who chose which laboratory he would direct referring clinicians' specimens to without those clinicians' input. *See id.* The court explained:

> The [second] scheme is much more like the hypothetical that *Miles* explicitly said *would* constitute an AKS violation: Medical service provider pays salesman, salesman makes choice about service provider, salesman is never overruled.
>
> To the same effect: [laboratory] pays [third party], [third party] is part of a scheme that selects service provider for patient, that selection is apparently never overruled—because it seems to have been hidden from the patients and providers. In short, there is enough evidence that, in the context of the [second] scheme, [the third party] might have been the relevant decisionmaker. And he was being compensated per referral. That is a substantive AKS violation.

*Id.*

*United States v. Polin*, 194 F.3d 863 (7th Cir. 1999), is also illustrative of when the relationship between the third party and the healthcare decision-maker evidences the payer's intent to improperly influence. *See Marchetti*, 96 F.4th at 825 (quoting *Miles*, 360 F.3d at 480) (describing *Polin* as example of "when 'non-doctors would fall within the scope of the [AKS]'"); *Miles*, 360 F.3d at 480-81 (same). In *Polin* a pharmacy intended to induce referrals under the AKS when it paid a sales representative $50 for every Medicare patient

whom he referred to the pharmacy for pacemaker monitoring services. *See Polin*, 194 F.3d at 866. The court explained that the pharmacy's intent to induce referrals was evidenced by the sales representative's effectively making the final decision about patient care:

> Once it was decided that the patient would be sent to an outside service for monitoring, [the sales representative] would suggest [the pharmacy] or a similar service to the physician. Never in his fourteen year career was [the sales representative's] suggestion rebuked by a physician. Indeed, after his recommendation was made, he would call [the pharmacy] and arrange for the patient's follow-up himself. Of course, [the pharmacy] would have to receive the physician's authorization before commencing service, but that permission seemed to be more of a formality or rubber stamping of [the sales representative's] referral.

*Id.*

In sum, a defendant's payments to a third party to procure referrals from clinicians are made with the intent "to induce referrals" within the meaning of the AKS and the EKRA when there is evidence that the defendant intended for the third party to improperly influence the clinicians. Examples of improper influence include exploiting personal access and making the final decision about patient care.

E

The court considers next whether Thompson has plausibly alleged that defendants' payments to their sales representatives were made "to induce referrals" within the meaning of the AKS and the EKRA.

Thompson must plead facts from which the court can reasonably infer that defendants "intended improperly to influence [healthcare decision-makers]." *Marchetti*, 96 F.4th at 827.

The "identity of the payee, while not essential, speaks to the intent of the payer. That is, as between payment to a rancher and a doctor, it is dramatically easier to infer intent improperly to induce medical referrals from the doctor." *Id.* at 826 (footnote omitted). Moreover, the structure of the sales representatives' contracts is relevant to, but not sufficient to establish, the payer's intent to induce referrals. *Id.*

Rather, the "key relationship" is between the sales representatives and the healthcare decision-makers. *Id.* at 827. It is not enough to allege that the sales representatives had "relationships with" or "access to" healthcare decision-makers. *Id.* The "relevant inquiry" is whether the sales representatives "improperly influenced" healthcare decision makers. *Id.* In particular, Thompson must allege facts from which the court can reasonably infer that the relationship between the sales representatives and the healthcare decision-makers "was more like the relationship in *Shoemaker* and less like the one in *Miles*." *Id.* Examples of improper influence include exploiting personal access and making the final decision about patient care. *See id.* at 826-27; *Shoemaker*, 764 F.3d at 629; *Miles*, 360 F.3d at 480; *Polin*, 194 F.3d at 866.

As pertinent here, Thompson alleges the following. Defendants paid sales representatives commissions from government healthcare reimbursements based on the volume and profitability of laboratory testing specimens funneled to Apollo Labs and Arbor. The sales representatives were chosen because of their ability to generate specimen referrals. "A core component of [Thompson's] role involved contacting established sales reps in the medical field and enticing them to contract with ALS." Am. Compl. (ECF No. 52) ¶ 107.

"[Thompson] assessed prospective ALS sales reps based on their existing capacity to begin directing specimens, evaluating their ability to direct profitable testing volume to Apollo Labs and Arbor." *Id.* ¶ 108. "No specific qualifications or technical knowledge were required to serve as an ALS sales rep. As long as a sales rep was able to funnel a sufficient volume of profitable specimens to Apollo Labs and Arbor, they remained on the payroll." *Id.* ¶ 127.

The sales representatives were salespersons, not advertisers. "The role of sales reps was limited to referring specimens; they were not paid to 'promote' Apollo Labs or Arbor in any marketing capacity." *Id.* ¶ 128. Defendants did not monitor or control how the sales representatives made referrals. "ALS sales reps were solely responsible for generating sales, with no assistance from ALS, Apollo Labs, or Arbor personnel, other than coordinating the shipment of specimens or, occasionally, arranging for phlebotomists to collect specimens." *Id.* ¶ 154. "ALS sales reps typically obtained specimens for Apollo Labs and/or Arbor using their own means and methods. There were no explicit directions provided to ALS sales reps regarding how they were expected to supply specimens, apart from the general expectation of HIPAA compliance." *Id.* ¶ 147.

> Neither the Defendant entities nor their agents monitored or questioned the nature of any agreements between healthcare service providers and sales reps. As a result, they were unaware of any kickback arrangements between ALS sales reps with healthcare providers or their staff that may have led to overutilization of laboratory services to increase kickbacks from Apollo Labs and Arbor.

*Id.* ¶ 159. And the sales representatives "controlled where their specimens would be sent."

*Id.* ¶ 129.

From these allegations, the court cannot reasonably infer that the relationship between the sales representatives and the healthcare decision-makers "was more like the relationship in *Shoemaker* and less like the one in *Miles*," because Thompson "does not provide a drop of color as to what [the sales representatives'] influence looked like." *Marchetti*, 96 F.4th at 827. Thompson comes closest to doing so through his allegations that defendants recruited and retained their sales representatives because they were well-established in the medical field and effective at making referrals—which might suggest that defendants intended for them to exploit their personal access to referring clinicians—and that the sales representatives "controlled where their specimens would be sent," Am. Compl. (ECF No. 52) ¶ 129—which might suggest that they made the final decision about patient care. But neither theory has been plausibly pleaded.

The court cannot reasonably infer that defendants intended for their sales representatives to exploit their personal access to referring clinicians without allegations about the relationship between the representatives and the clinicians. For example, in *Shoemaker* the third party payee, as the chairman of the hospital, "scheduled and set the agenda for hospital board meetings, contacted department heads for reports, and regularly dealt with [the hospital's] Chief Operating Officer." *Shoemaker*, 746 F.3d at 617. Here, by contrast, Thompson alleges nothing about the sales representatives' relationship with the referring clinicians, but rests on circumstantial indicia of their exploiting their personal access, such as that the representatives were well-established in the medical field and

effective at making referrals.[9] At best, those allegations support the inference that the sales representatives exercised some influence over referring clinicians. But, "[p]lainly, not every sort of influence is improper." *Marchetti*, 96 F.4th at 827.

Nor can the court reasonably infer that the sales representatives made the final decision about patient care. Thompson's singular allegation that the sales representatives "controlled where their specimens would be sent," Am. Compl. (ECF No. 52) ¶ 129, is too conclusory to support this inference. *See Iqbal*, 556 U.S. at 678. Thus without "any detail on the key relationship" between the sales representatives and the healthcare decision-makers, the court cannot reasonably infer that defendants' payments to its sales representatives were made "to induce referrals" within the meaning of the AKS and the EKRA. *See Marchetti*, 96 F.4th at 827.

Accordingly, because Thompson has not plausibly alleged that defendants violated the AKS or the EKRA, and therefore has not plausibly pleaded FCA falsity,[10] the court dismisses Thompson's FCA claims for failure to state a claim on which relief can be

---

[9]In fact, Thompson elsewhere acknowledges that "[n]either the Defendant entities nor their agents monitored or questioned the nature of any agreements between healthcare service providers and sales reps." Am. Compl. (ECF No. 52) ¶ 159.

[10]Alternatively, Thompson has not pleaded fraud with the requisite particularity. *See* Rule 9(b); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("[To] plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint[] . . . may [] survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.").

granted.[11]

IV

Having dismissed Thompson's federal-law claims for failure to state a claim, the court in its discretion declines to exercise supplemental jurisdiction over his pendent state-law claims. Although the court can exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), in this circuit "[t]he general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial[.]" *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009). Accordingly, the court dismisses Thompson's state-law claims without prejudice.

V

Although the court is dismissing Thompson's claims, it will permit him to replead. *See, e.g.*, *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (noting that district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing case, unless it is clear that defects are incurable or plaintiffs advise court that they are unwilling or unable to amend in a manner that will avoid dismissal). There is no indication that Thompson cannot cure the defects that the court has identified, and he expressly requests "the opportunity to replead, as necessary." P. Resp. (ECF No. 58) at 25. The court therefore grants him 28 days from the date this

---

[11]Each of Thompson's four FCA claims has a falsity element. *See* 31 U.S.C. § 3729(a)(1)(A), (B), (C), and (G); *see also Lemon*, 924 F.3d at 159.

memorandum opinion and order is filed to file a second amended complaint.

* * *

For the reasons explained, the court grants defendants' November 4, 2024 motion to dismiss and also grants Thompson leave to file a second amended complaint within 28 days of the date this memorandum opinion and order is filed.

**SO ORDERED**.

March 5, 2025.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE